UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

**Holding a Criminal Term**

**Grand Jury Sworn in on August 01, 2024**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CASE NO.** |
| | : | |
| **v.** | : | **GRAND JURY ORIGINAL** |
| | : | |
| **JOHN HAROLD ROGERS,** | : | **VIOLATIONS:** |
| | : | |
| | : | **18 U.S.C. § 1831(a)(5)** |
| **Defendant.** | : | **(Conspiracy to Commit Economic** |
| | : | **Espionage)** |
| | : | |
| | : | **18 U.S.C. § 1001** |
| | : | **(False Statements)** |

**INDICTMENT**

The Grand Jury charges that, at all times material to this Indictment:

**Introduction**

1.      Beginning as early as in or around May 2013 through on or about January 30, 2025, Defendant **JOHN HAROLD ROGERS ("ROGERS")** conspired with individuals located in the People's Republic of China ("PRC" or "China"), whose identities are known and unknown to the grand jury, to work to benefit the PRC by carrying away, sending, mailing, and obtaining—all without authorization—trade secrets of the Federal Reserve Board of Governors ("FRB") and the Federal Reserve Open Market Committee ("FOMC") in the United States, intending or knowing that the theft would benefit the PRC, agents of the PRC, and PRC instrumentalities and their agents. In furtherance of the conspiracy, ROGERS made false statements to the Federal Reserve Board Office of Inspector General, and those false statements had a material impact on its investigation.

2.     The Federal Reserve System is the central bank of the United States.  The FRB is the main governing body of the Federal Reserve System and an independent agency of the Executive Branch of the United States.  The FRB is also known as the Board of Governors.  The principal offices of the FRB are in the District of Columbia.

3.     The FOMC is a component of the Federal Reserve System.  It consists of twelve members: the seven members of the FRB, the president of the Federal Reserve Bank of New York, and four of the remaining eleven Reserve Bank presidents, who serve one-year terms on a rotating basis.  FRB staff assist the FOMC in its operations and, if appropriately cleared, have access to confidential information belonging to the FOMC.  As described on the Federal Reserve's website, "[t]he FOMC holds eight regularly scheduled meetings per year" at which it "reviews economic and financial conditions, determines the appropriate stance of monetary policy, and assesses the risk to its long-run goals of price stability and sustainable economic growth."

4.     The FRB's and the FOMC's confidential information is economically valuable when secret.  When FOMC announcements are released to the public, for example, financial markets often move in response.

5.     The FRB and FOMC take reasonable measures to maintain secrecy of their confidential information by, for example, controlling access to facilities, implementing security measures that limit and track access to its computer networks, classifying and controlling information based on its sensitivity, limiting access to sensitive information based on employees' need-to-know, training employees on security procedures, and requiring marking of confidential documents.

6.     The FOMC used a tiered system for classifying confidential information depending on its sensitivity.  The most sensitive information is designated as FOMC Class I information,

which includes policymaker views and pre-publication drafts of FOMC statements. The next most sensitive information is designated as FOMC Class II information, which generally applies to FRB staff economic forecasts and information about open market operations. Less sensitive data is designated as FOMC Class III.

7.      Having unauthorized access to FRB and FOMC confidential information could allow China to manipulate the U.S. market, in a manner similar to insider trading. China holds a large amount of U.S. foreign debt (approximately $1.146 trillion in August 2017, and approximately $816 billion as of October 2024). Gaining advance knowledge of U.S. economic policy, including advance knowledge of changes to the federal funds rate, could provide China with an advantage when selling or buying U.S. bonds or securities.

8.      ROGERS, age 63, is a U.S. citizen with a Ph.D. in Economics, who worked as a Senior Advisor in the Division of International Finance of the Federal Reserve Board of Governors from 2010 until 2021. In that role, ROGERS was entrusted with and had access to confidential FRB and FOMC information. ROGERS received regular training regarding the sensitivity and disclosure of such information.

9.      Starting no later than 2018, ROGERS responded to information requests from his co-conspirators, who worked for the intelligence and security apparatus of China and who posed as graduate students at a PRC university. Pursuant to those requests, ROGERS exploited his employment with the FRB by soliciting or otherwise seeking trade-secret information regarding proprietary economic data sets, briefing books for designated governors ("DesiGov Briefing Books") and sensitive information about FOMC deliberations and forthcoming announcements. ROGERS passed that information electronically to his personal email account, in violation of FRB policy, or printed it prior to traveling to China, in preparation for meetings with his co-conspirators.

