

U.S. Department of Justice

Jeanine Ferris Pirro
United States Attorney

*District of Columbia*

*601 D Street, N.W.*
*Washington, D.C.  20530*

November 7, 2025

VIA ELECTRONIC MAIL

| Jonathan Gitlen<br>Law Office of Jonathan Gitlen PLLC<br>900 19th Street, NW, Ste 500<br>Washington, DC 20006<br>Email: jonathan.gitlen@jgitlenlaw.com | Stephen A. Saltzburg<br>2000 H Street, NW<br>Washington, DC 20052<br>Email: ssaltz@law.gwu.edu |
|---|---|

      Re:    *United States v. John Harold Rogers,* Case No. 25-cr-00033
              Expert Notice – Robert Greene

Dear Counsel:

      Pursuant to Rule 16(a)(1)(G) of the Federal Rules of Criminal Procedure, please be advised that the government expects to call Mr. Robert Greene as an expert witness at trial in this matter. A disclosure of the opinions Mr. Greene may testify to at trial is attached as Exhibit A. Mr. Greene's *curriculum vitae* is attached as Exhibit B.

                                      Sincerely,

                                      Jeanine Ferris Pirro
                                      United States Attorney

                    By:  */s/ Thomas N. Saunders*
                           Thomas N. Saunders
                           Assistant United States Attorney
                           National Security Section

                           John A. Eisenberg
                           Assistant Attorney General

                           Nicholas Hunter
                           Yifei Zheng
                           Trial Attorneys
                           National Security Division

U.S. Department of Justice

Case 1:25-cr-00033-DLF   Document 39-1   Filed 11/24/25   Page 2 of 18

U.S. Department of Justice

# Exhibit A

**Robert W. Greene Expert Report for U.S. v. John Rogers**

November 7, 2025

**Introduction**

My name is Robert Greene, and I am a Partner at Patomak Global Partners, LLC, a risk and strategy consulting firm, where my client work primarily focuses on financial regulation and economic security issues. I am also a nonresident scholar at the Carnegie Endowment for International Peace's Technology and International Affairs Program and its Asia Program, where my research largely focuses on issues related to the financial system of the People's Republic of China (PRC), including PRC leadership's efforts to advance their geopolitical ambitions through various activities of the PRC's central bank and state-owned financial institutions.

Previously, I served as a Senior Advisor at the Department of the Treasury (Treasury). In this capacity, I worked on banking, digital assets, and insurance issues, as well as economic policy initiatives launched in response to the COVID-19 pandemic. I earned the Meritorious Service Award for my work at Treasury.

I also previously lived and worked in Beijing, the capital of the PRC, from 2018 through early 2020. While living in the PRC, I was a senior fellow at the Program on International Financial Systems, affiliated with Harvard University. I was also a visiting research fellow at the People's Bank of China School of Finance National Institute of Financial Research, a research center at the PRC's highest-ranked university, Tsinghua University. During this time, my research focused on, among other things, PRC financial regulation and the evolution of the PRC financial system.

My research has been cited in reports and studies published by various central banks, regulators, and Congressional committees, including the Federal Reserve Board, the U.S.-China Economic and Security Review Commission, and the U.S. Senate Foreign Relations Committee. Through this research, I have closely examined PRC leadership's geopolitical motivations for using financial channels to advance PRC national security and economic development objectives at the expense of U.S. interests. I have also examined the PRC's interconnectedness with U.S. financial markets, and how PRC leadership leverages this dynamic to advance geopolitical aims. Because of my expertise, I feel very comfortable explaining how the facts of this case fit into broader efforts by the PRC government to advance PRC national security objectives through financial risk intelligence gathering, financial market interventions, and currency manipulation.

In the first part of this statement, I explain how PRC leadership's ambitions to grow as a "financial power" and advance perceived PRC national security interests have resulted in financial sector activities that harm the United States, and why these ambitions have motivated PRC efforts to gather non-public information on U.S. central bank decision-making. In the second part of this statement, I assess the value of the "Trade Secrets" at focus in this case from this perspective. In the third part, I explain why information that was being sought by the co-conspirators in various taskings of interest in this case, as seen in evidence that I was provided, would have been of value to the PRC government and PRC financial institutions.

Robert W. Greene Expert Report for U.S. v. John Rogers                                            November 7, 2025

## I. Understanding PRC leadership's ambitions for "financial power" and how PRC financial activities in pursuit of PRC national security ambitions hurt U.S. interests

The People's Republic of China (PRC) was founded in 1949, and since its inception the PRC government has viewed control over the financial system generally and the value of the renminbi (the PRC's currency, also referred to as the yuan) in particular as essential means through which to advance the PRC's global and domestic policy ambitions.[1]

Those ambitions have grown considerably over the past few decades. PRC officials explicitly seek for their country to become a "financial power" with a "strong currency" and envision a new financial order in which the United States' role is greatly diminished.[2] PRC leadership has for years sought to expand global economic and geopolitical influence through activities in the financial domain, and has also overseen numerous actions in the financial domain that hurt U.S. interests.[3] These actions include decades of interventions in financial markets that undermined the competitiveness of U.S. manufacturing and U.S. exports,[4] as well as the build-out of financial channels to promote the renminbi's global use while reducing the U.S. dollar's role in international trade and finance.[5]

