**UNITED STATES DISTRICT
COURT FOR THE DISTRICT OF
COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 25-cr-033 (DLF)** |
| **JOHN HAROLD ROGERS,** | |
| **Defendant.** | |

## DEFENDANT'S NOTICE TO THE COURT OF SUPPLEMENTAL AUTHORITY RELATED TO DEFENDANT'S SECOND MOTION IN LIMINE

On November 21, 2025, Defendant filed his Second Motion in Limine (ECF No. 37) seeking to exclude specific opinions by Dr. Barry Naughton among other things. Defendant offers the following supplemental authority where Judge Rya W. Zobel (D. Mass) excluded the testimony of Dr. Naughton—*United States v. Lieber*, 566 F. Supp. 3d 110 (D. Mass 2021): (1) Superseding Indictment; (2) Government's Opposition to Lieber's Motion in Limine; and (3) Judge Zobel's Opinion.

December 30, 2025

Respectfully submitted,

/s/ Stephen A. Saltzburg
Stephen A. Saltzburg (D.C. Bar No. 156844)
2000 H Street, NW
Washington, DC 20052
Tel.: (202) 994-7089
Fax: (202) 994-9811
Email: sasaltz@law.gwu.edu

/s/ Jonathan K. Gitlen
Jonathan K. Gitlen (D.C. Bar No. 990918)
Law Office of Jonathan K. Gitlen PLLC
900 19th Street, NW, Suite 500

Washington, DC 20006
Tel.: (202) 568-5788
Fax: (202) 301-8556
Email: jonathan.gitlen@jgitlenlaw.com


*Counsel for Defendant*

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | Criminal No. 20-cr-10111-RWZ |
| | ) | |
| v. | ) | Violations: |
| | ) | |
| CHARLES LIEBER, | ) | Counts One and Two: |
| | ) | False Statements |
| Defendant | ) | (18 U.S.C. § 1001(a)(2)) |
| | ) | |
| | ) | Counts Three and Four: |
| | ) | Filing False Tax Returns |
| | ) | (26 U.S.C. § 7206(1)) |
| | ) | |
| | ) | Counts Five and Six: |
| | ) | Failure to File Reports of Foreign |
| | ) | Bank and Financial Account |
| | ) | (31 U.S.C. §§ 5312 and 5322(a)) |
| | ) | |

## FIRST SUPERSEDING INDICTMENT

At all times relevant to this First Superseding Indictment:

### General Allegations

A.    The Defendant

1.    CHARLES M. LIEBER ("LIEBER") was a United States citizen and a professor

in the Department of Chemistry and Chemical Biology (the "Department") at Harvard University

in Cambridge, Massachusetts ("Harvard"). Between approximately 2015 and 2019, LIEBER

served as Chair of the Department. In his career, LIEBER has published over 400 papers in peer-

reviewed journals concerning nanoscience and other scientific disciplines, and he is the principal

inventor on more than 50 patents.

2.    In addition to being a member of Harvard's faculty, LIEBER also served as the

Principal Investigator of the Lieber Research Group at Harvard. In addition to LIEBER, the Lieber

Research Group was staffed by Harvard graduate students and various postdoctoral researchers. According to its website, the Lieber Research Group was "focused broadly on science and technology at the nanoscale, harnessing the unique physical properties of novel nanomaterials to push scientific boundaries in biology and medicine."

B.      The Lieber Research Group Receives Federal Grant Funding

3.      The National Institutes of Health ("NIH") was a component of the U.S. Department of Health and Human Services. It was the primary agency of the U.S. government responsible for biomedical and public health research.

4.      In addition to conducting scientific research through its Intramural Research Program, NIH was the largest public funder of biomedical research in the world. Through its Office of Extramural Research, NIH awarded more than $32 billion annually to private research institutions, including colleges and universities like Harvard.

5.      In order to receive NIH funding, private research institutions and their principal investigators were required to submit a detailed application that described, among other things, the purpose and scope of the proposed research, the amount of funding requested, and how the funding would be used. NIH also required applicants and grant awardees to disclose all forms of research support and financial interests, including support from foreign governments or other foreign entities. Similarly, applicants and grant awardees were required to report to NIH all domestic and foreign affiliations, including affiliations with foreign governments, foreign academic institutions, and foreign research institutions. According to NIH, these reporting requirements were primarily designed to prevent the "diversion of intellectual property in grant applications or produced by NIH-supported biomedical research to other entities, including other countries;" the "[s]haring of confidential information on grant applications by NIH peer reviewers with others, including

2

foreign entities, or otherwise attempting to influence funding decisions; and the "distort[ion of] decisions about the appropriate use of NIH funds."

6.      The U.S. Department of Defense is an agency of the Executive Branch of the U.S. government.  The Department of Defense provided grant funding to private entities through a number of its components, including the Air Force Office of Scientific Research ("AFOSR") and Office of Naval Research ("ONR") (referred to collectively herein as "DOD").

7.      The Lieber Research Group was funded in large part by research grants from U.S. government agencies, including NIH and various components of DOD.  In fact, since 2008, through Harvard, the Lieber Research Group received more than $15,000,000 in NIH and DOD grant funding.

C.      Lieber's Undisclosed Affiliations with the People's Republic of China and its Thousand Talents Plan

8.      Wuhan University of Technology ("WUT") was a university located in Wuhan, China. According to its website, "WUT is one of the leading Chinese universities under the direct administration of the [Chinese] Ministry of Education and one of the universities in … [China's] construction plan of world-class universities and first-class disciplines."

9.      "WUT Professor" was a professor of "Materials Science" at WUT.  According to his biography on WUT's website, WUT Professor was an "Advanced Research Scholar" at Harvard under LIEBER's supervision between approximately 2008 and 2011.

10.     In or about November 2011, while employed as a full-time faculty member at Harvard, LIEBER traveled to Wuhan, China, ostensibly to speak at a "Nano-Energy Materials Forum" hosted by WUT. On or about November 9, 2011, several days before LIEBER traveled to WUT, the WUT Professor emailed LIEBER a "Contract for Strategic Scientist's Appointment" (the "Strategic Scientist Contract").  The contract, which was between LIEBER and WUT,

3

appointed LIEBER a Strategic Scientist at WUT for five years, beginning on or about November 15, 2011.

11.     In exchange for a salary of up to $50,000 per month, and round-trip, business-class airfare to and from WUT, the Strategic Scientist Contract required LIEBER to: (i) "[m]ake strategic, visionary and creative research proposals to guide the advancement of disciplines or scientific research institutes to become first class disciplines or scientific research institutes in China or the world, especially in frontier areas;" (ii) "supervise young teachers or receive them as visiting scholars;" (iii) "jointly publish[] academic papers in top international journals (in the name of WUT, and WUT faculty or students as the first author);" (iv) "[c]onduct national important (key) projects or internal cooperation projects that meet China's national strategic development requirements or state at the forefront of internal science and technology…;" and (v) "[c]arry out international exchanges and cooperation, and host or jointly host prominent international academic conferences in the name of WUT." The Strategic Scientist Contract also required LIEBER to "ensure working hours in WUT," which the contract noted "c[ould] be negotiable when significant contributions are made by [LIEBER] … for the construction and development" of WUT.

