UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA : | |
| : | Case No.: 25-cr-00033 (DLF) |
| v. : | |
| : | |
| JOHN HAROLD ROGERS, : | |
| : | |
| : | |
| Defendant. : | |

## GOVERNMENT'S TRIAL BRIEF

The government submits this trial brief for the purpose of avoiding unnecessary surprise at trial and preserving the Court's and the parties' time and resources. The government is not seeking a ruling from the Court at this time on any of the below-noticed items, but provides this notice to assist the Court in preparing for trial and for ruling during trial on the admission of evidence.

The government anticipates its case-in-chief to last approximately two weeks. The attorneys who will be trying the case for the government are Adam P. Barry and Thomas N. Saunders, Assistant United States Attorneys for the United States Attorney's Office in the District of Columbia, and Nicholas O. Hunter and Yifei Zheng of the National Security Division's Counterintelligence and Export Control Section, U.S. Department of Justice. Derra McQuaig is a paralegal specialist from the National Security Division who will sit at counsel table. The government anticipates that FBI Special Agent Alexander Ayris, the case agent, will also be seated at counsel table.

### I. THE CHARGES

The defendant is charged with one count of Conspiracy to Commit Economic Espionage, in violation of 18 U.S.C. §§ 1831(a)(5), and one count of Making Materially False Statements, in violation of 18 U.S.C. § 1001.

### A. Count One

The government intends to prove the conspiracy charge by adducing evidence that the defendant conspired with two individuals—whom he referred to as Hummin Lee and Ricky (Co-conspirators 1 and 2 in the indictment, respectively)—to provide them with inside information from the Federal Reserve. The defendant knew that one or both of his co-conspirators worked for the Chinese government, a fact he admitted to investigators at the Federal Reserve Board's ("FRB") Office of the Inspector General ("OIG") in February 2020. To find the defendant guilty, the government does not need to prove that the defendant knew his co-conspirators were foreign intelligence officers. Further, the information that the defendant and his co-conspirators conspired to misappropriate from the Federal Reserve was information they believed or intended to have the attributes of trade secrets—that is, information the Federal Reserve had taken reasonable measures to keep secret and that had actual or potential economic value. Hummin Lee tasked the defendant to collect such information, and the defendant complied with those requests, specifically seeking out information that the Federal Reserve prohibited from being shared outside of the Federal Reserve or used to benefit outside entities.

### B. Count Two

The government intends to prove the false statements charge by adducing evidence that the defendant was interviewed by OIG investigators in February of 2020, and that during that interview the defendant falsely asserted that he had never shared restricted Federal Reserve information outside of the Federal Reserve. This statement was material to the OIG's efforts to protect sensitive, nonpublic Federal Reserve information, including its investigation of the defendant and his co-conspirators.

## II. THE EXPECTED TESTIMONY

The government intends to call the following individuals to testify. The following list is intended merely as an aid for the Court. It is not intended to limit the government's ability to call additional witnesses as needed or to ask these witnesses about relevant matters beyond the descriptions provided below.

- **Joshua Gallin, FOMC Secretary –** Secretary Gallin is expected to testify about the dual mandate of the Federal Reserve System and the Federal Reserve's reputation globally (i.e., the Federal Reserve is considered the "gold standard" of central banking). He is also expected to provide an overview of the Federal Open Market Committee (FOMC), as distinguished from the Federal Reserve Board (FRB), with emphasis on FOMC meetings and role of the Federal Reserve Chair. He will also describe the role of the FOMC Secretariat and its responsibilities, FOMC classification levels for restricted information, and measures taken to protect FOMC information.

- **Jeremy Cannon, FRB IT Security –** Mr. Cannon is expected to testify about his role protecting Federal Reserve information. He will describe cyber-security measures that the Federal Reserve has taken to protect its information, including its data loss prevention policy and email policy. He will testify about how he learned of the defendant and why he began looking into the defendant as an insider threat, including reasons for identifying the defendant's associate "Hummin Lee" as a suspicious contact.

