UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA : | |
| : | Case No.: 25-cr-00033 (DLF) |
| v. : | |
| : | |
| JOHN HAROLD ROGERS, : | |
| : | |
| : | |
| Defendant. : | |

**SUPPLEMENTAL BRIEF REGARDING THE ADMISSIBILITY OF THE
DEFENDANT'S STATEMENTS IN HIS FEBRUARY 2020 INTERVIEW**

The United States respectfully submits this supplemental brief, as directed by the Court's January 13, 2026 minute order, regarding the admissibility of statements that the defendant made during the February 4, 2020 interview (the "OIG Interview") conducted by the Office of the Inspector General. As the government has previously indicated, the OIG interview was a major breakthrough and start to this case. Members of the Federal Reserve had reason to be suspicious of the defendant, but the OIG interview led them to key evidence, including the defendant's WeChat messages with Chinese intelligence officer Hummin Lee. Further, the defendant made a materially false statement during the interview, and that statement is the basis of Count Two. As detailed below, the clips selected by the government are probative of key facts pertaining to Count One, Count Two, or both. These clips do not risk unfair prejudice to the defendant.

**Clip 1 (pages 1-4)**

This clip is essential. It provides the jury with the context and purpose of the interview in which the defendant made multiple admissions relevant to Count One, and it provides information inextricably tied to the defendant's materially false statement that is the basis of Count Two.

When the interview started, federal investigators did not know why, exactly, the defendant wished to speak with them. They were generally aware of an extortion threat, but they did not

know much more than that. It was during this part of the interview that they first learned about the threat to release photos of the defendant and threats to harm the defendant's daughter. The rest of the interview was driven by law enforcement's efforts to unpack the information provided by the defendant here in Clip 1. This clip lays out the essential context for all other statements and admissions in the interview.

This clip is also relevant because it introduces the jury to the defendant and the defendant's efforts to avoid law enforcement's scrutiny and suspicion. The defendant wanted to avoid criminal prosecution. Nude photos may be embarrassing, but they are not criminal. The defendant's greater jeopardy was that the extortion investigation could reveal his espionage activity, leading to a conviction and substantial sentence of incarceration. The defendant used certain tactics during the interview to avoid further scrutiny and suspicion, and many of these tactics are revealed in this clip. For example, rather than answering a question directly, the defendant gave a meandering answer that was laden with irrelevant details ("Michelle's recommendation was to contact Lou Harris…" and "So, so at that point that, that was close to Super Bowl kickoff I just remember."). He added hard to decipher interjections ("I think there were 2 in the morning and then, and then there were like 3 more throughout the rest of the day."). He also tried to cast himself in a favorable light; for example, in this clip, he name-dropped a robust network of Federal Reserve colleagues, including high-ranking officials, suggesting that he is an integral part of the Federal Reserve community. He also suggested a lack of memory or difficulty processing information ("My, my brain is a little frazzled over the whole weekend…"). Also, later in the interview, he lied to avoid scrutiny, and this clip provides the context for one of the key lies he told—that is, denying taking intimate photographs of himself. This clip is highly relevant for helping the jury to understand the defendant's motivations, as well as his tactics for answering questions and attempting to avoid

scrutiny. These tactics are woven throughout the interview, and Clip 1 illustrates them well.

This clip is also essential because it is intrinsically tied to the facts supporting Count Two of the indictment. (See also the discussion of Clip 15, below). The defendant is charged with making a materially false statement based on his statement that he never shared or provided restricted Federal Reserve information with anyone outside of the Federal Reserve Board. When he made this statement, the defendant was responding to an investigator's question that contained in its premise the fact of the photo-related extortion threat—that is, the information described here, in Clip 1. For the jury to evaluate the veracity of the defendant's materially false statement, the jury should know the actual question to which he was responding. Thus, the information in Clip 1—specifically the information about intimate photographs—is intrinsically tied to the facts in Count Two.