Under the guise of teaching "classes," ROGERS would meet with his co-conspirators in hotel rooms in China where he would convey sensitive, trade-secret information belonging to the FRB and the FOMC. ROGERS has limited Chinese-language skills and relies heavily on translation tools/platforms or interpreters to communicate with non-English speakers.

10.    Specific trade secrets that ROGERS carried away, sent, mailed, or obtained, or attempted to obtain, without authorization in furtherance the conspiracy and with the intent to benefit a foreign government, foreign agent, or foreign instrumentality included at least the following:

    a.  **Trade Secret 1**: A DesiGov briefing book dated October 2018 titled "International Economic Topics";

    b.  **Trade Secret 2**: A Summary and Assessment of an Announcement by the European Central Bank dated March 7, 2019, and designated as FOMC Class II;

    c.  **Trade Secret 3**: A document dated June 6, 2019, containing notes on a briefing to a member of the FRB, and designated FOMC Class II;

    d.  **Trade Secret 4**: Notes of a briefing titled "Pre-FOMC Briefing" dated June 10, 2019, and designated FOMC Class II;

    e.  **Trade Secrets 5**: a spreadsheet that contained proprietary FRB information called "wide.xls"; and

    f.  **Trade Secret 6:** a spreadsheet that contained proprietary FRB information called "tight.xls" (collectively, "the Trade Secrets" or "Trade Secret Information" ("TSI")).

11.    On or about February 4, 2020, in response to questioning by the Office of the Inspector General for the Federal Reserve Board, ROGERS lied about his accessing and passage of sensitive information and his associations with his co-conspirators.

## The Conspiracy

12.    Other members of the conspiracy included:

a. **CO-CONSPIRATOR 1**: CO-CONSPIRATOR 1 worked for the intelligence and security apparatus of China and presented himself as a graduate student at Shandong University of Finance and Economics. In that role, CO-CONSPIRATOR 1 purported to be interested in learning about sensitive FRB fiscal policy in order to draft papers for the Research Institute of International Politics and Economics (RIIPE), and ultimately for the benefit of Shandong Province. Additionally, CO-CONSPIRATOR 1 tasked ROGERS to gather confidential information belonging to the FRB and the FOMC.

b. **CO-CONSPIRATOR 2**: CO-CONSPIRATOR 2 worked for the intelligence and security apparatus of China and was presented by CO-CONSPIRATOR 1 as a fellow graduate student in RIIPE at the Shandong University of Finance and Economics studying International Relations.

## <u>COUNT ONE</u>
**(Conspiracy to Commit Economic Espionage)**

13. The allegations in paragraphs 1 through 12 are realleged and incorporated here by reference.

14. From in or around May 2018 to in or around January 2025, in the District of Columbia and elsewhere, the defendant, **JOHN HAROLD ROGERS**, a United States citizen, did knowingly and intentionally conspire, combine, and agree together with other individuals whose identities are both known and unknown to the Grand Jury, including CO-CONSPIRATORS 1 and 2, to, without authorization, copy, duplicate, photograph, download, upload, alter, photocopy, replicate, transmit, deliver, send, mail, communicate and convey trade secrets, that is, non-public information belonging to the FRB or the FOMC, knowing or intending that the conduct would benefit a foreign government, foreign instrumentality, or foreign agent.

5

### Object of the Conspiracy

15.     The object of the conspiracy was for ROGERS to obtain, copy, send, possess, and communicate trade secrets belonging to the FOMC and FRB, intending or knowing that the theft would benefit the Government of the People's Republic of China, its agents, and its instrumentalities, and to conceal the purpose of the conspiracy and the acts committed in furtherance thereof.