---

[1] When the PRC was founded, its leaders embraced a Leninist mono-banking system with the state controlling the entire financial system. https://scholarship.law.upenn.edu/jil/vol42/iss3/5/. Soon after the PRC's founding, Chinese Communist Party (CCP) leadership equated the stand-up of the PRC's new currency, the renminbi, with the importance of military capabilities, and adapted a model of state-driven capital accumulation predicated on managed renminbi foreign exchange rates and managed trade with the broader "socialist world economy." https://www.cambridge.org/core/journals/journal-of-global-history/article/on-the-rationale-and-implications-of-chinas-rmb-internationalization-a-global-historical-perspective/88B691ED0F1F3BC5A4FE86E331C3A67A. In connection with CCP leadership's objectives, cross-border financial intermediation and the PRC's exchange rate remained tightly controlled by the PRC state from the 1970s through the early 2000s. *Id.* Over the last two decades, the CCP has also enhanced Party networks within the financial sector to achieve tight authority over the financial system. https://muse.jhu.edu/pub/43/article/898343/pdf.

[2] The PRC's leader, CCP General Secretary Xi Jinping, emphasized at the CCP's October 2023 Central Financial Work Conference that he wants the PRC to become a "financial power" with a "strong currency." https://www.qstheory.cn/20250306/2398d7d850d34a2698151ad72e1add1e/c.html. In 2021, the Director of the Institute of Finance of the People's Bank of China endorsed the renminbi becoming "the currency anchor of neighboring countries and countries with close investment and trade exchanges with China" at the expense of the dollar's role. https://finance.sina.com.cn/money/forex/forexinfo/2021-05-19/doc-ikmxzfmm3410588.shtml. In 2025, the head of China's central bank advocated for a more multipolar monetary system in which the U.S. dollar's dominant global role would inherently be diminished. https://www.safe.gov.cn/tianjin/2025/0623/2817.html.

[3] *See, for example,* https://carnegieendowment.org/research/2022/08/southeast-asias-growing-interest-in-non-dollar-financial-channelsand-the-renminbis-potential-role?lang=en.

[4] In 2018, a U.S. Department of the Treasury report concluded that the PRC's "exchange rate and intervention practices" had "promoted and sustained a significant undervaluation of [the PRC's currency]" for much of the prior three decades, imposing "significant and long-lasting hardship on American workers and companies." https://home.treasury.gov/system/files/206/2018-10-17-%28Fall-2018-FX%20Report%29.pdf. In 2014, the President of the Alliance for American Manufacturing issued a letter to the U.S. Treasury Secretary out of concern that the PRC's currency manipulation had for years hurt U.S. manufacturing. https://www.manufacturing.net/home/blog/13243075/is-currency-manipulation-hurting-american-manufacturing/. *See also* https://www.piie.com/research/piie-charts/2017/currency-manipulation-was-leading-cause-record-trade-imbalances-2000s.

[5] *See, for example,* https://carnegieendowment.org/research/2022/08/southeast-asias-growing-interest-in-non-dollar-financial-channelsand-the-renminbis-potential-role?lang=en; https://carnegieendowment.org/research/2024/10/chinas-dollar-dilemma?lang=en. Due to various PRC policy efforts, "the dollar's share of mainland China's cross-border payments has declined significantly since 2016, from

PRC officials have for years articulated financial policy efforts that harm U.S. interests in military-like rhetoric, describing such actions in the context of "financial war" or as necessary to advance the PRC's national security interests.[6] For example, and relevant to the time period of focus in this case, in 2015 the then-Vice Chairman of the PRC's largest state-owned bank published commentary explaining that "financial warfare . . . has become the main form of non-military confrontation" between countries, and advocating for the application of the military strategy of an "active defense" to "achieve national security through financial means."[7] Specifically, he advocated for, among other things, "tak[ing] the initiative in the global monetary and financial game, and striv[ing] for a leading position in the reform of the international monetary system and the reconstruction of the financial order."

To achieve a global financial order that better serves the PRC's interests at the expense of the United States, PRC leadership is particularly focused on monetary policy decision-making by the Federal Reserve System (known as the Fed, the U.S. central bank) and its effects on the PRC's "financial security." This term, "financial security," has been embraced by the PRC's political and military leaders for decades,[8] and it reflects PRC leadership's desire to, among other things, respond to external monetary policy decisions and influence the U.S. dollar-renminbi exchange rate in ways that benefit the PRC's geopolitical and economic interests.[9]

Indeed, in April 2017, the leader of the PRC, General Secretary Xi Jinping, delivered an important speech to Chinese Communist Party cadres in which he "stressed that financial security is an important part of national security."[10] Xi emphasized that the PRC "has become an important world financial power," and he tied this development with PRC authorities' efforts to "maintain financial security."[11] Relevant to the allegations in this case, Xi warned of "spillover effects" caused by "the adjustment of monetary and fiscal policies in some countries" which "may have an external impact on [the PRC's] financial security,"[12] and he encouraged cadres to "closely monitor, accurately predict, [and] effectively prevent" financial risks.[13] Two years earlier, a controversial 2015 National Security Law, shepherded by Xi, had tasked all PRC government bodies, citizens, businesses, and other organizations with extensive responsibilities

---

around 70 percent to less than 50 percent in 2023, while the renminbi's share reportedly approximately doubled and surpassed the dollar's for the first time in early 2023, reaching 48 percent." *Id*.