12.     In an email dated on or about November 11, 2011, LIEBER and the WUT Professor agreed that LIEBER would sign the Strategic Scientist Contract on November 15, 2011, when LIEBER was at WUT. According to his travel records, Lieber did, in fact, travel to the People's Republic of China ("PRC") on or about November 12, 2011.

13.     LIEBER returned to Massachusetts from WUT on or about November 17, 2011. The next day, in an email to the WUT Professor, LIEBER wrote, "I very much appreciate the effort that you put into making my visit a good one. I also agree that it would [be] productive, and hope

4

that we can push forward as per discussions to build up the joint laboratory to a truly world-level facility."

14.     Approximately one month later, on or about December 19, 2011, the WUT Professor emailed portions of a proposed website for the "WUT-Harvard Joint Nano Key Laboratory," which, according to the website, was established in 2009. The website prominently featured LIEBER's name, photograph and biographical information, and identified LIEBER as the "Laboratory Director." In his email to LIEBER about the website, the WUT Professor noted that "the Chinese version [of the website] will be made after your approval for [sic] the English version."

15.     On or about April 3, 2012, approximately five months after LIEBER signed the Strategic Scientist Contract, the WUT Professor emailed LIEBER to inform him that LIEBER had been selected to participate in PRC's Thousand Talents Plan. Specifically, the WUT Professor wrote:

> I am very happy to let you know that, in the **World** Recruitment Plan of **renowned** experts in China (also called as one thousand plan of foreign experts), you have been approved and awarded as invited strategic foreign expert by Chinese government because of your **world-leading** achievements, the **good collaboration basis** between you and WUT, and your great **contribution** to national academic exchange between China and USA. You are provided with personal benefit of one million RMB (~158,800 USD), a research funding of 5 million RMB (~794,000 USD) for development of WUT-Harvard joint nano key lab and collaboration research  This plan is the highest plan/program for famous foreign scientists in Chinese scientific field and only 40 famous experts from the world were awarded.

16.     The "Chinese Talent Programs" were a collection of plans designed by the PRC Government to attract, recruit, and cultivate high-level scientific talent in furtherance of PRC's scientific development, economic prosperity, and national security. The "Thousand Talents Plan"

5

was one of the most prominent PRC Talent Plans designed by the PRC government to incentivize individuals engaged in research and development in the United States and elsewhere to transmit (sometimes through illicit means) their knowledge, research and intellectual property to the PRC in exchange for salaries, research funding, laboratory space, honorary titles, and other incentives. The so-called "World Recruitment Plan of Renowned Experts in China" was part of the Thousand Talents Plan.

17.     On or about June 27, 2012, vthe WUT Professor emailed LIEBER a contract titled, "Employment Contract of 'One Thousand Talent' High Level Foreign Expert" (the "Thousand Talents Contract"). The WUT Professor asked for LIEBER's "ideas/comments/suggestions" within "one week when your schedule allows (of course, the sooner the better)."

18.     By its terms, the Thousand Talents Contract was effective for three years "from the date of signature." Among other things, the contract obligated LIEBER to: (i) conduct scientific research; (ii) "publish high-level articles in the renowned and important international academic journals in the name of Wuhan University of Technology;" (iii) assemble a research team with "strong ability of [sic] research and innovation" in LIEBER's field of expertise; (iv) "guide 1-2 distinguished young scholars and 3-4 doctoral students … and help them publish systematic articles in the international renowned journals;" (v) "organize 1-2 predominant influencing international conferences in his field in the name of Wuhan University of Technology;" and (vi) "invite 1-3 international top scientists to work in the lab as visiting scholars." The contract also required LIEBER to work at or for WUT "not less than nine months a year" by "declaring international cooperation projects, cultivating young teachers and Ph.D. students, organizing international conference[s], applying for patents and publishing articles in the name of" WUT.

6

19.     In exchange for his work for and on behalf of WUT, WUT agreed to pay LIEBER

a salary of up to $50,000 per month and living expenses of up to 1,000,000 Chinese Yuan (based

on 2012 exchange rates, approximately $158,000 U.S. dollars), to be paid over the three-year term

of the contract.  The contract also allocated 11,000,000 Chinese Yuan (or roughly $1.74 million

U.S. dollars based on 2012 exchange rates) for the joint Harvard-WUT Nano Key Lab and related

research.

20.     Duplicate copies of the Thousand Talents Contract—signed by WUT's President—

were mailed to LIEBER in Massachusetts on or about July 10, 2012.  In turn, LIEBER signed the

Thousand Talents Contract on or about July 21, 2012.  LIEBER subsequently mailed and caused

to be mailed signed copies of the Thousand Talents Contract to WUT.  Neither LIEBER, nor

anyone acting on LIEBER's behalf, notified Harvard, NIH or DOD of LIEBER's contractual

participation in the Thousand Talents Plan.

21.     After signing the Thousand Talents Contract, LIEBER traveled to WUT in or about

November 2012.  Before LIEBER's trip, on or about October 26, 2012, an employee of WUT (the

"WUT Employee") emailed LIEBER to ask how he preferred to be paid under the Thousand

Talents Contract.  The WUT Employee wrote:

> Before your visit, I would like to talk about one detail in the
> implementation of the contract of "one thousand talent" high level
> foreign expert between you and our university.  According to the
> article concerning the payment and living conditions, I want to know
> the way you prefer to be paid so that everything can be prepared
> before your coming.  I would like to provide two options for you to
> choose if you do not mind. Option one.  I help you open a new bank
> account in the Chinese Bank named ... ["Chinese Bank"].  The
> payment will be put into your account and you can get the payment
> from the branch of ... ["Chinese Bank"] in your country.  Option
> Two.  I can prepare the payment in cash.

7

22.     "Chinese Bank" is a state-owned bank headquartered in the PRC.  Chinese Bank has two U.S. locations in New York, New York.

23.     On or about November 12, 2012, while visiting WUT and with the assistance of at least one WUT employee, LIEBER opened an account at the Chinese Bank in the PRC.