- **OIG Special Agent Alan Hershkowitz –** The government may seek to call Special Agent Hershkowitz to testify twice. Near the start of the trial, SA Hershkowitz is expected to testify about the OIG and its role and purpose. He will also testify about how OIG investigators first learned of the defendant. He will discuss the OIG's general concern over the People's Republic of China ("PRC") targeting the Federal Reserve, including specific prior incidents. He will testify about the February 2020 interview of the defendant, relevant events that preceded that interview, and how those events framed and influenced the interview. He will also describe the aftermath of the February 2020 interview, including the defendant's forced resignation from the Federal Reserve and the OIG's investigation of the defendant following the interview. In sum, SA Hershkowitz's initial testimony will provide background information about the OIG and will describe how the investigation into the defendant began.

  When SA Hershkowitz is recalled to the stand near the end of the trial, he will provide limited testimony focused primarily on the second count of the indictment. He will provide testimony demonstrating why the defendant's statement during the February 2020 interview—that he had never shared restricted Federal Reserve information outside of the Federal Reserve—was both false and material to the OIG's investigation. SA Hershkowitz will also testify that the OIG is a federal authority whose jurisdiction covers the subject matter of the defendant's false statement.

- **FBI Special Agent Alex Ayris** – Special Agent Ayris is expected to testify about the FBI's involvement in this investigation, including the referral from the Federal Reserve OIG. SA Ayris will testify in detail about email messages found in the co-conspirator's Google accounts and WeChat messages found on the defendant's electronic devices. He will read the contents of key messages and text into the record for the jury. He will testify about a handful of relevant pieces of evidence, including digital items found on the defendant's electronic devices, recovered during the January 2025 court-authorized searches of the defendant's home. He will also testify about the defendant's frequent travel to China during the conspiracy, the true identities of the co-conspirators Hummin Lee and Ricky, and the cover story about fake classes that the co-conspirators used to try to conceal their illegal conduct. In addition, SA Ayris will describe the intelligence tradecraft that Hummin Lee used to recruit and develop the defendant as a source of inside information from the Federal Reserve.

- **FRB Senior Economic Project Manager Ruth Judson** – Ms. Judson is expected to testify about her professional relationship with the defendant. She will discuss the culture of the Federal Reserve, specifically the shared understanding about preserving the confidentiality of nonpublic Federal Reserve information. She will testify about the documents identified in the indictment as Trade Secrets 3 and 4.

- **FRB Assistant General Counsel Sean Croston** – Mr. Croston is expected to testify about the role of the ethics office at the Federal Reserve; the Federal Reserve's disclosure requirements for its employees' outside activities, outside employment, gifts, and supplemental income; and the defendant's submissions and disclosures.

- **Expert Witnesses** – The government expects to call four expert/opinion witnesses: Dr. Barry Naughton, Robert Greene, FBI Special Agent Scott Kistler, and Dr. Brad Setser. The substance of their expected testimony has been disclosed previously.

- **Translation, Authentication, and Chain of Custody Witnesses** – The government may call additional witnesses to authenticate evidence, provide a chain of custody, or confirm the accuracy of translations, as needed and dependent on ongoing negotiations with the defense.

III.   NOTICES

A. Offer of Self Authenticating Records

Pursuant to Rule 902(11), the government intends to offer copies of records obtained from internet service providers Google and Apple as evidence at trial. Those records are self-authenticating based on the provisions of Rule 901. The government does *not* offer the certifications pursuant to Rule 803(6) to overcome hearsay objections. Instead, the certificates are offered for the purpose of authenticating the records to avoid calling a witness from the service

providers for that ministerial purpose. The following records obtained from service providers, copies of which the government previously provided to the defendant, will be offered at trial:

- Account information, emails, and other records from the defendant's aegjrogers@gmail.com account with Google, Inc. Copies of the F.R.E. 902(11) certificates authenticating these records have already been provided to the defendant, but are attached again for convenience as Exhibits 1, 2, and 3.

- Account information, emails, and other records from Hummin Lee's various accounts with Google, Inc., including: hummin.lee@gmail.com, johnhohkcu@gmail.com, m.sebastian.mima@gmail.com, and jinchuan0323@gmail.com. Copies of the F.R.E. 902(11) certificates authenticating these records has already been provided to the defendant, but is attached again for convenience as Exhibits 2 and 3.