By comparison, the risk of unfair prejudice is low. Clip 1 contains one singular reference to "nude photos." The word "nude" is not vulgar or graphic. It is used, for example, in professional and decorous settings to describe things like fine art.[1] Moreover, there is nothing harmful, much less criminal, about taking and sharing such photos in private with a consenting adult or adults. Also, media reporting indicates that public sentiment surrounding the taking and sharing of such photos is increasingly socially acceptable in the age of the smart phone.[2] To the extent that a juror may experience a tinge of embarrassment or mild titillation by the reference to "nude photos," it is unlikely to be pronounced enough to risk any unfair prejudice, given current public attitudes and

---

[1] For example, the Smithsonian Associates hosted a lecture in 2022 titled, "Nude: The Unclothed Form in Western Art." *See* https://smithsonianassociates.org/ticketing/programs/nude-unclothed-form-in-western-art.

[2] *See, e.g.*, "The Nude Selfie is Now High Art," N.Y. Times (April 24, 2020) available at https://www.nytimes.com/2020/04/24/opinion/sunday/covid-nude-selfies.html. Other reporting suggests that this trend predates the rise of the smart phone. *See* "Revealing photos may be becoming passe," Today.com (Sept. 13, 2017), available at https://www.today.com/news/revealing-photos-may-be-becoming-passe-wbna20758479.

the discreet mention of such photos in Clip 1. Compared to the high probative value of the information in this clip, the risk of unfair prejudice is minimal.

Moreover, if the term "nude" were replaced with a more generic term like "embarrassing" or "sensitive," it could easily lead to confusion and speculation. Government witnesses will testify that the defendant was forced to retire in lieu of termination in 2021 because he violated Federal Reserve policy by using his work phone to take explicit sexual photographs. If that testimony and the related policy documents are sanitized of all reference to "nude photos," the jury will be left wondering why using a government-issued phone to take "embarrassing" photos warranted the defendant's termination. It may also allow the jury to draw the incorrect inference that the defendant's termination from the Board was somehow related to the criminal charges at issue in this case.

Accordingly, because the probative value of Clip 1 is high and the risk of unfair prejudice is low, the clip should be admitted.

**Clip 2, page 5**

As with Clip 1, Clip 2 is evidence of the defendant's tactics for trying to outsmart law enforcement and avoid further scrutiny and suspicion. Clip 2 is relevant for understanding the defendant's motives and his tactics in answering questions throughout the interview, including the materially false statement he made in Clip 15. In Clip 2, as in Clip 1, the defendant suggested he had trouble remembering or processing information ("I'm wracking my brain …"). He also emphasized facts likely to elicit sympathy. For example, he cast himself as the loving father, telling investigators he posts on social media about his kids, "of which I am very proud," he adds. He also tried to misdirect law enforcement with half-truths, admitting to chatting on a dating website

4

but indicating that that was three years ago. This clip is probative of the defendant's tactics during the interview to avoid scrutiny and suspicion.

There is no mention of nude photos in this clip, so the risk of unfair prejudice is low.

**Clip 2 (extended), pages 5-6**

Upon further reflection, the government seeks to expand Clip 2 to include the remainder of page five, including the rest of the defendant's response that continues at the top of page 6. Thus, the extended Clip 2 would end right where agent Hershkowitz says "Okay." This additional portion of the interview is relevant because the defendant admitted that he knew WeChat was monitored by the Chinese government. This means he was aware of the espionage threat, and more specifically, he was aware that his primary means of communication with Hummin Lee and his now-wife Liu Yu may have been surreptitiously reviewed by the Chinese government. There is no mention of nude photos.

**Clip 3, pages 9-11**

Clip 3 is further evidence of the defendant's tactics designed to mislead law enforcement and avoid scrutiny and suspicion. In Clip 3, the defendant made it explicit that he had never taken a nude photo of himself—again, that was a lie. He also offered a half-truth, referencing his activities on a dating website but suggesting that the photographs could have come from his using that dating website years ago. As before, the defendant feigned lack of memory or trouble processing information ("I'm wracking my brain on this."). As in other clips, he tried to misdirect law enforcement and lead them down a false path, hypothesizing that the dating website he used may have been hacked even when he knew that he had sent the photographs to the scammers himself, recently. Thus, this clip is highly probative, providing insight into the defendant's state of mind and examples of his efforts to mislead and misdirect law enforcement during the interview.

By contrast, the risk of unfair prejudice is low, as the clip contains one simple mention "nude photos," without elaboration or detail.