### Manner and Means

16.     Defendant ROGERS, and other persons whose identities are both known and unknown to the grand jury, including CO-CONSPIRATORS 1 and 2, carried out the conspiracy though the following means, among others, by:

    a.   Using encrypted messaging applications to communicate concerning topics about which it would be useful for ROGERS to collect information, including by soliciting information from FRB employees and collecting documents;

    b.   Using encrypted messaging applications to communicate about the logistics for meetings in the PRC for ROGERS to convey confidential information belonging to the FRB and the FOMC to his co-conspirators, all under the cover of ROGERS teaching "classes" to his co-conspirators;

    c.   Obtaining information about confidential FOMC deliberation and FOMC announcements before they were publicly released;

    d.   Obtaining the Trade Secrets;

    e.   Obtaining all or part of two confidential DesiGov Briefing Books;

f.  Meeting under the cover of "classes" that were really ad-hoc meetings in hotel rooms in China between ROGERS and CO-CONSPIRATORS 1 and 2, among others;

g.  Conveying confidential information belonging to the FRB and FOMC to CO-CONSPIRATORS 1 and 2 during the "classes" in China;

h.  Conveying open source and non-public information to CO-CONSPIRATORS 1 and 2, electronically and in person;

i.  Arranging, paying for, and receiving airfare, lodging, and dining for ROGERS to travel to China;

j.  Providing gifts for ROGERS and offering to arrange and pay for a beach vacation; and

k.  Concealing the nature of the conspiracy and ROGERS's misappropriation of FRB and FOMC trade secrets by making false statements to the Federal Reserve Office of Inspector General about the conspiracy and its members.

**Overt Acts in Furtherance of the Conspiracy**

17.    During and in furtherance of the conspiracy, and to affect the object thereof, Defendant ROGERS, CO-CONSPIRATOR 1, and other individuals known and unknown to the Grand Jury, committed the following overt acts, in the United States and elsewhere, among others:

a.  On or about May 24, 2013, CO-CONSPIRATOR 1 created an email account in the name of the cover identity he used with ROGERS. That email account was used exclusively for communication with ROGERS, a handful of people associated with ROGERS, and signing up for online accounts.

b.  On or about May 27, 2013, CO-CONSPIRATOR 1 sent the first email from the account to ROGERS.

c.  On or about September 10, 2014, CO-CONSPIRATOR 1 emailed ROGERS asking about preparations for ROGERS to visit China. CO-CONSPIRATOR 1 stated "don't worry about the cost of the trip, as you said, we don't waste money, but we can bear all the necessary cost, you can choose a comfortable and convenient way for the trip."

d.  On or about July 29, 2015, CO-CONSPIRATOR 1 emailed ROGERS asking when ROGERS could visit his Institute at the University in Shandong.

e.  On or about July 30, 2015, ROGERS responded that he was beginning a new project with a Chinese co-author on monetary policy and stated that "I hope you and your boss like it!" ROGERS indicated that he could visit once they have the results of the project in about a year. CO-CONSPIRATOR 1 replied to ROGERS that one year is longer than expected, they would "warmly welcome" ROGERS anytime, and will "afford all your...and your coauthor's costs related to this trip."

f.  On or about January 27, 2017, ROGERS emailed CO-CONSPIRATOR 1 from the United States stating that he planned to visit China in May, and asked, "Do you think you could arrange to pay for airfare plus 3 nights hotel in Beijing...and 3 nights hotel in Ji'nan?" CO-CONSPIRATOR 1 replied by email "plus 3 nights expenses of Beijing is no problem...just book any hotel you like in Beijing and let me know the price."

g.  On or about September 20, 2017, ROGERS emailed CO-CONSPIRATOR 1 and asked, "Can you book at the same hotel I stayed last time? That place was great!"

CO-CONSPIRATOR 1 replied that he called the hotel's service department, and stated "don't worry all related expenses is covered by us, I'll give to you when we meet in Jinan."

h.  On or about May 1, 2018, ROGERS sent an encrypted message to CO-CONSPIRATOR 1 asking "[h]ow is it going with the essay you are required to write?" CO-CONSPIRATOR 1 responded, "I'm collecting some questions for my report. I'll send to you later, thank you for your support."

i.  On or about May 2, 2018, CO-CONSPIRATOR 1 sent an encrypted message to ROGERS: "And here are some questions I collected as below." He then sent photographs of paper with questions printed on it. Those questions included what measures the Federal Reserve was planning on taking and on what timetable, including in response to issues related to China.