[6] *See generally* https://www.cambridge.org/core/journals/china-quarterly/article/logic-of-partial-rmb-internationalization-prc-perspectives-on-financial-war/F59B2CD96EB9FC7BA428D8D600ACB1F5.

[7] http://www.ccg.org.cn/archives/27231.

[8] *See, for example*, https://www.cambridge.org/core/journals/china-quarterly/article/logic-of-partial-rmb-internationalization-prc-perspectives-on-financial-war/F59B2CD96EB9FC7BA428D8D600ACB1F5 (quoting People's Liberation Army Air Force Major General Zhu Hongda's comments from 2011); https://www.uscc.gov/sites/default/files/2024-06/Zoe_Zongyuan_Liu_Testimony.pdf (quoting a 1997 speech by then-General Secretary of the Chinese Communist Party Jiang Zemin).

[9] *See generally* https://www.cambridge.org/core/journals/china-quarterly/article/logic-of-partial-rmb-internationalization-prc-perspectives-on-financial-war/F59B2CD96EB9FC7BA428D8D600ACB1F5.

[10] https://www.gov.cn/xinwen/2017-04/26/content_5189103.htm (a state media read-out of Xi's speech).

[11] *Id*.

[12] *Id*.

[13] *Id*.

to safeguard national security (established as a very broad concept by the law), and identified preventing "external financial risks" as part of safeguarding national security.[14]

Xi's comments and the 2015 National Security Law indicate how PRC leadership was, in 2017 and the years that followed, remarkably focused at the highest levels on monitoring and preventing U.S. monetary policy effects detrimental to PRC leadership's geopolitical and economic interests amidst a U.S.-China "trade war." Official statements and PRC state-affiliated publications indicate that during this time, PRC officials were particularly interested in accurately anticipating the *pace* and *direction* of U.S. interest rate changes, as these changes would affect the value of the U.S. dollar-renminbi exchange rate and the PRC's massive holdings of U.S. dollar-denominated assets.[15] As a former leader at one of the PRC's largest state-owned financial institutions explained, these holdings were a "battlefield" of a "financial war" between the PRC and the United States that he noted would allow for the exchange rate market to become a tool to put pressure on the PRC.[16]

Because PRC efforts to control the renminbi's value and to grow the PRC's global financial influence were at the time often described by PRC state-affiliated researchers in such militaristic language or as part of a broader effort to confront U.S. "hegemony" in the financial domain,[17] it is of no surprise that a 2022 U.S. Senate Committee on Homeland Security and Governmental Affairs staff report identified a multi-year effort by PRC actors to illicitly obtain non-public economic data from the Fed relevant to U.S. monetary policy decision-making.[18] Indicative of the seriousness with which PRC authorities approach "financial war," these efforts reportedly included PRC officials detaining and threatening a Fed economist who was visiting the PRC in an effort to coerce him to hand over such information.

Access to non-public Fed information can enable PRC government entities to more effectively advance PRC leadership's industrial and geopolitical ambitions, including by helping calibrate strategic interventions in foreign exchange markets that affect the renminbi's value in unfair ways that harm U.S. interests. Indeed, current and former PRC officials have observed that such interventions benefit the PRC's manufacturing sector and the PRC's economic development

---

[14] https://www.gov.cn/zhengce/2015-07/01/content_2893902.htm

[15] https://finance.sina.com.cn/money/forex/forexrmb/2018-06-04/doc-ihcikcew4555672.shtml;
http://www.cass.cn/xueshuchengguo/jingjixuebu/201801/t20180103_3802666.shtml;
https://www.yicai.com/news/5210212.html;
http://www.scio.gov.cn/xwfb/bwxwfb/gbwfbh/whglj/202307/t20230703_722129.html;
https://www.cpifa.org/site/there/Uploads/20161110/120%E6%9C%9F%E6%AD%A3%E6%96%87.pdf (p. 28).

[16] https://finance.sina.com.cn/money/bank/bank_hydt/2019-08-10/doc-ihytcitm8187120.shtml (by Chen Yuan, who also previously served as former Vice Chairman of the CCP's Chinese People's Political Consultative Conference). *See also* https://www.cambridge.org/core/journals/china-quarterly/article/logic-of-partial-rmb-internationalization-prc-perspectives-on-financial-war/F59B2CD96EB9FC7BA428D8D600ACB1F5.

[17] *See, for example*, http://www.imi.ruc.edu.cn/IMIsd/c4bc56dfc2394bb48ec9ccc23b53c605.htm;
http://theory.people.com.cn/n1/2018/0307/c40531-29853331.html;
https://finance.sina.com.cn/money/bank/bank_hydt/2019-08-10/doc-ihytcitm8187120.shtml;
https://www.cciee.org.cn/Detail.aspx?newsId=15731&TId=231.