24.     On or about January 10, 2013, the WUT Professor emailed LIEBER an agreement titled "Academic Cooperative Agreement between Harvard University, USA and Wuhan University of Technology, P.R. China" (the "Academic Cooperative Agreement").  The stated purpose of the agreement, which had a five-year effective term, was to "carry out advanced research and development of nanowire-based lithium ion batteries with high performance for electric vehicles."  Apart from its stated objective, the agreement provided for a "cooperative research program" whereby researchers from WUT would "visit Department of Chemistry and Chemical Biology of Harvard University for two months each year."  Without consulting anyone at Harvard, LIEBER signed the agreement on Harvard's behalf and returned the executed copies to the WUT Professor on or about January 11, 2013.

25.     On or about January 18, 2014, seemingly in accordance with the Academic Cooperative Agreement, LIEBER agreed with the WUT Professor to accept a WUT graduate student as a long-term "WUT-HU joint Ph.D student."  LIEBER's willingness to accept the WUT graduate student was conditioned on WUT agreeing to "support all of [the WUT graduate student's] salary and research costs while working in my lab."  In the same communication, LIEBER discussed an upcoming visit to WUT and made specific demands regarding the payment of his salary:

> I would like to receive ~1/2 of salary (for the current period) in US dollars, with the remainder deposited into the bank account that was set-up.  The ~00 that I promised to pay for the party following …
> [student's] Ph.D. defense in April, can be deduced from either 1/2.

8

26.     In or about June 2014, LIEBER continued to discuss his compensation under the Thousand Talents Contract with WUT.  In an email to the WUT Employee dated on or about June 16, 2014, LIEBER asked to maintain his account at the Chinese Bank "the way it has been for now," and he reiterated his earlier request that half of his salary be deposited into his account at the Chinese Bank, while the other half be paid to him in cash when he next visited WUT.  In the same email, LIEBER stated, "I think this is close to what [we] have done in [the] past."

27.     In late January 2015, LIEBER outlined his ongoing relationship with WUT in an email to the WUT Professor, confirming that he intended to visit WUT "several" times per year or "perhaps slightly more in the next couple years as we try to build up the nano-bio part of the lab."

28.     In or about January 2015, independent of LIEBER, Harvard learned for the first time of the WUT-Harvard Joint Nano Key Laboratory at WUT, including the fact that LIEBER was the director of the lab.  Harvard officials confronted LIEBER about the joint lab, and informed him that the use of Harvard's name and logo by WUT and LIEBER without Harvard's knowledge or consent violated university policy.  In response, LIEBER falsely told Harvard that he was involved in collaborative research with WUT for "mutual scientific interaction," but that WUT was using Harvard's name and logo without his knowledge or permission.

29.     In an email dated on or about February 20, 2015, LIEBER discussed with the WUT professor a manuscript written by WUT researchers.  In the same email, LIEBER also said that he "may be in touch with regards to several issues relating to my appointment/salary/funding @ WUT…."

30.     Thereafter, WUT continued to pay LIEBER his salary. ·In an email dated on or about November 26, 2015, the WUT Professor thanked LIEBER "for all you have done for our

university and me" and told LIEBER that WUT "put your salary in your ... [bank] card and we will help you change the cash for you when you come to Wuhan."

D.  LIEBER's False Statements to DOD

31.  Since in or about 2009, LIEBER has been the principal investigator associated with at least six research grants funded by various DOD entities, including ONR and AFOSR. The total value of these grants exceeded $8 million. As of April 2018, LIEBER was the principal investigator associated with three active DOD grants.

32.  On or about April 24, 2018, DOD investigators interviewed LIEBER about his active grants and whether LIEBER and his employer, Harvard, had properly disclosed foreign collaboration and/or affiliations to DOD in grant applications and other grant-related submissions. The interview took place at LIEBER's office on the Harvard campus. During the interview, among other things, LIEBER falsely told the DOD investigators that he had never been asked to participate in China's Thousand Talents Plan, but that he "wasn't sure" how China categorized him.

E.  LIEBER's False Statements to NIH

33.  LIEBER was the principal investigator associated with at least three NIH-funded research grants – with a total value of over $10 million – awarded to Harvard since in or about 2008. Two of those grants were being actively funded by NIH as of November 2018.

34.  On or about November 15, 2018, NIH inquired of Harvard about whether LIEBER and/or Harvard had failed to disclose LIEBER's then-suspected relationship with WUT and the PRC's Thousand Talents Program. In order to respond to NIH's inquiry, Harvard questioned LIEBER about his foreign affiliations generally, and any connection he might have had to WUT. Based upon the information it received from LIEBER, Harvard submitted a written response to

10

NIH on or about January 10, 2019. In its response, among other things, Harvard wrote, "Dr. Lieber has represented that he is not and has never been a participant" in PRC's Thousand Talents Plan.

F.   LIEBER Failed to Report to the IRS Income Earned from WUT and His Interest in a Chinese Bank Account

### *Relevant Tax and Financial Reporting Requirements*

35.    The Internal Revenue Service ("IRS") was an agency of the United States Department of the Treasury responsible for administering the tax laws of the United States and collecting taxes owed to the United States.

36.    All citizens of the United States were obligated to report all income earned, regardless of where they earned it, on a U.S. Individual Income Tax Return, IRS Form 1040 ("Form 1040"), each year, and they were required to pay the tax due on that income.

37.    Citizens of the United States were also obligated to report to the IRS each year whether they had an interest in, or signature authority over, a financial account in a foreign country for that year by checking "Yes" or "No" in the appropriate box on Schedule B of the Form 1040, and identifying the country where the account was maintained.

38.    Each year, citizens of the United States with an interest in, or signature authority over, one or more financial accounts in a foreign country with an aggregate value of more than $10,000 at any time during the prior year were required to file with the Commissioner of Internal Revenue a Report of Foreign Bank and Financial Accounts ("FBAR") using FinCEN Form 114. In the FBAR, the taxpayer was required to identify, among other things, the name of the financial institution at which the account was held, the account number, and the maximum value of the account during the prior calendar year. The FBAR for the applicable year was due by June 30 of the following year.

11

### *LIEBER's FBAR and Tax Filing History*

39.    On or about the dates listed below, LIEBER made and subscribed Forms 1040 for

the tax years listed below, which were filed with the IRS and which contained a written declaration

that they were made under the penalties of perjury.

| **DATE** | **TAX YEAR** |
| --- | --- |
| April 15, 2014 | 2013 |
| September 29, 2015 | 2014 |

In each of these tax years, LIEBER earned income from WUT in the form of salary and other

payments made to him pursuant to the Strategic Scientist and Thousand Talents Contracts that was

not reported on the appropriate Form 1040.

40.    On Schedules B of his 2013 and 2014 Forms 1040, LIEBER answered "No" in

response to the question, "[a]t any time during [the year] did you have a financial interest in, or

signature authority over, a financial account (such as a bank account, securities account, or

brokerage account) located in a foreign country?"  In fact, during each of these years, LIEBER

had an interest in, and signature authority over, a bank account at the Chinese Bank located in the

PRC.