- Account information, files, and other records (including backed-up WeChat messages and notes the defendant wrote) from the defendant's iCloud account with Apple, Inc., registered to the gmail account aegjrogers@gmail.com. A copy of the F.R.E. 902(11) certificate authenticating these records has already been provided to the defendant, but is attached again for convenience as Exhibit 4.

Pursuant to Rules 902(11), (13), and (14), the government also intends to offer into evidence forensic extractions of electronic devices that investigators obtained during the investigation. Those records were generated by qualified forensic examiners using industry-standard digital forensic tools that produce accurate extractions of digital information on electronic devices. The extractions were verified by a process of digital identification. Of particular note, investigators found numerous relevant WeChat messages between the defendant, his co-conspirators Hummin Lee and Ricky, and his girlfriend in China on devices that were seized from the defendant. The digital images/extractions from the digital devices are authenticated by Rule 902(13) and (14) certificates, so there is no need to call the forensic examiners who performed the extractions as trial witnesses. The government intends to offer the following digital images/extractions:

- Forensic extractions from the defendant's personal iPad and FRB-issued iPhone 7, both of which he voluntarily provided to Office of Inspector General ("OIG") for the Federal Reserve Board ("FRB") of Governors on February 4, 2020, when he

was interviewed. A copy of the F.R.E. 902(11), (13), and (14) certificate authenticating those records has already been provided to the defendant, but is attached again for convenience as Exhibit 5.

- Forensic extractions from the defendant's iPhone 13 and iPhone 13 Pro seized on the day of his arrest in January 2025. A copy of the F.R.E. 902(11), (13), and (14) certificate authenticating those records has already been provided to the defendant, but is attached against for convenience as Exhibit 6.

The government understands that the defendant does not intend to challenge the authenticity of the service-provider and forensically extracted evidence described above. The government hopes to enter into stipulations with the defendant as to the authenticity of the above-described evidence.

The government may obtain other certificates for self-authenticating records in order to streamline its trial presentation. The government will submit such certifications to the defense upon obtaining them.

**B.  Offer of Defendant's Travel Records Pursuant to Public-Record Certification**

The government has obtained official records from U.S. Customs and Border Protection ("CBP") of the defendant's international air travel in and out of the United States. CBP maintains those records as a regular part of its duties in the Traveler Enforcement Compliance System ("TECS") database. The United States obtained a certificate of public records that authenticates the records pursuant to the public records provision of Rule 902(4), which allows for admission over a hearsay objection pursuant to the public records exception to the rule against hearsay, Fed. R. Evid. Rule 803(8). A copy of the F.R.E. 902(4) certification is attached for convenience as Exhibit 7.

**C.  Translations**

The defendant is a native English speaker and not known to be fluent in Mandarin Chinese. The volume of Mandarin language in the documentary exhibits, therefore, is quite small for a case

of this type. The Mandarin-language material is also likely uncontroversial. For example, the government has sought translations of the names of the contacts in the email account associated with Lee's true identity (jinchuan0323@gmail.com), and of a small number of WeChat messages. As it obtains them, the government is providing official translations to the defense in hopes of obtaining stipulations that the translations are accurate.

In his WeChat messages, the defendant would sometimes use standard Mandarin phrases he would type in Pinyin (i.e., using roman characters for Mandarin phrases) like "Xièxiè," which means "thank you." The government expects to have the FBI case agent—Alex Ayris—explain his understanding of these common Pinyin phrases, to the extent he knows them, while reading WeChat messages to the jury. SA Ayris has obtained a working understanding of such phrases from working on this case and other cases related to Chinese espionage activities, and can testify to his understanding of their meaning as an admissible lay opinion. *See* Fed. R. Evid. 701, Committee Notes on Rules—2000 Amendment (explaining that a lay witness may testify based on "particularized knowledge that the witness has by virtue of his or her position."). The government has notified the defense of its intent to have SA Ayris offer such testimony, and the defense requested notice as to what Pinyin phrases SA Ayris will testify about, which the government will provide in advance of trial.