**Clip 4, pages 14-16**

In the first part of Clip 4, the defendant explained how he met his now-wife, Ms. Liu. This is highly relevant to Count One. The government will adduce evidence at trial showing that the defendant's involvement in the criminal conspiracy evolved in parallel with the defendant's relationship to Ms. Liu and the Chinese intelligence officer Hummin Lee. The defendant became much more involved with Hummin Lee right after the defendant met Ms. Liu. This clip also contains the defendant's own description of Hummin and the type of relationship they had. Hummin successfully recruited the defendant to join the criminal conspiracy, and one motive that drove the defendant to participate in the conspiracy was the defendant's affection and indebtedness to Hummin. The defendant's own admission that he felt these sentiments toward Hummin is highly probative.

This clip is also relevant because it further illustrates the tactics that the defendant used to try to misdirect law enforcement. During the interview, rather than focus on the extortion scam, the defendant launched into a description of his relationship to Hummin Lee. (While that information is relevant to Count One, it was not relevant to the questions being asked during this OIG interview in 2020—at least it wasn't relevant until the defendant mentioned Hummin in the first instance.) The defendant was preemptively feeding investigators the version of Hummin that the defendant wanted them to have in their minds *before* they found his emails and WeChat messages with Hummin. The defendant knew that any investigation into the extortion scam would likely include an examination of the defendant's email since that's how the threats were conveyed.

The defendant also understood that any examination of his emails would reveal his email communications with Hummin. Thus, the defendant was seeking to frame those communications for investigators, in advance. This information is important for the jury to understand the tactics the defendant was using to try to outsmart his interviewers and keep his criminal conduct concealed.

This clip contains no reference to the nude photographs, so the risk of unfair prejudice is low.

**Clip 5, pages 16-17**

This clip is relevant because it shows how the defendant continued to misdirect law enforcement by referring to a dating website that he purportedly used three years earlier. The risk of unfair prejudice is low. When the investigators inquired about sharing "potentially nude photos," the defendant stated merely that he "wouldn't rule it out," but it would have been years ago.

**Clip 6, page 20**

This clip is relevant because it provides a crucial detail about the defendant's relationship with his now-wife Ms. Liu. As the evidence shows, the defendant became much more involved with the Chinese intelligence officer Hummin Lee when the defendant learned that Ms. Liu was pregnant with the defendant's child. The fake "classes" between the defendant and Hummin began around the time the baby was born. The defendant's relationship to Ms. Lui is critical to understanding the defendant's motivations for joining the conspiracy and his willingness to be recruited into the conspiracy. In addition, the details in this clip—including that the defendant and

7

his wife don't share a common language—will be crucial for the jury as they navigate the evidence of this key relationship between the defendant and Ms. Liu. This clip contains no reference to nude photos, and the risk of unfair prejudice is low.

**Clip 7, page 22**

As with Clip 6, Clip 7 is relevant because it provides a key detail about the defendant's relationship with Ms. Liu. One of the most important milestones in the defendant's relationship with Ms. Liu—and his relationship with Hummin—is when he learned that Ms. Liu was pregnant with his child. At that time, his interactions with Hummin became much more frequent and involved. One of the benefits that the defendant received from Hummin as part of the conspiracy is Hummin's assistance and facilitation of the defendant's relationship with Ms. Liu, including their marriage and the birth of their daughter. This clip contains no reference to nude photos, and the risk of unfair prejudice is low.

**Clip 8, pages 26-27**

This clip is relevant to Counts One and Two of the indictment. The government will argue that the defendant attempted to conceal his criminal conspiracy using a fake cover story, claiming he was teaching a PhD student (Hummin) at Shandong University. However, in this clip, the defendant admits to teaching at only two institutions during his sabbatical, neither of which is Shandong. This is evidence, consistent with the government's case, that there were no legitimate classes at Shandong and that those "classes" with Hummin were a fake cover story to conceal the defendant's sharing of restricted Federal Reserve information. This clip contains no reference to nude photos, and the risk of unfair prejudice is low.

**Clip 9, page 30**

The government expects the defendant to claim that he was accessing restricted Board information, in part, to support his research. This clip is important for pinning down the defendant about what, specifically, he was researching at the time and possibly show that the restricted documents he obtained were not germane to that research. This clip contains no reference to nude photos, and the risk of unfair prejudice is low.