j.  On or about May 3, 2018, ROGERS emailed two colleagues at the FRB asking for information he could share on a trip to China about "(1) US-China trade issues, including current account imbalances, (2) How we (the Fed staff) think about exchange rates, and/or (3) views (any views) on the equilibrium value of the RMB." In response on May 4, 2018, one of ROGERS's colleagues provided two pdfs, one named "China RED Note 5-1-2018.pdf" and one named "China desigov apr 2018.pdf."

k.  On or about May 6, 2018, ROGERS emailed "China desigov apr 2018.pdf" from his Federal Reserve email account to himself at his Federal Reserve email account and his personal email account.

l.  On or about May 6, 2018, ROGERS boarded a flight to Shanghai, China.

m.  On or about May 9, 2018, ROGERS exchanged encrypted messages with CO-CONSPIRATOR 1 indicating they planned to go out together at a Chinese restaurant in China.

n.  On or about May 10, 2018, ROGERS emailed the file "China desigov apr 2018.pdf" to CO-CONSPIRATOR 1.

o.  From on or about September 4, 2018, through on or about September 5, 2018, ROGERS and CO-CONSPIRATOR 1 exchanged encrypted messages about topics for teaching and ROGERS's requests to make his meetings with CO-CONSPIRATOR 1 and his colleagues appear more like classes so the meetings would appear "legitimate in the eyes of the Fed."

p.  On or about September 11, 2018, while ROGERS was in China, ROGERS and CO-CONSPIRATOR 1 exchanged encrypted messages regarding a purported class that ROGERS would teach in China, in the evening in a hotel suite.

q.  On or about September 12, 2018, ROGERS and CO-CONSPIRATOR 1 exchanged encrypted messages about "homework" that ROGERS would assign as part of his purported class. ROGERS messaged "Can you write down here the questions you want to write about for Homework 1? I want to add that to the syllabus now." After CO-CONSPIRATOR 1 proposed a topic, ROGERS wrote: "Sure, it's totally up to you."

r.  From on or about September 25, 2018, through on or about September 26, 2018, ROGERS and CO-CONSPIRATOR 1 exchanged encrypted messages about topics for ROGERS's purported "next two classes" in China, which were requested by CO-CONSPIRATOR 1's "boss."

s.    On or about October 9, 2018, ROGERS and CO-CONSPIRATOR 1 exchanged encrypted messages about "the teaching" ROGERS would provide. ROGERS and CO-CONSPIRATOR 1 decided to hold "the teaching" on the weekend when CO-CONSPIRATOR 1 could arrive in Shanghai.

t.    On or about October 10, 2018, ROGERS emailed a Senior Economist at the Federal Reserve seeking information to share with people in China, specifically on trade policy uncertainty and U.S. investment. On or about October 11, 2018, the Senior Economist sent an email attaching two files to ROGERS.  The text of the email included the banner marking "INTERNAL FR/OFFICAL USE // FRSONLY" in bold font, which designates that the information is FOMC Class III confidential information, allowed only for use within the Federal Reserve System.

u.    From on or about October 11, 2018, through on or about October 12, 2018, ROGERS and CO-CONSPIRATOR 1 continued to exchange encrypted messages about topics of interest to CO-CONSPIRATOR 1 and when to hold ROGERS's purported class.  They ultimately decided to hold the class at an ad-hoc time after meeting for dinner.

v.    On or about October 12, 2018, and again on or about October 13, 2018, ROGERS emailed files from the Senior Economist to his personal email account, and then forwarded them from that account to CO-CONSPIRATOR 1.

w.    On or about October 16, 2018, CO-CONSPIRATOR 1 sent an encrypted message asking to pay either ROGERS or his wife and get their signature on a receipt.

x.    On or about October 24, 2018, and again on or about October 25, 2018, ROGERS and CO-CONSPIRATOR 1 exchanged encrypted messages about logistics and

topics for their next meeting, including arranging class wherever ROGERS's wife's parents would be. ROGERS told CO-CONSPIRATOR 1, "I was thinking that if you guys have made progress on the homework, it is legitimate to meet in Jinan and have me 'grade' it."