[18] https://www.hsgac.senate.gov/wp-content/uploads/imo/media/doc/HSGAC%20Report%20-%20China%20Threat%20to%20the%20Fed.pdf.

more broadly.[19] But conversely, and as explained above, the negative effects to the United States can be pronounced, which is why the U.S. Department of the Treasury formally designated the PRC in 2019 as a "currency manipulator," noting that it was engaged in "competitive devaluation" of its currency with the goal of gaining an "unfair competitive advantage in international trade."[20] Calls to designate the PRC a currency manipulator were bipartisan: President Donald Trump along with Democrats such as Senators Chuck Schumer and Bernie Sanders supported labeling the PRC a "currency manipulator."[21]

In short, throughout the 2017 to 2019 period of most interest for this case, PRC leadership sought to orchestrate actions in the financial domain that advanced PRC leadership's economic and geopolitical objectives at the expense of the U.S. economic interests and with the long-term goal of undermining the United States' dominant role in global finance.

## II. Trade Secrets 1 through 4 contain information that would have been valuable to the PRC's leadership, government bodies, and financial institutions

What follows is an assessment of why information contained in Trade Secrets 1-4 would have been valuable to PRC officials and market participants contributing to PRC leaders' efforts to expand the PRC's economic and geopolitical power through activities in the financial domain.

*********

    A) *Trade Secret 1*

I understand that Trade Secret 1 is an October 2018 briefing book created by senior Fed staff for a newly nominated member of the Board of Governors of the Federal Reserve System. Trade Secret 1 contains information on international economic topics and was marked as non-public information.

Trade Secret 1 contains information that would have been valuable to the PRC government and PRC financial institutions. Trade Secret 1 contains views of Fed staff on the U.S. trade deficit and recent developments in U.S. trade policy.[22] It provides Fed staff's view on how the dollar's leading global role benefits the U.S. economy.[23] It also contains an overview of thinking by certain Fed staff regarding the PRC's economic challenges, including an assessment by staff regarding the likely trajectory of PRC policymaking related to debt deleveraging and backstops

---

[19] *See, for example,* https://www.cambridge.org/core/journals/china-quarterly/article/logic-of-partial-rmb-internationalization-prc-perspectives-on-financial-war/F59B2CD96EB9FC7BA428D8D600ACB1F5 (quoting Zhu Hongda); http://ipd.cssn.cn/xscg/qt/201711/t20171127_3756101.shtml; https://finance.sina.com.cn/money/bank/bank_hydt/2019-08-10/doc-ihytcitm8187120.shtml.
[20] https://home.treasury.gov/news/press-releases/sm751
[21] https://www.cfr.org/election2020/candidate-tracker/bernie-sanders; https://www.democrats.senate.gov/newsroom/press-releases/schumer-statement-on-trump-administration-again-refusing-to-label-china-a-currency-manipulator; https://www.schumer.senate.gov/newsroom/press-releases/schumer-graham-urge-action-against-chinas-unfair-currency-manipulation.
[22] Trade Secret 1, 42-46, 67-68.
[23] Trade Secret 1, 26-29.

to credit shocks.[24] Together, these insights into Fed staff's perceptions of ongoing U.S.-China trade tensions and financial risks facing the PRC, and understanding what information on these topics Fed staff would choose to emphasize when briefing an incoming voting member of the Fed's Federal Open Market Committee (FOMC), which sets U.S. monetary policy, would have been of value to PRC officials. This information would have thus been useful to PRC entities concerned about the future trajectory of FOMC decisions, and would have also been valuable in briefing PRC officials participating in U.S.-PRC negotiations that were ongoing at the time.[25]

Additionally, Trade Secret 1 contains Fed staff's perspectives regarding the potential for U.S. monetary policy "spillovers" in emerging markets and in the PRC.[26] This area of focus, as noted above, was contemporaneously of significant focus at the highest levels of the PRC leadership.

Trade Secret 1 also includes an analysis of "seigniorage gain," which is a benefit to the United States of its currency being the most used currency in international trade and finance.[27] As recorded in Trade Secret 1, Fed staff estimated that the seigniorage gain was $15 billion in 2017. The PRC government cited the existence of a seigniorage gain to deflect U.S. government criticisms of the PRC's unfair trade and financial activities around this same time.[28]

Importantly, Trade Secret 1 is also a "very useful . . . concrete example of 'information flow.'"[29] Accordingly, access to information contained in Trade Secret 1 would have been valuable to the PRC government and PRC financial institutions, as it provides deep insights into what information Fed staff chooses to emphasize to brief an incoming senior Fed official who will soon cast votes on the FOMC.

Unauthorized access by the PRC government to the information in Trade Secret 1, particularly the totality of insights into "information flow" that it provides, would have enabled PRC government bodies and PRC financial institutions to better anticipate Fed decision-making, in turn improving these entities' ability to advance PRC leadership's objectives. Such unauthorized access would have also been consistent with PRC leadership's emphasis on monitoring for "spillover effects" caused by external monetary policies—particularly those of the United States.

    B) *Trade Secret 2*

Access to information contained in Trade Secret 2 in 2019 would have helped PRC government analysts and PRC financial institutions more effectively anticipate monetary policy decisions in the United States. Trade Secret 2 is marked as "Class II FOMC - RESTRICTED (FR)." Trade Secret 2 is a March 2019 internal Fed staff summary and assessment of monetary policy changes announced by the European Central Bank (ECB)—Europe's central bank for the euro currency

---

[24] Trade Secret 1, 91-96.
[25] For 2018-19 timelines of these negotiations, *see* https://www.theabcgroupllc.com/the-us-china-trade-war-a-timeline/; https://www.reuters.com/article/business/timeline-key-dates-in-the-us-china-trade-war-idUSKBN1ZE1AA/.
[26] Trade Secret 1, 6-7, 86-89, 95, 100-101.
[27] Trade Secret 1, 28.
[28] http://www.xinhuanet.com/politics/2018-09/24/c_1123475272.htm.
[29] This quotation comes from an email that the government provided to me that purports to have been written by the defendant on November 7, 2018.

area. The transcript of the 7-8 November 2018 FOMC meeting, released at the end of November 2018,[30] indicated that at least one FOMC member explicitly considered potential ECB monetary policy trajectories in the context of deciding on the Federal Funds Rate.[31] PRC government analysts and PRC financial institutions would have benefited from timely access to the non-public economic data projections contained in Trade Secret 2 and used by the FOMC to assess future ECB monetary policy trends.