41.    LIEBER also did not file an FBAR or FinCEN Form 114 for the years 2014 and

2015 declaring his interest in the Chinese Bank account, despite that account having an aggregate

value of more than $10,000 in each year.

12

COUNT ONE
False Statements
(18 U.S.C. § 1001(a)(2))

The Grand Jury charges:

42.     The allegations set forth in paragraphs 1 through 41 are re-alleged and incorporated by reference as if set forth fully herein.

43.     On or about April 24, 2018, in the District of Massachusetts, the defendant,

CHARLES LIEBER,

knowingly and willfully made a materially false, fictitious, and fraudulent statement and representation in a matter within the jurisdiction of the executive branch of the Government of the United States, which LIEBER then knew to be false, that is, LIEBER told investigators from DOD's Defense Criminal Investigative Service, that he was never asked to participate in China's Thousand Talents Program, and that he "wasn't sure" how China categorized him, when, in fact, LIEBER had previously been asked by representatives of Wuhan University of Technology ("WUT") in China to participate in China's Thousand Talents Program and, in or about July 2012, signed a three-year contract with WUT entitled "Employment Contract of 'One Thousand Talent' High Level Foreign Expert."

All in violation of Title 18, United States Code, Section 1001(a)(2).

COUNT TWO
False Statements
(18 U.S.C. § 1001(a)(2))

The Grand Jury further charges:

44.     The allegations set forth in paragraphs 1 through 41 are re-alleged and incorporated by reference as if set forth fully herein.

45.     On or about January 10, 2019, in the District of Massachusetts, the defendant,

CHARLES LIEBER,

knowingly and willfully made and caused to be made a materially false, fictitious, and fraudulent statement and representation in a matter within the jurisdiction of the executive branch of the Government of the United States, which LIEBER then knew to be false, that is, LIEBER caused Harvard University to tell the NIH that LIEBER "[wa]s not and has never been a participant in" China's Thousand Talents Program, when, in fact, LIEBER had signed a three-year Thousand Talents Agreement with WUT entitled "Employment Contract of 'One Thousand Talent' High Level Foreign Expert" in or about July 2012.

All in violation of Title 18, United States Code, Section 1001(a)(2).

14

COUNT THREE
Filing a False Tax Return
(26 U.S.C. § 7206(1))

The Grand Jury further charges:

46.     The allegations set forth in paragraphs 1 through 41 are re-alleged and incorporated by reference as if set forth fully herein.

47.     On or about April 15, 2014, in the District of Massachusetts and elsewhere, the defendant,

CHARLES LIEBER,

did willfully make and subscribe a U.S. Individual Tax Return, for the tax year 2013, which was verified by a written declaration that it was made under the penalties of perjury, and which was filed with the Director, Internal Revenue Service, and which return the defendant did not believe to be true and correct as to every material matter, in that: (1) LIEBER underreported and failed to report income from WUT; and (2) LIEBER failed to report that he had an interest in, or signature authority over, bank, securities, and other financial accounts located in the People's Republic of China.

All in violation of Title 26, United States Code, Section 7206(1).

## COUNT FOUR
Filing a False Tax Return
(26 U.S.C. § 7206(1))

The Grand Jury further charges:

48.     The allegations set forth in paragraphs 1 through 41 are re-alleged and incorporated by reference as if set forth fully herein.

49.     On or about September 29, 2015, in the District of Massachusetts and elsewhere, the defendant,

### CHARLES LIEBER,

did willfully make and subscribe a U.S. individual Tax  return, for the tax year 2014, which was verified by a written declaration that it was made under the penalties of perjury, and which was filed with the Director, Internal Revenue Service, and which return the defendant did not believe to be true and correct as to every material matter, in that: (1) LIEBER underreported and failed to report income from WUT; and (2) LIEBER failed to report that  he had an interest in, or signature authority over, bank, securities, and other financial accounts located in the PRC.

All in violation of Title 26, United States Code, Section 7206(1).

16

COUNTS FIVE AND SIX
Failure to File Report of Foreign Bank and Financial Accounts
(31 U.S.C. §§ 5314 and 5322)

The Grand Jury further charges:

50.     The allegations set forth in paragraphs 1 through 41 are re-alleged and incorporated by reference as if set forth fully herein.

51.     On or before the due dates listed below, in the District of Massachusetts and elsewhere, the defendant,

CHARLES LIEBER,

did willfully fail to file with the Commissioner of the Internal Revenue Service, U.S. Department of the Treasury, a Report of Foreign Bank and Financial Accounts ("FBAR") disclosing that he had an interest in, and signature and other authority over, a bank, securities, and other financial account in a foreign country, to wit, at least one bank account located in the People's Republic of China at the Industrial and Commercial Bank of China, which had an aggregate value of more than $10,000 at any time during the years listed below, as follows:

| Count | Calendar Year | Due Date of FBAR |
|-------|---------------|------------------|
| Five  | 2014          | June 30, 2015    |
| Six   | 2015          | June 30, 2016    |

All in violation of Title 31, United States Code, Sections 5314 & 5322(a); and Title 31, Code of Federal Regulations, Sections 1010.350, 1010.306(c)-(d), and 1010.840(b) (formerly Title 31 Code of Federal Regulations, Sections 103.24, 103.27(c)-(d) and 103.59(b)).

17

A TRUE BILL.

FOREPERSON

Jason A. Casey
Assistant U.S. Attorney

District of Massachusetts: July 28, 2020
Returned into the District Court by the Grand Jurors and filed.

/s/ Noreen A. Russo

DEPUTY CLERK

7/28/20 at 4:15 PM

Date and Time

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | ) |
| | ) |
| CHARLES LIEBER | ) |
| | ) |
| Defendant. | ) |

Case No. 1:20-cr-10111-RWZ

## **GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION _IN LIMINE_**

The defendant moves _in limine_ to preclude the government from introducing three discrete pieces of evidence: (1) an employment contract between the defendant and Wuhan University of Technology ("WUT") called the "Employment Contract of 'One Thousand Talent' High Level Fortign [sic] Expert" (hereafter "the Thousand Talents Contract" or "the Contract"); (2) expert testimony from Dr. Barry Naughton concerning China's Thousand Talents Program designed to give the jury context and help them better understand the evidence; and (3) translations of Chinese language documents and tangible objects found on the defendant's electronic devices and at his home intended to help the jurors understand the evidence.  As described in detail below, all this evidence is relevant and admissible.  The Court should deny the defendant's motion accordingly.