### D. Recording and Transcriptions of the Defendant's February 4, 2020 Interview with FRB OIG

The audio recording of the defendant's February 2020 interview with the FRB OIG contains critical admissions by the defendant that go to key elements including his knowledge that Lee and Ricky wrote reports for the government of the PRC. Subject to the Court's ruling on the defendant's pending motion under Rule 404(b), *see* ECF No. 53, the government therefore intends to seek admission of the entire interview recording into evidence, along with the transcript of the

7

recording. The defense has had both the audio recording and the transcript since shortly after the defendant's arrest in January 2025.

Given the importance of the admissions the defendant made in the interview, it is necessary for the jury to be able to have both the audio and the transcript to aid its review and deliberations. *See United States v. Holton*, 116 F.3d 1536, 1540-41 (D.C. Cir. 1997) (describing how a transcript of a recording "may help a juror listening" to the recording and avoid "repetitious and time consuming replaying" of recordings during deliberations). At trial the government will play select audio clips from the interview with a rolling transcript on the video monitors to aid the jury's comprehension. The audio recording and transcript of the entire interview will be entered into evidence for use by the jury during its deliberations.

It is appropriate to admit the transcript, including for use during the jury's deliberations, assuming the court provides the government's proposed instructions that the jury must rely on the audio recording and not the transcript in the event of a perceived discrepancy. *See* ECF No. 40-1 at 24 (Proposed Jury Instruction for Recordings and Transcripts). The D.C. Circuit has long approved using accurate transcripts to assist the jury in following a tape during trial, provided the court follows procedures to ensure the jury does not rely on a party's transcript instead of the tape recording, including instructing jurors that "their personal understanding of the tape supersedes the text in a transcript." *Holton*, 116 F.3d at 1536, 1541. The D.C. Circuit has also cautioned that admitting a transcript as evidence can be error if it creates "a risk that the jurors may have relied on the government's version of the conversations, set out in the transcript, without simultaneously listening to the authenticated tapes to verify the transcript's accuracy." *United States v. Strothers*, 77 F.3d 1389, 1393 (D.C. Cir. 1996). Reconciling those concerns, *Holton* holds "it is within the district court's discretion to permit the jury to use transcripts during deliberations." 116 F.3d at

1541. The *Holton* Court explained "the better practice" is to require "formal admission into evidence during the trial," while also ensuring the jury is instructed—as the government set forth in its proposed jury instructions—that it must rely on the audio in the event of a perceived discrepancy with the transcript. *Id.* at 1542–43.

### E. Admissions of the Defendant's Communications with PRC-based Co-Conspirators and Girlfriend

The majority of communications the government will seek to admit at trial fall into one of the following categories:

- *Category 1*: WeChat and email messages between the defendant and Hummin Lee (co-conspirator #1 in the indictment) during the targeting and recruitment phase when Hummin recruited Rogers to "teach" him inside information about the Federal Reserve.

- *Category 2*: WeChat and email messages between the defendant and Hummin Lee and/or "Ricky" (co-conspirator #2 in the indictment) after Rogers became responsive to taskings from Hummin and Ricky in 2018.

- *Category 3*: Pre-marital WeChat and email messages between the defendant and his to-be wife, Yu Liu, who the defendant met on a website called Asian Dating in 2017, impregnated soon thereafter, and married in March 2018.

- *Category 4*: Email communications between the defendant and employees of the Federal Reserve Board, including emails in which the defendant solicited inside Federal Reserve information during the conspiracy.

All of the above-described categories of communications are relevant and admissible over a potential hearsay objection for multiple reasons:

#### 1. Category 1: The Defendant's Communications with Hummin Lee During Lee's Efforts to Target and Recruit the Defendant.

As alleged in the indictment, Hummin Lee (Co-Conspirator #1) "worked for the intelligence and security apparatus of China and presented himself as a graduate student at Shandong University of Finance and Economics (SDUFE)." Indictment ¶ 12a. The evidence will show how Lee developed the defendant as a source over a period of years and eventually became

heavily involved in all aspects of the defendant's life in China. Lee facilitated the defendant's travel, the relationship with the defendant's girlfriend, their wedding, communications between them, visa applications, and finances. The defendant became indebted to Lee and, by 2018 at the latest, he joined the ongoing conspiracy involving Lee, Ricky, and other Chinese government agents to misappropriate Federal Reserve secrets for the benefit of the PRC.