**Clip 10, pages 31-34**

This clip is highly relevant to Count One. The government will argue that the defendant's espionage activities started in earnest in 2018 when he lived in China on sabbatical. This clip provides the jury with the defendant's account of why he went to China and what he did there. The government plans to show the jury that the defendant is lying about teaching "classes" to Hummin, and that the government's understanding of events is correct, by contrasting the defendant's account here in Clip 10 with other evidence. In addition, this clip is highly relevant because it provides additional, crucial details about the defendant's relationship to Hummin. As a trained intelligence officer, Hummin recruited the defendant by creating in him a sense of indebtedness and affection. Those sentiments are expressed clearly in this clip.

This clip is also relevant because, like earlier clips, it demonstrates the defendant's tactics during the interview, including his tendency to misdirect the interviewers with irrelevant tangents ("I'm going to be telling stories here, I, I shouldn't go on too long.") and his efforts to educate the agents about Hummin, pre-framing the lens through which they would see the communications between Hummin and the defendant.

This clip is also relevant because it contains an account of how Hummin's boss attempted to give the defendant a packet of hundred-dollar bills. This incident is relevant because it corroborates key pieces of the government's case, including that Hummin worked for the Chinese government, that Hummin and the people he served wanted Federal Reserve information, that the defendant was aware of these facts, and yet the defendant did not remove himself from the situation.

This clip contains no reference to nude photos, and the risk of unfair prejudice is low.

**Clip 11, pages 44-45**

This clip is relevant to establish the timeline of the defendant's activities in China and that the defendant characterized his own memory as "good." It also establishes that the defendant frequently traveled to foreign countries as part of his job at the Board and was familiar with the Board's policies regarding foreign travel and reimbursement, which he regularly followed except as it related to his work with Hummin and Shandong University. This clip contains no reference to nude photos, and the risk of unfair prejudice is low.

**Clip 12, pages 49-50**

To prove that the defendant's "classes" with Hummin were not legitimate, the government will adduce evidence that the defendant withheld information from the Federal Reserve—including information that, if the classes had been legitimate, he would have been required to disclose pursuant to internal Federal Reserve disclosure rules. The defendant's failure to disclose this information indicates that the classes with Hummin were not legitimate and were something he wished to conceal. Clip 12 is probative because it contains evidence that the defendant was

aware of these internal disclosure rules. This clip contains no reference to nude photos, and the risk of unfair prejudice is low.

**Clip 13, pages 51-53**

Like Clip 10, this clip provides the defendant's own account of his activities in China. By contrasting the defendant's account with other evidence, the government intends to prove that the defendant's account is incomplete and misleading.

This clip is also relevant because it demonstrates the defendant's state of mind and motivations during the interview and his efforts during the interview to misdirect law enforcement. Earlier in the interview, the defendant noted that he had been offered a packet of cash by Hummin's boss who was seeking Federal Reserve information. *See* Clip 10. In Clip 10, the defendant strongly suggested that the packet of cash was an inappropriate inducement to share nonpublic information ("They just want to know what's, what's the Fed thinking"). Here, however, the defendant attempted to reframe that anecdote, referring to the money as an "honorarium" that academics receive as a "standard" practice. Perhaps realizing that his earlier account could trigger heightened suspicion, the defendant attempted to correct course here in Clip 13.

This clip contains no reference to nude photos, and the risk of unfair prejudice is low.

**Clip 14, pages 56-57**

This clip is highly relevant, along with Clip 10 and Clip 13. In this clip, the defendant confirms that Hummin's boss wanted the defendant to provide nonpublic information. The defendant's answer was vague and somewhat evasive; he did not say what specifically Hummin's boss wanted or whether he directly asked for nonpublic information. Yet, the defendant did

11

confirm his understanding that Hummin's boss "would love to have had some secret Fed forecasting information." A major part of the government's case is that Hummin was seeking nonpublic Federal Reserve forecasting information. Evidence at trial will show that Hummin's taskings to the defendant were obviously framed to obtain such information, and the defendant complied with those taskings by gathering such nonpublic forecasting information for Hummin. This clip contains no reference to nude photos, and the risk of unfair prejudice is practically nil.