y.  On or about November 6, 2018, ROGERS emailed two colleagues at the Federal Reserve and his personal email account seeking information for his purported classes in China. ROGERS specifically asked for information about the Board and FOMC, what they forecast, and how they do it. On or about November 7, 2018, after one of the colleagues responded, ROGERS replied "[i]f possible, could you send me, say, the desi-gov book for [the names of two governors of the Federal Reserve Board].  Obviously, that's not something I could or would share, but it would be very useful for me as a concrete example of 'information flow.'" The colleague responded that he could provide but asked ROGERS not to include ROGERS's personal email account on the email chain.

z.  On or about November 8, 2018, ROGERS received the requested DesiGov book (Trade Secret 1) from his colleague at his Federal Reserve email account. ROGERS then forwarded Trade Secret 1 to his personal email account, despite his colleague's request. The second page of the briefing book contained a larger banner that the information was nonpublic and not to be disseminated:



aa.  On or about November 29, 2018, CO-CONSPIRATOR 1 proposed a topic for the next "class" with ROGERS. CO-CONSPIRATOR 1 requested arranging a class titled "the trend of U.S. monetary policy in 2019" and asked for "official fed statement and presentation from current FOMC members." ROGERS agreed that "the topic is perfect."

bb.  On or about November 30, 2018, ROGERS emailed a colleague at the Federal Reserve asking for the "most straightforward way of accessing" forecast data used by the Federal Reserve. ROGERS stated, "I'm interested in our GDP forecasts back to about 1994."

cc.  On or about December 9, 2018, ROGERS and CO-CONSPIRATOR 1 confirmed meeting for dinner in Shanghai followed by "class" with "JACK" on December 10, 2018.

dd.  On or about December 20, 2018, following an FOMC meeting and announcement the previous day, ROGERS sent an email to CO-CONSPIRATOR 1 stating in part "that said, the Fed trimmed its forecast for economic growth for the next year, from 2.5 percent to 2.3 percent, and signaled it will increase rates only twice next year instead of the three hikes it had anticipated." CO-CONSPIRATOR 1 responded via email to ROGERS "aha, just like what we talked about at dinner…"

ee.  On or about February 14, 2019, CO-CONSPIRATOR 1 sent encrypted messages to ROGERS requesting two classes when ROGERS would be in Shanghai, and requesting specific topics, to include "how the Fed will shrink the balance-sheet in 2019."

ff.  On or about March 8, 2019, ROGERS emailed from his FRB email account to his personal email account verbatim portions of Trade Secret 2 and removed the designation of FOMC Class II from the information.

gg.  On or about May 17, 2019, ROGERS sent a message to CO-CONSPIRATOR 1 saying that he should get free upgrades, to which CO-CONSPIRATOR 1 responded, "I'll pay in cash, just pay it."

hh.  On or about June 1, 2019, and again on or about June 2, 2019, ROGERS and CO-CONSPIRATOR 1 messaged about setting up a "'class'" in Beijing on June 15 or 16, 2019.  ROGERS himself used quotes around the word "class," asking CO-CONSPIRATOR 1: "What are your thoughts on doing the next 'class'[?]" CO-CONSPIRATOR 1 told ROGERS he wanted to write a report on the U.S. economic situation in the first half of 2019 and asked, "could you please find some Fed or other official statements, articles of this?"

ii.   On or about June 13, 2019, ROGERS printed Trade Secret 3 and Trade Secret 4 using his FRB account. Both documents include information about the FOMC's thinking in the leadup to its upcoming public announcement on June 19, 2019.

jj.   On or about June 14, 2019, ROGERS flew from Dulles International Airport to Beijing.

kk.   On or about June 15, 2019, CO-CONSPIRATOR 1 and ROGERS exchanged encrypted messages about meeting in the hotel lobby before heading to lunch.

ll.   On or about June 16, 2019, ROGERS sent CO-CONSPIRATOR 1 a photograph of CO-CONSPIRATOR 1, CO-CONSPIRATOR 2, and ROGERS's former student in a hotel room next to a television.

mm.   On or about June 19, 2019, ROGERS copied verbatim an FOMC press release that was published on the same day at 2:00 pm in an encrypted message to CO-CONSPIRATOR 1. CO-CONSPIRATOR 1 responded, "[s]ame as you predicted!" and "[b]ut there's some slight changes in the statement, like deleting the word 'patient,' some economists said its preparing for declining interest rate." ROGERS responded "Exactly!!!!" FOMC Minutes from the June 18-19, 2019 committee meeting were released to the public on July 10, 2019, and stated "[i]n describing the monetary policy outlook, members agreed to remove the 'patient' language."