The information in Trade Secret 2 is quite valuable in that it provides ▮▮▮▮▮▮ economic measures that the ECB would consider in deciding whether to adjust monetary policy,[32] which as explained above, was considered by the FOMC in the context of determining U.S. monetary policy changes. The author of Trade Secret 2 indicates ▮▮▮▮▮▮ is notable given that Tealbook data, due to its sensitivity, is not released publicly until *five* years after the FOMC meeting for which the Tealbook was prepared. (Tealbooks are produced by Fed staff, "distributed to the [FOMC] prior to each regularly scheduled FOMC meeting, [and] contain in-depth analysis of current economic and financial conditions and projections, along with background and context on monetary policy alternatives."[33]) The euro area growth and inflation projections from Trade Secret 2 ▮▮▮ was not released publicly by the Fed until 2024.[34]

Access to these forecasts in 2019 could have helped the PRC government more effectively forecast and anticipate monetary policy decisions in the United States given the relevance of this data to FOMC decision-making. Moreover, comments in 2018 and 2019 by analysts at the PRC's largest sovereign wealth fund and the PRC's foreign exchange regulator, respectively, indicated that PRC state actors were keenly interested in potential divergences of U.S. and ECB monetary policy decisions.[35] Trade Secret 2 provides ▮▮▮▮▮▮.

Trade Secret 2 also contains a ▮▮▮▮▮▮. This assessment would have similarly been valuable to PRC government entities seeking to assess the potential trajectory of monetary policy divergence between the Fed and the ECB. Specifically, Trade Secret 2 includes ▮▮▮▮▮▮ [▮▮▮▮▮▮ It goes on to assess ▮▮▮▮▮▮] ▮▮▮ Unauthorized access to these insights in 2019 would have been of value to the PRC

---

[30] https://www.federalreserve.gov/newsevents/pressreleases/monetary20181129a.htm.
[31] https://www.federalreserve.gov/monetarypolicy/files/FOMC20181108meeting.pdf (page 120).
[32] https://www.ecb.europa.eu/mopo/intro/html/index.en.html.
[33] https://www.federalreserve.gov/monetarypolicy/fomc_historical.htm.
[34] https://www.federalreserve.gov/monetarypolicy/files/FOMC20190320tealbooka20190308.pdf (compare pages 40-41 and 132 with Trade Secret 2).
[35] https://other.caixin.com/2018-01-11/101196690.html; http://www.scio.gov.cn/xwfb/bwxwfb/gbwfbh/whglj/202307/t20230703_722129.html.

government and to PRC financial institutions seeking to better anticipate future Fed and ECB monetary policy divergences.

Finally, it is worth noting that information in Trade Secret 2 would have also been valuable as an example of "information flow" within the Fed. Indeed, Trade Secret 2 is ▮▮▮▮▮▮▮▮▮▮ meetings where U.S. monetary policy decisions were made.[36] The author of Trade Secret 2, another Fed economist, notes ▮▮▮▮▮▮▮▮▮▮.

In short, Trade Secret 2 contains sensitive information that was non-public at the time and would have been highly valuable to PRC entities seeking to advance PRC national security interests, as articulated by PRC leadership. Unauthorized access by PRC entities to Trade Secret 2's information would have helped PRC entities fulfill the directions of PRC leadership to "accurately predict" and "effectively prevent" financial risks and to monitor for "spillover effects" caused by "the adjustment of monetary . . . policies" outside of the PRC. This non-public information would have been able to be used to enable PRC officials to better anticipate future FOMC decisions and thereby better calibrate actions in the financial domain aimed at advancing the PRC's economic and geopolitical ambitions.

### C) *Trade Secret 3*

As with Trade Secrets 1 and 2, Trade Secret 3 is valuable as an example of "information flow" within the Fed's innerworkings, showing how an FOMC member—▮▮▮▮▮▮▮▮▮▮. Thus, it would have been valuable to PRC entities seeking to better anticipate FOMC decision-making. Several excerpts in particular also stand out from this document, marked as "CLASS II FOMC-RESTRICTED FR."

First, Trade Secret 3 ▮▮▮▮▮▮▮▮▮▮ Insights into ▮▮▮▮▮▮▮▮▮▮ covering the European economy, for reasons explained above, would have in this context been valuable to PRC government bodies and financial institutions.