### **Summary of Argument**

The Thousand Talents Contract — Exhibit A to the defendant's motion — appears in discovery not as a standalone document, but as an attachment to multiple email communications between the defendant and WUT officials.[1]   Generally speaking, these email communications

---

[1] The defendant attaches the contract as Exhibit A to his motion but omits the email to which the contract was attached.  The government includes both the email _and_ the attached Thousand Talents Contract here as Exhibit C.

demonstrate that the contract was offered, negotiated, agreed to, and signed by the defendant and WUT officials (in hard copy, not electronically) between approximately April and July 2012. These email communications are admissible as "verbal acts" and "verbal parts of an act" to prove *the fact* that the defendant and WUT discussed and agreed to the Thousand Talents Contract, and what the terms of that contract were. *See* Fed. R. Evid. 801, Advisory Committee Note (c) (excluding from hearsay "verbal acts and verbal parts of an act, in which the statement itself affects the legal rights of the parties or is a circumstance bearing on conduct affecting their rights"). These emails are also admissible for another non-hearsay purpose: to prove the defendant's knowledge, state of mind, and intent, as well as the extent of his relationship with WUT. In these circumstances — where the government will not be offering the Thousand Talents Contract to prove that the defendant (or WUT for that matter) later acted in conformity with its terms — the Contract and related emails are not hearsay. To be sure, significant additional evidence will prove the defendant followed through on his commitments under the Thousand Talents Contract.[2]

As for Dr. Naughton, his testimony will concern matters — namely, the purpose and scope of China's Thousand Talents Program[3] — that are outside the knowledge and understanding of the average juror. His testimony will be relevant and helpful to the jury in understanding the

---

[2] Extensive evidence—including the defendant's own admissions and adoptive admissions—will establish that he performed various tasks for and with WUT in furtherance of the Thousand Talents Contract, including by advising WUT graduate students, reviewing draft manuscripts written by WUT graduate students, agreeing to allow WUT graduate students to work in his lab at Harvard, traveling to WUT, acknowledging WUT in scientific articles, and engaging in other tasks. Other emails sent by the defendant, as well as documents found at the defendant's home on the day of his arrest, will prove that WUT paid the defendant for his services.

[3] The government expects the evidence will show that the Thousand Talents Program is a program established by the Chinese national government to attract, recruit, and cultivate high-level scientific talent in furtherance of China's scientific development, economic prosperity, and national security. The evidence will establish that the Thousand Talents Program is often implemented by universities in China – in this case, the Wuhan University of Technology – on behalf of the national government.

evidence, including why the defendant's false statements were material. Dr. Naughton's testimony will *not* be unduly prejudicial, and the jury should be permitted to hear it in its entirety. Nonetheless, if the Court is inclined to entertain the defendant's motion, the Court should defer any ruling on the admissibility of Dr. Naughton's testimony until an out-of-jury hearing the morning he is scheduled to testify at trial.

Finally, translations of select Chinese language documents will be relevant and helpful to the jury regardless of whether the defendant speaks, reads, or understands Mandarin. These select translations — likely in the form of brief oral testimony from a Chinese linguist — are necessary to give the jury context and to explain, as a factual matter, what certain documents are (for example, that documents found in the defendant's home are account opening forms from the Industrial and Commercial Bank of China). A pretrial ruling that generally precludes the government from offering *any* Chinese to English translations is inappropriate.

### Background

The defendant has been charged by Superseding Indictment with making false statements related to his involvement with China's Thousand Talents Program, subscribing to materially false income tax returns, and failing to file Reports of Foreign Bank and Financial Account ("FBAR") with the IRS disclosing his interest in a Chinese bank account. Of most relevance to the defendant's motion are the false statement offenses, which are alleged in Counts One and Two of the Superseding Indictment. To prove those offenses, among other things, the government must establish that the defendant's statements were false, and that the defendant *knew* his statements were false. *See* FIRST CIRCUIT PATTERN JURY INSTRUCTION 4.18.1001; *United States v. Duclos*, 214 F.3d 27, 33 (1st Cir. 2000).

Count One specifically alleges that the defendant falsely told investigators from the Defense Criminal Investigative Service ("DCIS") in April 2018 that he "was never asked to participate in

3

China's Thousand Talents Program" and that "he 'wasn't sure' how China categorized him" vis-à-vis the Thousand Talents Program.    Superseding Indictment ¶¶ 32, 43.    In Count Two of the Superseding Indictment, the defendant is alleged to have caused Harvard University to falsely tell the National Institutes of Health ("NIH") that he "[wa]s not and has never been a participant in" the Thousand Talents Program. *Id.* at ¶¶ 34, 45.    As to Count One, therefore, the government expects to prove that:

> (1)    Lieber was asked to participate in the Thousand Talents Program by WUT officials at various times in 2012 and again in 2015 (after his initial Thousand Talents Contract expired); and/or

> (2)    that Lieber was aware that WUT officials and others consistently characterized him as a Thousand Talents Program member between at least 2012 and 2015.

As to Count Two, the government expects to prove:

> (3)    that Lieber willfully participated in the Thousand Talents Program.

To prove these three things, the government intends to rely in part on email communications between the defendant and WUT officials.    Among these emails are communications reflecting the genesis, negotiation, and completion of the Thousand Talents Contract.  These Contract-related emails reflect, among other things, (i) WUT officials informing the defendant that he has been selected for the Thousand Talents Program and then providing him iterative drafts of the Thousand Talents Contract; (ii) the defendant's appreciative and engaged responses to those emails; and (iii) communications discussing the acceptance, signing, sending, and receipt of the Thousand Talents Contract.  The following are examples of some of these communications:

> 1)    An email from a WUT official dated April 3, 2012 notifying the defendant that he has been "approved and awarded as invited strategic foreign expert by Chinese government" to participate in the "Word Recruitment Plan of renowned experts in China (also called as [sic] one thousand plan of foreign experts)," and the defendant's response thereto. *See* Exhibit A.

4

2) An email from a WUT official to the defendant dated June 1, 2012 attaching the Thousand Talents Contract and soliciting the defendant's "comments/modifications." *See* Exhibit B.

3) An email from the defendant to the WUT official dated June 2, 2012 acknowledging receipt of the Thousand Talents Contract and saying he will "review the documents for the 1000 plan when I have time."[4] *See* Exhibit C.

4) An email from the WUT official dated June 27, 2012 attaching a revised Thousand Talents Contract and asking for the defendant's "response/reply" within one week. *See* Exhibit C.

5) An email from the defendant to the WUT official dated June 28, 2012, in which the defendant writes, among other things, "I think this revised version [of the Contract], which addresses the previous concerns we discussed at Harvard, is good. How should we proceed with completing (signing)?" *See* Exhibit D.

6) An email from the WUT official responding to the defendant's June 28, 2012 email, in which the official writes, "Our university will sign 1000 plan agreement and send to you for your signature by Fedex." *See* Exhibit D.