Category 1 communications are admissible as non-hearsay statements. Many of the messages will not be offered for the truth of the matter asserted and are, therefore, not hearsay. *See* Fed. R. Evid. 801(c)(2). For example, many of the messages are admissible in order to show their effect on Rogers, who grew increasingly indebted to Lee for all of the gifts, services, money, and help Lee provided. *See, e.g.*, *United States v. Sesay*, 313 F.3d 591, 599 (D.C. Cir. 2002) ("[A]n out-of[-]court statement that is offered to show its effect on the hearer's state of mind is not hearsay under Rule 801(c)." (quoting *United States v. Thompson*, 279 F.3d 1043 1047 (D.C. Cir. 2002)).

Further, the defendant's own messages to Lee are admissible as statements of a party-opponent under Rule 801(d)(2)(A) (statements offered "against an opposing party" and "made by the party in an individual . . . capacity" are "not hearsay).

The corresponding WeChat and email messages from Lee to Rogers are also admissible for the non-hearsay purpose of giving context to Roger's own statements. *See, e.g.*, *United States v. Bostick*, 791 F.3d 127, 147 (D.C. Cir. 2015) (statements of informant "not introduced for their truth but rather to provide context for [defendant's] statements regarding the transaction."); *United States v. Lewisbey*, 843 F.3d 653, 658 (7th Cir. 2016) ("The messages he *received* were admitted not for the truth of the matter asserted but instead to provide context for [defendant's] own messages."); *United States v. Moore*, No. 18-198, 2021 WL 1966570, at *5 (D.D.C. May 17, 2021)

(defendant's incoming messages were "not hearsay because they are offered for context rather than for their truth").

In addition, all of Lee's statements to the defendant are admissible for their truth as co-conspirator statements under Rule 801(d)(2)(E). "Rule 801(d)(2)(E) authorizes the admission of an out-of-court statement by a co-conspirator of a party during the course and in furtherance of the conspiracy." *United States v. Gewin*, 471 F.3d 197, 201 (D.C. Cir. 2006). The "conspiracy" for purposes of admission under Rule 801(d)(2)(E) need not be the charged conspiracy, or even an illegal one. "Rather, the rule, based on concepts of agency and partnership law and applicable in both civil and criminal trials, embodies the long-standing doctrine that when two or more individuals are acting in concert toward a common goal, the out-of-court statements of one are . . . admissible against the others, if made in furtherance of the common goal." *Id*.

Moreover, statements made by a co-conspirator prior to a defendant joining an unlawful conspiracy are admissible against the defendant. *E.g.*, *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 393 (1948) ("[T]he declarations and acts of various members [of a conspiracy], even though made or done prior to the adherence of some of the conspiracy become admissible against all as declarations or acts of co-conspirators in aid of the conspiracy."); *United States v. Amede*, 977 F.3d 1086, 1097-98 (11th Cir. 2020) ("[A] co-conspirator's declaration made in the course and in furtherance of a conspiracy is admissible against a co-conspirator, even one who may have joined the conspiracy after the statement was made."); Wright & Miller, Federal Practice and Procedure § 6779 (2025 ed.) ("Statements can be admitted under Rule 801(d)(2)(E) even if the party against whom the evidence is offered did not join the conspiracy until after the statements were made."); *see also, e.g.*, *United States v. Jackson*, 627 F.2d 1198, 1212 n.30 (D.C. Cir. 1980) ("It is clear that a party who knowingly joins an unlawful conspiracy may be held responsible for acts done in

11

furtherance of the conspiracy both prior to and subsequent to his joining."). Therefore, statements made by Lee and others in furtherance of the targeting and recruitment of the defendant to commit economic espionage against the Federal Reserve—before the defendant agreed to do so—are admissible against the defendant for their truth.