**Clip 15, page 59**

This is an essential clip. It contains the materially false statement that forms the basis of Count Two. In this clip, the defendant stated that he "never" shared restricted Federal Reserve information outside the Federal Reserve Board. He made that statement in response to a question that expressly referenced the photo-related extortion threat that triggered this interview. The question was: "I have to ask you about the photos… And I'm thinking if this were to escalate some more or something like that… and they can come at you from a different angle. So did you ever provide or share any restricted Board information?" The question expressly referred to the threat about the photos and whether the extortionists might come at the defendant from a "different" angle—where "different" meant, in contrast to the threat about the photos. For the jury to understand the question and thus be able to evaluate the defendant's response, it is crucial that they know the context of the extortion threat involving the photos. These issues are inextricably linked, especially as they relate to whether the defendant's false statement was made knowingly and willfully.

This clip is also relevant because it contains the defendant's admission that he was paid by

12

"SHUFE"—i.e., Shanghai University—to teach, presumably while on sabbatical. As indicated earlier, the defendant was required to disclose certain information to the Federal Reserve about his activities in China. The government will argue that the defendant provided only a patchwork incomplete and evolving disclosures. Every instance where, as here, the defendant disclosed that he worked or was paid by one university in China but failed to disclose his work at other universities in China is evidence that the defendant was trying to conceal his criminal conduct.

The probative value of this clip is high, as it contains information important to Count One and essential to Count Two. The probative value is not substantially outweighed by the risk of unfair prejudice, given the sanitized nature of the content of the clip.

**Clip 16, pages 60-61**

This clip is relevant to illustrate how close the defendant was to Hummin, including trusting Hummin to maintain custody of his Chinese ATM card. This clip contains no reference to nude photos, and the risk of unfair prejudice is low.

**Clip 17, pages 62-63**

In this highly probative clip, the defendant makes key admissions. He admits that Hummin, in addition to being a purported graduate student, had a boss. He admits that this boss was trying to obtain insider information, or in his words "rumors," from the defendant about whether the Federal Reserve would raise interest rates. This clip contains no reference to nude photos, and the risk of unfair prejudice is low.

**Clip 18, pages 79-81**

This clip is relevant because it shows the defendant's modus operandi as it relates to implausible scenarios that he knows are not what they claim to be, but he nonetheless participates in them because of the psychological or other benefits that he receives. The defendant's description of the Nigerian scam and his acknowledgment that despite knowing that it was a scam, he continued to communicate with the scammer and send him money is probative of his motive and intent in choosing to play along with Hummin's cover story as a graduate student whom the defendant was teaching "classes" to in China even though, deep down, the defendant knew that Hummin was not merely a graduate student interested in learning about economics. The fact that the defendant recognized the Nigerian scam early on is also probative of his knowledge and intent as it relates to whether he could have genuinely been tricked by Hummin during their nearly decade-long relationship. This clip contains no reference to nude photos, and the risk of unfair prejudice is low.

**Clip 19, page 84**

After further consideration, the government withdraws consideration of this clip and does not plan to present this clip during its case-in-chief.

Respectfully submitted,

JEANINE FERRIS PIRRO
United States Attorney

*/s/ Thomas N. Saunders*
THOMAS N. SAUNDERS
ADAM P. BARRY
Assistant United States Attorneys

N.Y. Bar No. 4876975
Cal. Bar No. 294449
National Security Section
601 D Street, NW, Room 5-120
Washington, D.C. 20530
Office: 202-252-7790 / 202-252-7793
Email: thomas.saunders@usdoj.gov
          adam.barry@usdoj.gov


JOHN A. EISENBERG
Assistant Attorney General for National Security

Nicholas O. Hunter
D.C. Bar No. 1022355
Trial Attorney
National Security Division,
U.S. Dep't of Justice
950 Pennsylvania Ave, NW
Washington, D.C. 20530
E-mail: nicholas.hunter@usdoj.gov
Telephone: (202) 353-3434

Yifei Zheng
N.Y. Bar No. 5424957
Trial Attorney
National Security Division,
U.S. Dep't of Justice
950 Pennsylvania Ave, NW
Washington, D.C. 20530
E-mail: yifei.zheng@usdoj.gov
Telephone: (202) 353-0252