nn.   On or about February 4, 2020, ROGERS gave a recorded interview to the FRB OIG in the District of Columbia. During that interview, ROGERS discussed his relationship with CO-CONSPIRATOR 1, stating that at his institute "they do a lot of reports for the provincial government, they're in Shandong Province." ROGERS stated in the interview that he was offered money in 2013 and told CO-

CONSPIRATOR 1 that he could not accept it. When asked, "[w]hy not just remove yourself from that situation?" ROGERS replied, "No, I, I did." When asked, "So you never met with the same people again?" ROGERS replied, "No, no, no, no, I mean [CO-CONSPIRATOR 1] was, it was [CO-CONSPIRATOR 1] and his, his institute. No, no, I set them straight. Don't put this money in front of me."

oo.  In the same interview, on or about February 4, 2020, when asked, "So did you ever provide or share any restricted Board information? So let me, let me, you know, restricted FR, restricted controlled, internal FR, FOMC information of any class, did you share or provide any of this information with anyone else outside of the Board?" ROGERS responded "Never."

pp.  On or about February 4, 2022, CO-CONSPIRATOR 1 sent a message to ROGERS asking if ROGERS and his wife would be interested in traveling to the city of Qingdao city in Shandong province and arranging a "class." CO-CONSPIRATOR 1 also stated, "all related expenses will be covered by us, and we can pay for the class."

qq.  On or about August 11, 2023, ROGERS attempted to obtain via email from former colleagues still at the FRB, asking for two Excel spreadsheets (Trade Secrets 5 and 6) that contained a proprietary information belonging to the FRB.

rr.  In or around 2023, ROGERS was paid 3,399,012.98 CNY – approximately $448,160 USD (pre-tax) – as a part-time professor at a Chinese University.

**(Conspiracy to Commit Economic Espionage**, in violation of Title 18, United States Code, Section 1831(a)(5))

## COUNT TWO
### (False Statements)

18.    The allegations in paragraphs 1 through 17 are realleged and incorporated here by reference.

19.    On or about February 4, 2020, in the District of Columbia, the defendant, **JOHN HAROLD ROGERS,** who acted in furtherance of the conspiracy alleged in Count One, did willfully make a false statement in a matter within the jurisdiction of the Federal Reserve Board, whose office is located in the District of Columbia, and the statement was material to the to the activities or decisions of the Federal Reserve Board Office of Inspector General.

(**False Statements,** in violation of Title 18, United States Code, Section 1001)

## FORFEITURE ALLEGATIONS

20.    The allegations contained in Count One this Indictment are hereby realleged and incorporated by reference for the purpose of alleging forfeitures pursuant to Title 18, United States Code, Section 1834(a) and Title 28, United States Code, Section 2461(c).

21.    Upon conviction of the offenses alleged in Count One of this Indictment, the defendant, **JOHN HAROLD ROGERS**, shall forfeit to the United States any property, real or personal, which constitutes, or is derived from proceeds traceable to this offense, pursuant to Title 18, United States Code, Section 1834(b), and Title 28, United States Code, Section 2461(c). The United States will also seek a forfeiture money judgment for a sum of money equal to the value of any property, real or personal, which constitutes, or is derived from proceeds traceable to this offense.

22.    In the event of conviction, the United States may seek a money judgment.

23.    If any of the property described above, as a result of any act or omission of the defendant:

a.  cannot be located upon the exercise of due diligence;

b.  has been transferred or sold to, or deposited with, a third party;

c.  has been placed beyond the jurisdiction of the court;

d.  has been substantially diminished in value; or

e.  has been commingled with other property which cannot be divided without

difficulty,

the United States of America shall be entitled to forfeiture of substitute property pursuant to Title

21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Sections

2323(b)(2) and 982(b)(1).


A TRUE BILL


FOREPERSON


*Edward R. Martin /USB*

EDWARD R. MARTIN
U.S. ATTORNEY FOR THE UNITED STATES
IN AND FOR THE DISTRICT OF COLUMBIA