Trade Secret 3 would have also been helpful for these entities because it contains ▮▮▮▮▮▮▮▮▮▮. PRC entities would have

---

[36] https://www.federalreserve.gov/monetarypolicy/files/FOMC20180613meeting.pdf;
https://www.federalreserve.gov/monetarypolicy/files/FOMC20181108meeting.pdf;
https://www.federalreserve.gov/monetarypolicy/files/FOMC20190130meeting.pdf.

benefitted from knowing that potential ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Most importantly, the document contains a private exchange between ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. This exchange took place just days before an upcoming FOMC meeting on June 18-19, 2019.[37] Timely access to this interaction would have certainly been valuable to PRC government bodies and financial institutions because it provides insights into how a ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ and in advance of a particular interest rate vote days later. (These votes are guided by inflation expectations.)

The information in Trade Secret 3, taken together, would have enabled PRC entities to better anticipate the direction of a particular FOMC member's monetary policy views and use non-public information provided to the FOMC to better calibrate actions in the financial domain aimed at advancing the PRC's economic and geopolitical ambitions. Obtaining unauthorized access to Trade Secret 3's information in 2019 would have been consistent with fulfilling PRC leadership's stated interest in monitoring for "spillover effects" caused by "the adjustment of monetary and fiscal policies" outside of the PRC.

  D) *Trade Secret 4*

Trade Secret 4 relates to a briefing by a senior Fed staffer to FOMC members in advance of the upcoming FOMC meeting on June 18-19, 2019, and is marked "CLASS II FOMC—Restricted FR."

Trade Secret 4 contains various pieces of non-public information that would have been valuable to PRC leadership at the time. To begin with, it includes a ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

PRC leadership, government bodies, and financial institutions would have also undoubtedly valued access to the following statement by the author of Trade Secret 4: ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. By obtaining unauthorized access to Trade Secret 4's information in 2019, a PRC entity would have been fulfilling PRC leadership's direction to "closely monitor" and "accurately predict" financial risks, given PRC leadership's concerns over the "spillover effects" of U.S. monetary policy changes. PRC entities could have leveraged this non-public information to adjust market

---

[37] https://www.federalreserve.gov/monetarypolicy/fomcpresconf20190619.htm.

activities in financially beneficial ways or to support the calibration of PRC monetary policy in such a way that advanced PRC leadership's economic and geopolitical goals.

*********

In conclusion, Trade Secrets 1 through 4 each contain non-public information that would have been valuable to PRC entities seeking to carry out PRC leadership's direction to "accurately predict" and "closely monitor" financial risks given leadership's concerns over the "spillover effects" of U.S. monetary policy at the time. The non-public information contained in Trade Secrets 1 through 4 would have enabled PRC entities to more effectively anticipate U.S. monetary policy decision making, thus enabling PRC entities to better calibrate responses to U.S. monetary policy decisions with an eye towards advancing the PRC's economic and geopolitical goals. The non-public information contained in Trade Secrets 1 through 4 would have also, quite simply, been of value to PRC state-owned financial entities active in financial markets and with U.S. dollar asset holdings.

**III. Evidence provided by the government indicates that Rogers received taskings from the co-conspirators to obtain valuable, non-public information related to U.S. monetary policy-making that would have helped PRC entities advance PRC leadership's objectives**

The government has provided me with a document and various WeChat message exchanges that the government alleges Rogers received from one of his co-conspirators and that contain various requests or taskings. It is my expert opinion that in numerous instances the information being sought in these taskings is timely, non-public information related to U.S. monetary policy decision-making that would have been valuable to PRC entities in advancing PRC leadership's geopolitical and economic objectives.

First, the government has provided me with evidence that the government alleges shows that, on May 2, 2018, Co-Conspirator 1 asked Rogers to "collect answers from your colleagues or documents" regarding a number of sensitive, time-bound, and process-oriented questions involving the Fed. Specifically, this evidence shows that these taskings covered the following topics: the "Fed's expectation for the future trend of the dollar" and any "specific plan and timetable" for related Fed measures; how the Fed "evaluate[s] the trade war with China proposed by Trump"; and whether "the Fed [will] adjust the monetary policy to cooperate with the trade war." These taskings are quite probing and seem designed to obtain from Rogers timely, non-public information on how the Fed and U.S. policymakers are assessing economic and monetary policy issues that were at the time of high interest to PRC leadership. Such information would have been valuable to PRC entities seeking to carry out activities in the financial domain aimed at advancing PRC leadership's geopolitical and economic policy objectives.

Second, the government has provided me with evidence that the government alleges shows that, between September 2018 and December 2018, Co-Conspirator 1's requests for Rogers to engage in "teaching" or to host a "class" included several requests aimed at understanding the Fed's and U.S. policymakers' assessments of various countries' and regions' economies and monetary policies. Specifically, this evidence shows that Co-Conspirator 1 requested "teaching" or a "class" on the following topics: (1) "how the States or the FED assest [sic] or cope the risk [sic]

from emerging market [sic]" (September 4, 2018); (2) "How the States assess the EU economy and their monetary policy" (September 25, 2018); and (3) "How the States and the FED assess Japan's economic [sic]" (September 25, 2018). These requests seem focused on understanding valuable information regarding the Fed's inner-workings and on obtaining non-public, forward-looking Fed assessments of these various issues—such as the information in Trade Secret 2.