7) An email chain dated between July 13 and July 21, 2012, involving the defendant, the WUT official and others, in which the defendant acknowledges receipt of the Thousand Talents Contract and states his intention to sign it. The WUT official, in turn, writes that he has received the signed contract approximately one week later. *See* Exhibit E.

As discussed below, all these emails are admissible for non-hearsay purposes.

## Argument

### I.    The Contract and Communications About the Contract are Not Hearsay.

"So long as out-of-court statements are not offered for their truth, they are not hearsay…."

*United States v. Murphy*, 193 F.3d 1, 5–6 (1st Cir. 1999) ("It is unnecessary to fit such statements into one particular category, like verbal act, although this is often done, primarily as a short-hand way of explaining the non-hearsay purpose for which the statement is offered."); *Gutierrez–Rodriguez v. Cartagena*, 882 F.2d 553, 575 (1st Cir. 1989). An example of this is so-called "verbal acts." The

---

[4] The defendant's statements are not hearsay under Fed. R. Evid. 801(d)(2).

5

Committee Notes to Federal Rule of Evidence 801 expressly exclude from the definition of hearsay "verbal acts and verbal parts of an act, in which the statement itself affects the legal rights of the parties or is a circumstance bearing on conduct affecting their rights." A verbal act is an utterance of an operative fact that gives rise to legal consequences. *See United States v. Diaz*, 597 F.3d 56, 65 (1st Cir. 2010); *Lorraine v. Markel Am. Ins. Co.*, 241 F.R.D. 534, 567, n.50 (D. Md. 2007) ("Verbal acts … are not hearsay, because the statement is admitted merely to show that it was actually made, not to prove the truth of what was asserted in it."). "A contract … is a form of verbal act to which the law attaches duties and liabilities and therefore is not hearsay." *Mueller v. Abdnor*, 972 F.2d 931, 937 (8th Cir. 1992); *Murphy*, 193 F.3d at 6 (noting that "the 'I accept' that shows that an agreement has been formed" is an example of a verbal act). Thus, "the hearsay rule does not exclude relevant evidence as to what the contracting parties said or wrote with respect to the making or the terms of an agreement." *Lorraine*, 241 F.R.D. at 567, n.50.

Since the very outset of this case, the defendant has disputed that he entered into a Thousand Talents Contract with WUT. The defendant's motion *in limine* to exclude the Contract only reinforces this point. The defendant's effort to keep the Thousand Talents Contract from the jury is not surprising: that he negotiated and agreed to the Contract are strong indicators that the defendant, in fact, participated in the Thousand Talents Program. Consequently, these communications are highly relevant to the government's case (in particular, Counts One and Two). These communications will be offered by the government as verbal acts to show the offer and acceptance of the Thousand Talents Contract: first, that WUT selected the defendant to participate in the Thousand Talents Program (Exhibit A); second, that WUT offered the defendant the Thousand Talents Contract (Exhibit B); third, that WUT made a revised offer incorporating revisions suggested by the defendant (Exhibit C); and fourth, that the defendant and WUT agreed to sign, and did sign, the Thousand Talents Contract (Exhibit D). All of these communications

constitute "what the contracting parties said or wrote with respect to the making or the terms of an agreement." *Lorraine,* 241 F.R.D. at 567, n.50. Thus, they are admissible as verbal acts and verbal parts of an act.

Email communications about the formation of the Thousand Talents Contracts are also admissible for another non-hearsay purpose: to prove the defendant's knowledge, state of mind, and intent.[5] It is well established that "the mere utterance of a statement, without regard to its truth, may indicate circumstantially the state of mind ... of the declarant and is not hearsay." *Smith v. Duncan,* 411 F.3d 340, 346 n. 4 (2d Cir. 2005) (internal quotation marks omitted); *see also* MCCORMICK ON EVIDENCE § 249 ("A statement that D made a statement to X is not subject to attack as hearsay when its purpose is to establish the state of mind thereby induced in X, such as receiving notice or having knowledge[.]").

As described above, to prove Counts One and Two, the government must prove one or more of the following:

(1)     Lieber was asked to participate in the Thousand Talents Program by WUT officials at various times in 2012 and again in 2015 (after his initial Thousand Talents Contract expired); and/or

(2)     that Lieber was aware that WUT officials and others consistently characterized him as a Thousand Talents Program member between at least 2012 and 2015; and/or

(3)     that Lieber willfully participated in the Thousand Talents Program.

Regardless of whether the WUT official's statements in the emails themselves are true, email communications from the WUT official concerning and/or attaching the Thousand Talents

---

[5] Such communications could also be used to demonstrate the nature of the defendant's relationship with WUT. The nature and extent of the relationship is circumstantial evidence of the defendant's participation in the Thousand Talents Program. Insofar as the defendant also lied to DCIS and NIH about the nature and duration of his relationship with WUT, it also tends to establish that his lies about the Thousand Talents Program were not an innocent mistake.

Contract are relevant to all three points.  For example, an email from the WUT official asking for the defendant's comments and suggestions on the Thousand Talents Contract, *see* Exhibit B, tends to establish the defendant's awareness of the fact that he was asked to participate in the Thousand Talents Program.  Similarly, emails notifying the defendant of his Thousand Talents Program award, *see* Exhibit A, and the parties' subsequent agreement as to the Thousand Talents Contract, *see* Exhibits B, C and D, tend to establish that the defendant *knew* how China categorized him — namely, as a member of the Thousand Talents Program — as well as his knowledge that he participated in the Thousand Talents Program.

Stated more broadly, without regard to their truth, these emails are relevant to establishing the defendant's state of mind, including his knowledge that his statements to the DCIS investigators and NIH were false.  When offered for this purpose, communications about the Thousand Talents Contract (including the contract itself) are not hearsay.  *See United States v. Dupre*, 462 F.3d 131, 137 (2d Cir. 2006) (emails from investors to defendant making accusations of fraud not hearsay when offered to show defendant's knowledge of fraud); *United States v. Hanjuan Jin*, 833 F. Supp. 2d 957, 969 (N.D. Ill. 2011) (email from Chinese business to defendant about Chinese business' customer admissible to show that defendant "was on notice" that Chinese business "performed work for … a unit of the Chinese military").  For these reasons, the Court should deny the defendant's motion to exclude the Contract.[6]

---

[6] The defendant also argues that the government cannot authenticate emails attaching the Thousand Talents Contract because the WUT employee who sent the emails will not be testifying at trial.  This argument has no merit.  While it is true that the sender of these emails will not testify for the government—there is no legal mechanism to compel him to travel from China to the United States for trial—that does not preclude the government from authenticating his emails and the attachments thereto.  It is well established that email communications can be (and often are) authenticated absent testimony from the sender or the recipient of the email.  *See, e.g.*, *United States v. Fluker*, 698 F.3d 988, 998-1000 (7th Cir. 2012) (holding that emails were properly authenticated even though neither the author nor anyone who saw the author write the emails testified given sender's email address and the content of email); *United States v. Safavian*, 435 F. Supp. 2d 36, 40 (D.D.C. 2006) (holding that distinctive characteristics were sufficient to authenticate emails where emails contained names of senders and recipients and contents discussed various professional and personal

## II.    The Testimony of Dr. Barry Naughton Concerning the Thousand Talents Program is Relevant and Admissible.

Dr. Naughton's testimony is relevant to this case and essential to helping jurors understand a Chinese government program that they will likely be hearing about for the first time during this trial. Contrary to defendant's claims, it will not be unfairly prejudicial, confusing, or a waste of time. It should be allowed in full.