The evidence shows that from the moment he met Rogers, Lee was involved in an ongoing conspiracy to recruit Rogers to provide the Chinese government with inside information from the Federal Reserve. As a PRC intelligence officer, Lee was not working alone. To name just one example of many, in a series of March and April 2014 emails with the defendant, Lee repeatedly referred to his "boss" as someone who, like Lee, wanted the defendant to come visit the Research Institute of International Politics and Finance ("RIIPE") at Shandong University of Finance and Economics in Shandong, China. Attached as Exhibit 8 for reference. And ample evidence suggests that Lee was working with Ricky throughout their operation to collect intelligence about the Federal Reserve through the defendant. *See also* Indictment ¶ 1 (describing conspiracy as beginning as early as in or around May 2013). Lee's statements made while recruiting the defendant to join the conspiracy, therefore, were made during and in furtherance of the charged conspiracy and are "not hearsay." *See* Fed. R. Evid. 801(d)(2)(E).

### 2. Category 2: The Defendant's Communications with Hummin Lee and Ricky After the Defendant Joined the Conspiracy

Category 2 statements between the defendant and Lee or Ricky are admissible for the same reasons as Category 1 statements. Many statements will not be offered for the truth of the matter asserted, but to show the effect on the defendant, context for the defendant's statements, questions posed by Lee, and the overall nature of the relationship between the co-conspirators.

To the extent statements in the messages are offered for the truth of the matter asserted—a message-specific inquiry—they are "not hearsay" under Rule 801(d). The defendant's own

statements are admissible as statements of a party under Rule 801(d)(2)(A). Lee's and Ricky's statements to the defendant are admissible as co-conspirator statements under Rule 801(d)(2)(E).

### 3. Category 3: The Defendant's Pre-Marital Communications with Lu Yiu

The government will seek to admit pre-marital communications between the defendant and his now wife, Lu Yiu (a.k.a, YuYu), who the defendant married in Hong Kong in March 2018. The burgeoning and intense romantic relationship between YuYu and the defendant is relevant to the charges for several reasons. *First*, aspects of the defendant's relationship with YuYu were facilitated—from the outset and to an extreme degree not consistent with the relationship between a student and professor—by Lee and Ricky. Among other things, Lee: (1) facilitated communications between YuYu and the defendant, who did not speak the same language; (2) arranged and funded travel for both of them in and around the PRC; (3) advised and facilitated visa and divorce paperwork so the defendant and YuYu could be married in Hong Kong; (4) was the best man at the wedding; (5) facilitated the payments of cash to YuYu; (6) facilitated visa and travel paperwork for defendant's daughter with YuYu; and (7) attended custody arbitration hearings between YuYu and her ex-husband. Those are just a few examples of many more that will be shown at trial. The indebtedness that the defendant developed to Lee for making possible the defendant's romantic relationship, marriage, and creation of a new family is powerful evidence that the defendant knowingly joined the conspiracy to misappropriate secret information belonging to the Federal Reserve. The evidence shows that the defendant became especially responsive to Lee's taskings to collect information and "teach" it to Lee and Ricky shortly after the defendant married YuYu in March 2018.

*Second*, the evidence helps show that the defendant was a Sinophile. He loved China, Chinese culture, Chinese people, and Chinese women. The defendant's efforts to solicit romance

from women in China while he lived in the United States and his eventual creation of a family with YuYu are powerful evidence of the defendant's proclivity for and love of China. And the defendant's Sinophilia is powerful evidence of his motive to commit economic espionage for the benefit of the PRC.

Many of the messages between YuYu and the defendant will not be offered for the truth of the matter asserted. Such messages are not inadmissible hearsay. *See* Fed. R. Evid. 801(c), 802. To the extent messages from Rogers to YuYu are offered for the truth of the matter asserted, they are statements of a party-opponent and, therefore, "not hearsay." Fed. R. Evid. 801(d)(2)(A). Statements made by YuYu will be offered to show the effect on the defendant or to provide context for the defendant's own statements.

The government will not seek admission of communications between Rogers and YuYu after they married due to potential issues involving the marital communications privilege.