The government has also provided me with evidence that the government alleges shows that on February 14, 2019, Rogers received focused questions from Co-Conspirator 1 specifically asking "how" the Fed "would shrink the balance-sheet in 2019" and "how" the Fed "assess[es] the U.S. economy trend [sic] in 2019." These probing, time-bound questions—focused on the Fed's carrying out of sensitive functions and its sensitive assessments specific to 2019—strike me as a blatant attempt to solicit timely, non-public Fed information from a current Fed employee (Rogers) that would help PRC entities "accurately" predict financial risks, advance leadership's vision for "financial security," and calibrate actions in the financial domain that would align with PRC leadership's economic and geopolitical objectives and harm U.S. interests.

********

I, Robert W. Greene, approve of this expert disclosure and the information contained herein.

*[signature: Robert W. Greene]*
_____                                           Date: <u>November 7, 2025</u>
Robert W. Greene

# Exhibit B

# ROBERT W. GREENE
E-mail: rgreene@patomak.com

| | | |
|---|---|---|
| **Education** | **HARVARD UNIVERSITY**, **JOHN F. KENNEDY SCHOOL OF GOVERNMENT** | Cambridge, MA |
| | Master in Public Policy, International Trade & Finance concentration | |
| | **THE COLLEGE OF WILLIAM & MARY** | Williamsburg, VA |
| | Bachelor of Business Administration, Finance & Public Policy (*magna cum laude*) | |

**Professional Experience**

*Core skills*: advising senior decision-makers and producing high-impact research on Chinese/SE Asian/U.S. financial markets & economic security trends; managing global teams; risk/strategy consulting; data analysis

**PATOMAK GLOBAL PARTNERS** — Washington, DC

- 2025-present — **Partner & Chief Operating Officer**
- 2021-2025 — **Vice President & Chief of Staff**
- 2017-2018 — **Senior Associate**

- Manages client engagements focused on assessing economic security policy risks relevant to clients' planned activities and investments in U.S. and Asia, including risks related to Chinese economic statecraft and to cross-border investment restrictions.
- Identifies economic security risks associated with clients' China exposure, drafting reports and analyses to guide business decisions made in response to U.S.-China de-risking trends.
- Leads project teams for compliance engagements at banks: managed capital, liquidity, and sanctions compliance gap analyses for a large bank and led analyses of transaction data reporting deficiencies.
- Advises and produces research for non-bank financial institutions on various financial market structure strategy issues, including topics related to financial market infrastructure and Treasury markets.
- Manages key elements of firm operations.

**CARNEGIE ENDOWMENT FOR INTERNATIONAL PEACE** — Washington, DC

2021-present — **Non-Resident Scholar, Asia Program & Cyber Policy Initiative**

- Authors studies and commentary on Chinese financial sector policies, the dollar-renminbi relationship, Southeast Asian financial infrastructure, and China's related geoeconomic ambitions; cited in reports published by the Federal Reserve Board, the U.S.-China Economic and Security Review Commission, the Senate Foreign Relations Committee, the Rand Corporation, and various prominent think tanks.
- Provides views and analyses on Chinese financial sector topics in interviews with the *Wall Street Journal*, *Bloomberg*, the *South China Morning Post*, *Foreign Policy*, and other media outlets.
- Participates in dialogues and roundtables on Chinese financial sector and economic statecraft issues; speaks at related Carnegie events and participates in dialogues with other think tanks.

**U.S. DEPARTMENT OF THE TREASURY** — Washington, DC

2020-2021 — **Senior Advisor, Financial Institutions** (awarded Treasury's Meritorious Service Award)

- Conducted research on structural contours of a non-market economy central bank's payments system.
- Produced analyses for Treasury leadership of banking and insurance sector policy issues, digital asset industry developments, and Federal Reserve System actions; contributed to related Congressionally mandated reports and Treasury stakeholder engagement on these topics.
- Supported Treasury leadership's implementation of and analytics for emergency lending programs.

**THE EURASIA GROUP** — remote

2019-2020 — **Consultant, Geo-technology group and China group**

- Developed research for clients on evolving Chinese government policy approaches towards economic security, fintech, and internet governance, using Chinese language skills.
- Produced analyses on internal Chinese political dynamics surrounding Chinese cross-border investments associated with the Belt and Road Initiative.

**PROGRAM ON INTERNATIONAL FINANCIAL SYSTEMS** (PIFS) — Beijing, China / Cambridge, MA

2018-2020 — **Senior Fellow** (served as only China-based scholar for PIFS, a program affiliated with Harvard University)

- Co-led research project analyzing Chinese equity market structure, collaborating with scholars from PIFS and Tsinghua University, industry participants, and data vendors.
- Participated in U.S.-China and U.S.-Japan dialogues with senior policymakers and industry leaders.