Rule 702 of the Federal Rules of Evidence governs testimony by expert witnesses.  In pertinent part, it states that "a witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise" if the expert's scientific, technical, or other specialized knowledge "will help the trier of fact to **understand the evidence** or to determine a fact in issue…." Fed. R. Evid. 702 (emphasis added).  According to the Advisory Committee Notes, "[a]n intelligent evaluation of the facts is often difficult or impossible without the application of some scientific, technical, or other specialized knowledge."  The First Circuit has said, therefore, that the proper inquiry is "whether the untrained layman would be qualified to determine intelligently and to the best possible degree the particular issue without enlightenment from those having a specialized understanding of the subject matter involved."  *United States v. Lamatiina*, 889 F.2d 1191 (1st Cir. 1989) (internal quotations omitted).  The trial court has wide discretion in determining whether to admit expert testimony.  *Id.*

At the core of this case — particularly Counts One and Two — is China's Thousand Talents Program.  To convict on Counts 1 and 2, among other things, the jury must find that the defendant made *materially false* statements about whether he was asked to participate in the Thousand

---

matters); *United States v. Siddiqui*, 235 F.3d 1318, 1322 (11th Cir. 2000) (holding that emails were authenticated by contents – including email address, automatic reply to sender, and use of nicknames – and context where messages indicated knowledge of matter at issue in obstruction charge); *United States v. Bertram*, 259 F. Supp. 3d 638, 641 (E.D. Ky. 2017) (stating that "participation in a particular email is not a prerequisite to authenticating it" while also noting the "low bar" for authenticating emails).

Talents Program (Count 1), whether he did participate in the Program (Count 2), and whether he knew how China categorized him with respect to the Program (Count 1). A statement is "material" if is has "a natural tendency to influence or to be capable of influencing the decision of the decisionmaker to which it was addressed, regardless of whether the agency actually relied upon it." *See* FIRST CIRCUIT PATTERN JURY INSTRUCTION 4.18.1001. During the trial, the government will present evidence concerning the questions posed to the defendant about the Thousand Talents Program and his corresponding answers. The government also intends – as it must – to present evidence concerning materiality; that is, why the defendant's false statements were, at a minimum, capable of influencing DCIS and NIH.

Dr. Naughton's testimony will help the jury understand the origin, purpose, scope and implementation of the Thousand Talents Program. Not only is this context critical to the jury's basic understanding of what the Thousand Talents Program is, but it will also help explain *why* DCIS and NIH asked the defendant about the Thousand Talents Program in the first place and why the defendant's statements were capable of influencing their respective decision-making. As set forth in the government's expert disclosure, Dr. Naughton testimony will consist of basic, uncontroverted information about the Thousand Talents Program. He will testify that in about 2006, the Chinese government initiated a technology-advancement strategy that continues to this day. He will testify that this strategy was critical to China's economic survival and covered numerous technical areas, including materials science (the defendant's area of study and expertise). He will testify that the Thousand Talents Program, and its provincial and local analogues, were important parts of this strategy. He will testify generally about the types of individuals targeted for the Thousand Talents Program (prominent scientists and researchers) and the benefits offered to such individuals (salary, research funding, etc.). And he will testify that these facts, while likely unknown to jurors in this case, were and are common knowledge to anyone

10

with a passing familiarity with the Chinese economy, in part because the Chinese government has stated them publicly.

Should Dr. Naughton be permitted to testify, for the reasons described above, the government expects that emails attaching the Thousand Talents Contract — attached Exhibits A, B, C, and D, among potential others — will already be in evidence. The government anticipates asking Dr. Naughton to review the contract and give *brief* testimony concerning whether the contract is consistent with the overall goals, aims and structure of the Thousand Talents Program. This sort of testimony is widely permitted by expert witnesses. It is no different, for example, than expert testimony about whether coded text messages or telephone conversations involving the defendant are consistent with the methods and techniques employed by drug conspirators. *See, e.g., Lamattina*, 889 F.2d at 1194 (holding that "[e]xpert testimony … is helpful in cases where juries must determine the meaning and significance in recorded conversations of the jargon used in criminal operations"). In light of his education, training and experience, *see* Exhibit F (Naughton CV), Dr. Naughton is more than qualified to explain how the Thousand Talents Contract fits within China's overall economic, technology and national security policies. Such testimony is critical to the jury's ability to understand the significance and materiality of the defendant's false statements.

Dr. Naughton's testimony will not be unfairly prejudicial. The defendant appears to want to exclude as much testimony as possible about "China" because he perceives it to be prejudicial. But the simple fact of the matter is that the defendant's conduct concerns China and its most prominent talent recruitment program. Many jurors – perhaps all of them – will be hearing about talent recruitment programs for the first time during this trial. For this reason, and to prove that the defendant's statements were material to DCIS and NIH, the government must give context to the Thousand Talents Program. Other than the fact that it involves China, the defendant does not

11

explain why this context (including fundamental testimony about the policies that justify and gave rise to the Thousand Talents Program) is unfairly prejudicial.  Indeed, by the defendant's logic, any testimony connecting the defendant to China would be unfairly prejudicial.  Such a position is not tenable.  China and the Thousand Talents Program are unavoidably part of this case.  Whatever prejudice accompanies Dr. Naughton's testimony, it is not unfair because it will not have "an undue tendency to suggest decision on an improper basis…."  *United States v. Vazquez-Soto*, 939 F.3d 365, 371 (1st Cir. 2019) (rejecting Rule 403 challenge to introduction of photographs of defendant riding his motorcycle in case involving alleged false statements regarding disability status).

The government respectfully asks the Court to deny this aspect of the defendant's motion.  To the extent the Court is inclined to entertain the defendant's request, however, the government asks the Court to defer any ruling on the motion until an out-of-jury hearing the morning Dr. Naughton is expected to testify at trial.