### 4. Category 4: The Defendant's Communications with Federal Reserve Board Employees

The government will seek admission of emails the defendant sent to colleagues at the Federal Reserve Board, soliciting information in furtherance of the conspiracy. Such emails are relevant because they demonstrate the defendant taking overt acts in furtherance of the conspiracy and pursuing its illegal ends.

The Category 4 emails are all admissible over potential hearsay objections. Most Category 4 emails will not be offered for the truth of the matter asserted. Instead, the defendant's emails are written acts in furtherance of the charged conspiracy. To the extent that any particular assertion made by the defendant might be viewed as admissible for its truth, it is a statement of a party-opponent and, therefore, "not hearsay." Fed. R. Evid. 801(d)(2)(A).

Response emails to the defendant from his Federal Reserve colleagues will be offered for non-hearsay purposes. Those emails will be admissible, for example, to give meaning and context to the defendant's own statements. Some of the colleague's statements will be admissible to show the effect on the defendant or that he was successful in collecting inside information from his colleagues.

### F. Summary Exhibits

A summary chart or table is admissible as substantive evidence when it fairly summarizes voluminous writings that "cannot conveniently be examined in court," the underlying materials are themselves admissible, and those materials were made reasonably available to the opposing party for inspection or copying. Fed. R. Evid. 1006; *United States v. Hemphill*, 514 F.3d 1350, 1358 (D.C. Cir. 2008) (Rule 1006 requires that "the documents themselves must be admissible," that the proponent "must make the underlying documents reasonably available for inspection and copying," and that the summary be "accurate and nonprejudicial"). The proponent need not introduce the underlying documents into evidence that are the subject of the summary exhibit. *Hemphill*, 514 F.3d at 1359.

#### 1. WeChat Summary Exhibit

WeChat is a popular social, texting, and payments platform used in the PRC. The electronic devices and iCloud account the government obtained while investigating the defendant included tens of thousands of WeChat messages to and from the defendant. The government found the defendant's WeChat messages in (1) the iPhone and iPad he voluntarily provided to the FRB OIG in February 2020, (2) search warrant returns from Apple, Inc., for the defendant's iCloud account, and (3) two iPhones seized from the defendant on the day he was arrested. The government

identified tens of thousands of WeChat messages between the defendant and Lee, Ricky, and/or YuYu in amongst those various sources spanning the timeframe 2017-2024.

The government has created a summary exhibit of relevant WeChat messages (the "WeChat Summary Exhibit"). The messages are otherwise viewable in their original state through specialized forensic software that is too burdensome to use in Court. The government, therefore, extracted the WeChat messages into a Microsoft Excel table that shows the date of each message, the sender, the recipient, and the source of the message, in chronological order. The messages in the WeChat Summary Exhibit consist only of messages between the defendant and either Lee, Ricky, or YuYu (i.e., Categories 1-3 of communications identified above). The government has not included all such messages because there are too many to be viewed in court in a reasonable amount of time and the volume could otherwise overwhelm the jury. Nonetheless, the WeChat Summary Exhibit still has thousands of messages. The government expects to have law enforcement witnesses read many, but not all, of the messages in the summary exhibit during their testimony.

The government has endeavored to ensure that the WeChat messages selected for inclusion in the summary exhibit present a complete representation of particular conversation threads.

The WeChat Summary Exhibit is authenticated by Rule 902 certificates signed by the forensic examiners who performed forensic imaging and extraction of the various electronic devices from which the WeChats came, and law-enforcement witnesses who will testify that the WeChat messages in the WeChat Summary Exhibit match those in the certified forensic extractions. The messages are also authenticated by their content and embedded photographs that can be used to the identify the communicants. The defendant has also indicated he will not

challenge authenticity at trial (though, this was before the government provided the WeChat Summary Exhibit to the defense).

The defense has had access to *all* the defendant's WeChat messages for months through discovery that included the full forensic extractions from the various devices that contained WeChat messages and the production of the defendant's iCloud account, which contained backed up WeChat messages. The government is providing the WeChat summary exhibit to the defense prior to the January 9, 2026 pre-trial conference.