**Robert W. Greene**  Curriculum Vitae - Page 2 of 2

| | |
|---|---|
| 2018-2020 | **TSINGHUA UNIVERSITY** — Beijing, China<br>**Visiting Research Fellow, People's Bank of China School of Finance**<br>(research activities entirely funded by Luce Scholars Program and PIFS)<br>• Co-authored academic research with Chinese scholars on the history and regulation of Chinese financial-commercial conglomerates; used Chinese language skills to analyze historical documents and filings.<br>• Built novel datasets on Chinese conglomerates' financial assets, coordinating the efforts of colleagues. |
| 2016-2017 | **PROMONTORY FINANCIAL GROUP, AN IBM COMPANY** — Washington, DC<br>**Associate**<br>• Evaluated the suitability of a major Asian exchange for derivatives linked to client's equity indexes; client acted on recommendation backed by analysis of stock market and derivatives exchanges data.<br>• Drafted stress scenario recovery plans for a major financial market utility.<br>• Supported the remediation of various compliance issues identified at a banking client by its regulator. |
| 2015-2016 | **U.S. HOUSE OF REPRESENTATIVES FINANCIAL SERVICES COMMITTEE** — Washington, DC<br>**Fellow / Analyst**<br>• Drafted analyses for chief economist of Federal Reserve System structure and policy trends.<br>• Developed research for senior staff assessing options to reform post-2008 financial crisis policy changes. |

**Academic Experience**

**Program on International Financial Systems**, Fellow (2021-present)
**American Mandarin Society (AMS)**, Fellow (1 of 12 American government officials, business leaders, and academics chosen by AMS to participate in 1-week Chinese political theory class, taught in Mandarin, at Shanghai's preeminent public administration academy) (2023)
**Singapore University of Social Sciences**, Fellow (2018-20)
**Taipei Language Institute (Beijing)**, language student (2018-20)
**Hanyu Shuiping Kaoshi (HSK) IV** (advanced intermediate Mandarin proficiency exam) (passed in 2019)
**Luce Scholar** (1 of 18 Americans selected by the Henry Luce Foundation for U.S.-Asia professional exchange fellowship that provided funding for research activities and language training in China) (2018-19)
**Harvard University John F. Kennedy School of Government Mossavar-Rahmani Center for Business and Government**, Research Assistant/Associate (2014-16)
**George Mason University, Mercatus Center**, Research Associate and Program Coordinator (2012-14)

**Selected Publications**

*Research citations*: cited in studies published by the Federal Reserve Board, various non-U.S. central banks, the U.S. Treasury Department, U.S. banking regulators, and various committees of the U.S. Congress; also cited in *Financial Times*, *The Wall Street Journal*, *Bloomberg*, 100+ other media outlets.

*Carnegie Endowment for International Peace working papers and commentary* (available [here](#))
China's Dollar Dilemma (2024)
The Difficult Realities of the BRICS' Dedollarization Efforts—and the Renminbi's Role (2023)
Asia's Interest in Wholesale Central Bank Digital Currency and Challenges to Cross-border Use (2023)
Southeast Asia's Growing Interest in Non-dollar Financial Channels & the Renminbi's Potential Role (2022)
How Sanctions on Russia Will Alter Global Payments Flows (2022)
Beijing's Global Ambitions for Central Bank Digital Currencies Are Growing Clearer (2021)
What Will Be the Impact of China's State-Sponsored Digital Currency? (2021)
Will China Control the Global Internet Via its Digital Silk Road? (with Paul Triolo) (2020).

*Academic journal articles*
"Conglomeration Unbound: The Origins and Globally Unparalleled Structures of Multi-sector Chinese Corporate Groups Controlling Large Financial Companies." (with Wang Xian & Yan Yan) *University of Pennsylvania Journal of International Law* (2021) ([link](#)).
"Singapore's Open Digital Token Offering Embrace: Context & Consequences." (with David Lee Kuo Chuen) *Journal of the British Blockchain Association* (2019) ([link](#)).
"Improving U.S. Financial Regulation Through OIRA Review & Robust Regulatory Analysis Standards." *Rutgers Journal of Law & Public Policy* (2016) ([link](#)).
"Opening the Gate to Money Market Fund Reform." (with Hester Peirce) *Pace Law Review* (2014) ([link](#)).

*Harvard University John F. Kennedy School of Government working papers*
Published or co-published (with Marshall Lux) working papers on contingent convertible capital instruments ([link](#)), credit card lending trends ([link](#)), non-bank mortgage markets ([link](#)), and community banking ([link](#)).

**Addendum to Robert W. Greene CV (July 2025) transmitted to the Government**

*Additional publications authored or co-authored by Robert W. Greene since November 2015*

(as of November 7, 2025)

https://patomak.com/2025/09/29/the-understanding-de-banking-executive-order-2/

https://patomak.com/2025/08/08/fincen-targets-three-mexican-financial-institutions-for-fentanyl-training/

https://patomak.com/2024/07/16/treasury-issues-notice-of-proposed-rulemaking-implementing-the-white-houses-executive-order-on-outbound-investment/

https://patomak.com/2023/08/14/president-bidens-outbound-investment-executive-order-the-scope-of-new-investment-prohibition-and-notification-requirements-remains-far-from-certain/

https://patomak.com/2023/05/08/proposed-fsoc-guidance-could-lead-to-bank-like-regulation-for-asset-managers-private-funds-and-non-bank-mortgage-companies-as-well-as-new-federal-regulatory-frameworks-for-digital-assets-a/

https://patomak.com/2022/11/02/fsoc-releases-digital-asset-report-signaling-increased-future-scrutiny/

https://patomak.com/2021/06/29/who-is-in-charge-here-liability-considerations-for-decentralized-exchange-platforms/

https://patomak.com/2021/03/08/six-patomak-takeaways-regarding-2021-sec-division-of-examinations-risk-alert-on-digital-assets/

https://www.nytimes.com/roomfordebate/2016/04/14/has-dodd-frank-eliminated-the-dangers-in-the-banking-system/dodd-frank-is-hurting-community-banks