### III. Chinese to English Translations of Select Documents and Objects Will be Relevant and Helpful to the Jury.

The defendant is correct that certain documents and objects relevant to this case contain Chinese characters.  At this juncture, the government is likely to seek to introduce translations of just two documents, both of which will be offered through a qualified Chinese linguist.[7]  Neither translation is likely to be controversial.  The translations will be offered to help the jury understand two particular pieces of evidence.

First, on the day of the defendant's arrest, his residence contained apparent application forms from a bank in China that contained both English and Chinese characters.  A translation of

---

[7] The government's witness and exhibit lists are due to be exchanged with defense counsel tomorrow, November 30, 2021.  The government is in the process of completing its exhibit designations.

the Chinese characters will aid the jury in understanding the nature of the document that was in the defendant's possession (*i.e.*, a Chinese bank account application).  Second, shortly after his interview with DCIS, the defendant emailed a contact in China requesting their assistance deleting or, short of that, modifying certain language about the length of the defendant's association with WUT found on a publicly available website associated with the Chinese Academy of Sciences. On one of the defendant's digital devices, investigating agents found a PDF copy of the website (bearing the same print date as the above-referenced email to the defendant's Chinese contact) with certain language highlighted.  The name and content of the website are all in Chinese characters, and a translation of the highlighted portion will aid the jury in understanding what language the defendant wanted changed.  The fact that the defendant does not read or understand Chinese does not preclude the government from offering translations for this purpose, where the documents at issue were either in his home or sent by him.

The government is in the process of completing its proposed translations and will share them with defense counsel forthwith.  To the extent the defendant continues to object to the translations' use at trial, the government respectfully asks that the Court make admissibility determinations during the trial.

**Conclusion**

For the reasons set forth above, the government respectfully asks the Court to deny the

defendant's motion in its entirety.


                         Respectfully submitted,

                         NATHANIEL R. MENDELL
                         Acting United States Attorney

     By:    */s/ Jason A. Casey*         
              Jason A. Casey
              James R. Drabick
              Assistant United States Attorneys


Dated: November 29, 2021




CERTIFICATE OF SERVICE

    I hereby certify that this document was filed of November 29, 2021, through the ECF
system, which will provide electronic notice to counsel as identified on the notice of Electronic
Filing.

                         */s/ Jason A. Casey*         
                         Jason A. Casey
                         Assistant United States Attorney

# *United States v. Lieber*

United States District Court for the District of Massachusetts

December 13, 2021, Decided; December 13, 2021, Filed

CRIMINAL ACTION NO. 1:20-CR-10111-RVVZ

**Reporter**

2021 U.S. Dist. LEXIS 239677 *; __ F.Supp.3d __; 2021 WL 5882566

UNITED STATES OF AMERICA v. CHARLES LIEBER

**Prior History:** *United States v. Lieber, 2021 U.S. Dist. LEXIS 197575 (D. Mass., Oct. 13, 2021)*

**Counsel:** **[*1]** For Charles Lieber, Defendant: Catherine M. Deist, LEAD ATTORNEY, PRO HAC VICE, Mukasey Frenchman LLP, New York, NY; Torrey K. Young, LEAD ATTORNEY, Mukasey Frenchman LLP, New York, NY; Marc L. Mukasey, PRO HAC VICE, Mukasey Frenchman LLP, New York, NY.

For USA, Plaintiff: Jason A. Casey, LEAD ATTORNEY, Evan D. Panich, United States Attorney's Office MA, Boston, MA; James R. Drabick, US Attorney's Office - MA, J. Joseph Moakley U.S. Courthouse, Boston, MA.

**Judges:** RYA W. ZOBEL, UNITED STATES DISTRICT JUDGE.

**Opinion by:** RYA W. ZOBEL

# Opinion

ORDER

ZOBEL, S.D.J.

Defendant has filed two motions *in limine* (Docket ## 196, 201).

**I. Defendant's Motion *in Limine* to Preclude Certain Evidence and Expert Testimony (Docket # 196)**

A. Request to preclude an unsigned, unexecuted draft document purportedly related to China's Thousand Talents Program (# 1).

DENIED. The challenged evidence may be admitted, *de bene esse*, for purposes of showing state of mind, knowledge, intent, or other exception to the Federal Rules of Evidence's prohibition against hearsay.

B. Request to preclude the expert testimony of Dr. Barry Naughton (# 2).

ALLOWED, The government asserts that Dr. Naughton's proffered testimony—regarding "the origin, purpose, scope and **[*2]** implementation of the Thousand Talents Program"—is "critical context to the jury's basic understanding of what the Thousand Talents Program is" and "why" Defendant's statements at issue in this case "were capable of influencing" the government agencies to whom they were made. Docket # 200 at 10. However, the proffered context of the Thousand Talents Program is not required for the jury to understand the evidence or to decide the issue of materiality. *Fed. R. Evid. 702(a)* (permitting expert testimony if "the expert's scientific, technical or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue"); 1972 Advisory Comm. Notes to *Fed. R. Evid. 702* (noting that expert testimony is inappropriate when an "untrained layman would be qualified to determine intelligently and to the best possible degree the particular issue without enlightenment from those having a specialized understanding of the subject involved in the

dispute," and when such expert opinion would be "unhelpful" and "a waste of time").

C. Request to preclude Chinese-to-English translations of certain documents and things (# 3).

The relevance of this evidence is unclear at this stage of the proceedings, and, **[\*3]** accordingly, ruling on this request is deferred to trial.

## II. Defendant's Motion *in Limine* to Preclude Evidence Pursuant to *Federal Rules of Evidence 403* and *404(b)* (Docket # 201)

A. Requests to preclude (1) statements to Jeremy Bloxham and others at Harvard in and around January 2015 concerning Wuhan University of Technology ("WUT") and the Harvard-WUT Joint Nano Laboratory, (2) statements by Defendant to the Defense Criminal Investigative Service on April 24, 2018, and (3) statements by Defendant to Harvard University officials between approximately November 30, 2018 and January 10, 2019 concerning WUT and China's Thousand Talents Program (## 1, 2, and 3).

DENIED at this stage of the proceedings.

B. Request to preclude Defendant's financial conflict of interest disclosure forms submitted to Harvard University (# 4).

ALLOWED.

C. Requests to preclude the "Contract for Strategic Scientist's Appointment" and "Academic Cooperation Agreement" (## 5 and 6)

The relevance of this evidence is unclear at this stage of the proceedings, and, accordingly, ruling on these requests is deferred to trial.

D. Requests to preclude specific e-mail communications between Defendant and the Chinese Academy of Sciences in or around August 2015 and **[\*4]** between Defendant and

ShanghaiTech University in or around June 2015 (## 7 and 8).

ALLOWED.

December 13, 2021

DATE

/s/ Rya W. Zobel

RYA W. ZOBEL

UNITED STATES DISTRICT JUDGE

---

**End of Document**