### 2. Travel Summary

As mentioned above, the government has obtained records from CBP of the defendant's entries and exits from the United States on international flights. Those records evidence the defendant's travel to and from the PRC in furtherance of the conspiracy. The official records as provided by CBP, however, are extensive and difficult to review in Court given the use of codes to represent airports and the extensive other information provided in the official records. The government has therefore created a summary exhibit to display only the relevant travel records in a format that will be easy for the jury to digest. The summary travel exhibit is attached as Exhibit 9. The summary exhibit only depicts the defendant's travel to and from the PRC or other countries in Asia through which the defendant connected. The government will authenticate the summary exhibit through the testimony of a law-enforcement witness who will testify that the summary exhibit accurately reflects the official CBP records.

### 3. Other Summary Exhibits

#### a. Jinchuan0323 Bookmarks

Jinchuan0323@gmail.com is the email address that Hummin Lee used in his real name: Jin Chuan. Search warrant returns obtained from Google for that email address showed his internet

bookmarks. In the native format provided by Google, however, the bookmarks do not show the hyperlink address for the corresponding website. The government has therefore created a summary exhibit that shows the name of the bookmark next to the hyperlink, in tabular format. The summary exhibit is attached as Exhibit 10. The government has also translated the bookmark name associated with the hyperlink http://www.ccdi.gov.cn. The bookmark name translates to "Central Commission for Discipline Inspection and Ministry of Supervision Website." That translation is included in the summary exhibit.

### b. Gmail Contacts for hummin.lee and jinchuan0323

In search warrant returns from Google, the government obtained the contacts associated with jinchuan0323@gmail.com (the account in the name of Lee's true identity) and hummin.lee@gmail.com (Lee's cover identity used for his handling of the defendant). In its native form, the contact information is confusing and requires parsing of data fields to be made sensical. The government, therefore, has parsed the contact information into tabular format and translated the Mandarin language contact names next to the original names in the summary chart.

### G. Market Price Information

Evidence in the WeChat messages shows that the defendant provided predictions to Lee and Ricky about the FOMC's June 19, 2019 interest-rate announcement, before the announcement was made. In order to show the value of FOMC information and the effect FOMC announcements have on markets, the government will seek admission of two graphs depicting the changes in value of the 10-year U.S. Treasury note on June 19, 2019. Those graphs were obtained from Bloomberg Financial Services reporting market data and are attached as Exhibits 11 and 12. Both graphs are admissible over a hearsay objection pursuant to Rule 803(17), which allows for admission of

"[m]arket quotations, lists, directories, or other compilations that are generally relied on by the public or by persons in particular occupations." Fed. R. Evid. 803(17).

### H. Demonstrative and Illustrative Exhibits

The government expects to use demonstrative and illustrative exhibits, such as organization charts of the PRC government and the Federal Reserve System, and timelines of events and overt acts of the conspiracy alleged, to help the jury understand the witnesses' testimony. The government will provide the defense with copies of demonstrative and illustrative exhibits ahead of witnesses' testimony. Demonstrative and illustrative exhibits will not be provided to the jury during deliberations.

\* \* \*

The government stands ready to respond to any questions the Court may have at the pretrial conference currently scheduled for January 9, 2026, or at any other time.

Respectfully submitted,

JOHN A. EISENBERG
Assistant Attorney General
National Security Division

*/s/ Nicholas O. Hunter*
Nicholas O. Hunter
D.C. Bar No. 1022355
Yifei Zheng
N.Y. Bar No. 5424957
Trial Attorneys
National Security Division
U.S. Department of Justice
950 Pennsylvania Ave, NW
Washington, D.C. 20530
Telephone: (202) 353-3434
E-mail: nicholas.hunter@usdoj.gov
yifei.zheng@usdoj.gov

JEANINE FERRIS PIRRO
United States Attorney

Adam P. Barry
Cal. Bar No. 294449
Thomas N. Saunders
N.Y. Bar No. 4876975
Assistant United States Attorneys
National Security Section
601 D Street, NW
Washington, D.C. 20530
Office: 202-252-7793
Email: adam.barry@usdoj.gov
thomas.saunders@usdoj.gov