UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA : | |
| : | Case No.: 25-cr-00033 (DLF) |
| v. : | |
| : | |
| JOHN HAROLD ROGERS, : | |
| : | |
| : | |
| **Defendant.** : | |

### GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION FOR RELEASE FROM DETENTION PENDING SENTENCING

After a two-week trial, Defendant John Rogers was convicted of lying to federal investigators about whether he shared restricted Federal Reserve information outside of the Federal Reserve System. He is now a convicted defendant and remains in custody. His sentencing is scheduled for May 27, 2026. Defendant seeks to be released from custody while he awaits to be sentenced. ECF No. 83. But because he is now convicted, Defendant bears a heavy burden to convince the Court to release him. At the post-conviction stage of a case, there is a strong presumption that Defendant will remain detained. Indeed, under controlling law, the Court "*shall* order that a person who has been found guilty of an offense and who is awaiting imposition or execution of sentence . . . be detained" unless Defendant can show by clear and convincing evidence that he is "not likely to flee or pose a danger to the safety of any other person or the community." 18 U.S.C. § 3143(a)(1) (emphasis added). Defendant's Motion for Release from Detention Pending Sentencing (hereinafter "Motion" or "Mot."), ECF No. 83, fails to meet this demanding standard. Defendant remains a significant flight risk and Defendant's Motion does not demonstrate otherwise by clear and convincing evidence. Therefore, Defendant should remain detained through sentencing.

## ARGUMENT

**A.     The Strong Presumption Post Conviction Is that Defendant Will Remain Detained Pending Sentencing**

Now that Defendant has been convicted of a crime, "a different detention statute, with different presumptions, applies—namely, 18 U.S.C. § 3143." *United States v. Wiggins*, 613 F. Supp. 3d 348, 353 (D.D.C. 2020).  Under § 3143, "a court is generally *required to detain* the defendant as the background rule." *Id.* (emphasis added).  Unlike at earlier stages in a criminal proceeding, § 3143 creates a "strong presumption of post-conviction detention." *United States v. Braun*, 2024 WL 4528964, at *2 (D.D.C. Oct. 18, 2024).

This presumption can only be rebutted by "clear and convincing evidence that the person is not likely to flee or pose a danger to the safety of any other person or the community if released." 18 U.S.C. § 3143(a)(1).  The Court should "make the same flight risk and dangerousness assessment that the Bail Act requires . . . only, now, detention is presumed, and it is the defendant's burden to convince the court that he satisfies the non-dangerousness and no-flight-risk conditions of release." *Wiggins*, 613 F. Supp. 3d at 353-54 (internal citations omitted). Here, that means that Defendant bears the burden of "present[ing] evidence sufficient to allow the court to reach a firm conviction" that he is not likely to flee. *Samra v. Shaheen Bus. & Inv. Grp., Inc.*, 355 F. Supp. 2d 483, 494 (D.D.C. 2005); *see also United States v. Chansley*, 2021 WL 4133655, at *2 (D.D.C. Sept. 10, 2021) ("Now the *defendant* must convince the Court that he is neither a flight risk nor a danger to the safety of others or the community.") (emphasis in original).

The Government agrees with Defendant that he does not pose a risk of dangerousness to the community or to any individual, so the analysis below focuses on whether Defendant has rebutted the presumption of detention by demonstrating through clear and convincing evidence

that he does not pose a flight risk. Mot. at 2 n.2. As explained below, Defendant has failed to rebut this presumption.

B.    **Defendant Has Failed to Rebut the Presumption of Post-Conviction Detention with Clear and Convincing Evidence**

    1.    **Defendant Fails to Carry His Burden for Pre-Sentencing Release**

To rebut the presumption of detention, Defendant offers no new evidence, but instead makes a handful of arguments, only some of which are tethered to the 18 U.S.C. § 3142(g) factors.

*First*, he argues that because he was acquitted of the conspiracy to commit economic espionage count, his conviction for lying to the Federal Reserve Board's Office of Inspector General ("OIG") means that he has a much lower likely sentence and, therefore, does not have an incentive to flee. Mot. at 3. While it is true that Defendant now faces only five years in prison, as opposed to fifteen, the nature and circumstances of his conviction counsel against release. It is uncontested that Hummin Lee was a Chinese spy trying to obtain Federal Reserve secrets from Defendant. *See, e.g.*, Trial Tr. (Jan. 30, 2026) at 108:3-4 ("Q. Who do you now think Hummin Lee is? A. A spy.") and 148:23-149:2 ("Q. In asking you for the specific plan and timetable that the Fed was planning to adopt related to the dollar, was Hummin Lee asking you for nonpublic information?" Q. I think he probably was at – at that point…"). Furthermore, it is uncontested that Defendant considered Hummin Lee to be his best friend in China and that they had an incredibly close personal bond. In other words, one of Defendant's best friends—and one of the reasons he sits in jail today—is a spy for the Chinese intelligence services.

The Chinese intelligence services are highly capable and Chinese spies elsewhere have used sophisticated and highly coordinated operations to escape house arrest and flee to China. For example, in August 2025, two defendants who were working for the Chinese government, arrested in Serbia, and awaiting extradition to the United States, cut their ankle bracelets in a coordinated

manner and fled to China on a private Gulfstream jet owned by a Chinese company.[1]  Simply put, Defendant admitted that he worked for years with someone he claims he only now realizes is a Chinese spy. That spy—Hummin Lee—found his meetings with Defendant so useful that he continued to meet with Defendant and provide him with benefits for years.

Defendant's acquittal of the economic espionage charge does not change this.  "It is well established that the statute of conviction alone does not establish the seriousness of an offense." *Wiggins*, 613 F. Supp. 3d at 357 (considering seriousness of offense as part of the "nature and circumstances" of a conviction).  The facts surrounding the conviction do.  Here, Defendant continues to have a strong tie to an adversarial foreign government that will not extradite him to the United States and has proven capable and willing to help allies of China evade American justice.  *See, e.g.*, *United States v. Shan Shi*, 17-cr-110-3 (CRC) (in 2017, Gang Liu was placed on personal recognizance with an ankle monitor after being arraigned on charges of economic espionage; in November 2017 Liu boarded Air China flight to China, even though he no longer possessed his U.S. passport, and fled to China where he remains); *see also United States v. Vo*, 978 F. Supp. 2d 41, 45 (D.D.C. 2013) (finding defendant's overseas assets and contacts in Vietnam, a country which maintains no extradition treaty with the United States, gave her the ability to evade capture); *United States v. Myers et al.*, No. 9-00150 (D.D.C. June 10, 2009) ECF No. 16 at 16 ("The United States does not have an extradition treaty with Cuba; indeed the two countries do not have diplomatic relations."); *United States v. Butina*, No. 18-00218 (D.D.C. July 24, 2018) ECF No. 15 at 6 ("A defendant's citizenship of a country with which the United States has no extradition

---

[1] *See British spy and his Chinese handler used private jet to escape to China, report claims*, Intelnews.org (Nov. 10, 2025), *available* at https://intelnews.org/2025/11/10/01-3417/; *see also 2 Men Wanted For Attempting to Smuggle Arms to China, Harassing Dissident Flee House Arrest In Serbia*, Radio Free Europe / Radio Liberty (Sept. 16, 2025), *available* at https://www.rferl.org/a/serbia-john-miller-cui-guanghai-arms-smuggling-apec-xi/33531833.html.

treaty is a factor relevant to an assessment of the defendant's history and characteristics."); *United States v. Amar*, 300 F. Supp. 3d 287, 289 (D.D.C. 2018) (finding that a defendant who was a citizen of a country with which the United States had no extradition treaty had a "plausible destination to which to flee).

Moreover, Defendant's 1001 conviction exposes him to significant prison time under the Guidelines and the 18 U.S.C. § 3553(a) factors. The statutory maximum penalty for the 1001 conviction is 60 months and, as will be briefed more fully in the Government's sentencing memorandum, multiple Guidelines enhancements apply that the Government submits fully support an upward departure, including obstruction of justice due to Defendant's perjury, abuse of position of trust, and use of sophisticated means. Contrary to Defendant's assertion, Mot. at 3, the applicable Guideline is § 2B1.1, not § 2J1.2. Under § 2B1.1, as with an economic espionage conviction (*see* Guidelines Appendix for 18 U.S.C. § 1831), the Court may consider the actual or intended pecuniary loss or gain resulting from Defendant's deceit. In this case, because insider Federal Reserve information is so valuable, the loss figure can easily push Defendant to the statutory maximum sentence under 1001. Defendant's exposure at sentencing provides him a strong incentive to flee.

*Second*, Defendant argues that despite his 1001 conviction, he "was not trying to hide information from the" OIG investigators. Mot. at 4. This appears to be another argument for release based on the nature and circumstances of the conviction. But this § 3142(g) factor also counsels against release. To convict Defendant of the 1001 count, the jury found that the evidence proved beyond a reasonable doubt that Defendant's false statements to OIG were made knowingly and willfully. *See* ECF No. 76 (Final Jury Instructions) at 36. They concluded that his lie to the OIG was not made by mistake or accident.

Defendant also wrongly characterizes the jury's verdict as finding only that Defendant shared a Federal Reserve FOMC Class II document with a co-author in March 2019 and forgot to tell the OIG investigators about that single instance. Mot. at 4.[2] This ignores the exhibits and testimony that showed multiple instances where Defendant shared restricted Federal Reserve information with people outside the Federal Reserve, including Hummin Lee. For example, it ignores the April 2018 DesiGov Book section on China marked "Internal FR" that Defendant emailed to Hummin. *See* Gov. Exs. G352, 352A. It ignores the October 2018 Internal Federal Reserve analysis on washing machine tariffs that was marked "Internal FR/Official Use//FRSOnly," which Defendant emailed to Hummin after forwarding it from his Board email account to his personal Google Account. *See* Gov. Exs. G353, G581, G581A. Defendant even admitted on direct and cross examination that he told Hummin not to share the washing machine tariff analysis with anyone because he knew it was sensitive but nonetheless sent it to Hummin so that he could "teach" him about the topic during "class."

---

[2] Defendant also wrongly claims that his willingness to consent to OIG's search of his electronics and Google Account led to the discovery of the March 2019 transmission. Mot. at 4. This is incorrect. As the agents testified at trial, they were unable to review the contents of Defendant's personal email account and Hummin Lee's email account until they executed email search warrants in 2024.



Furthermore, the evidence at trial showed that on numerous occasions, Defendant printed or removed from Board email systems sensitive and non-public Federal Reserve information shortly before meeting with Hummin Lee in China to teach "classes" about topics similar to the topics discussed in the sensitive and non-public Federal Reserve documents that Defendant had accessed shortly before those meetings. For example, in November 2018, Defendant emailed a DesiGov Book with a limited distribution warning page to his personal email account, in violation of Board policies:

> **Nonpublic Information**
>
> **FOR YOUR USE ONLY**
>
> **DO NOT DISSEMINATE**

*See* Gov. Exs. G413 and G413A. He sent this email shortly before meeting with Hummin Lee in China.

Additionally, Defendant sent an internal Board analysis about the European Central Bank that was marked Class II FOMC to his personal email account and then to a professor at Fudan University with a request to turn the email into a PDF. *See* G336 and G421. Defendant sent the request to the Fudan University professor a few days before meeting with Hummin Lee in China for another "class." On an earlier occasion, Defendant had similarly sent a restricted Board document to a person at Fudan University and asked that person to save the document to a thumb drive shortly before meeting with Hummin for "class." Gov. Ex. G412. Therefore, contrary to Defendant's argument in his Motion, the jury's verdict did not reject the Government's claim that Defendant shared restricted Federal Reserve information with Hummin. Indeed, to find that Defendant's statement to the OIG investigators in 2020 that he "never" shared restricted Federal Reserve information outside the Board constituted a violation of 1001, the jury needed to conclude that the false statement was material. It is unreasonable to conclude from the jury's verdict that they found that Defendant's failure to mention the Fudan University email, standing alone without any connection to Hummin, was material. The significance of this for the present Motion is that

under the Guidelines and the 18 U.S.C. § 3553(a) factors, Defendant still faces a significant sentence and continues to have an incentive to flee should he be released pending sentencing. *See also* Guideline § 1B1.3(c) ("Relevant conduct" includes acquitted conduct if such conduct "also establishes, in whole or in part, the instance offense of conviction").

*Third*, Defendant argues that he and his family have suffered during his pre-trial detention. Mot. at 4. This is not a factor under § 3142(g) and it is irrelevant to determining whether Defendant poses a flight risk. The Court should not consider it.[3]

But even if the Court were to consider the hardship on Defendant's family, the primary reason Defendant offers for why he should be released is to care for his minor daughter Shushu. Mot. at 4 ("Prior to Defendant's detention, Defendant had been the primary caregiver of Defendant's young daughter, who is seven years old."). The reality, however, is that for the last 13 months while Defendant has been detained, Shushu's care has been provided by others.

[REDACTED]

---

[3] To the extent Defendant is arguing under 18 U.S.C. § 3145 that his personal circumstances constitute "exceptional reasons" for his release, that section does not apply here. Section 3145 concerns "[a] person subject to detention pursuant to section 3143*(a)(2) or (b)(2)*." 18 U.S.C. § 3145(c) (emphasis added). Neither of those subsections of Section 3143 applies here, because based on Defendant's 1001 conviction, Section 3143(a)*(1)* governs.

*Fourth*, Defendant argues that he has "ample ties to the local community" and "a supportive family." Mot. at 4-5. These are factors that may be considered under § 3142(g) as aspects of Defendant's history and characteristics. But the Defendant has not proposed any third-party custodian or plan for release. And while his siblings and mother attended trial, none of them offered to be a third-party custodian and all live in different states that are located far from the District of Columbia. Likewise, neither Defendant's adult children, his ex-wife, nor his current wife Yuyu Liu have offered to be a custodian.

Defendant was a long-time D.C. area resident, but in the years leading up to his arrest, he spent a significant amount of time in China and established deep personal and professional connections there. Before he was arrested in January 2025, his sole employment was in China at Fudan University, and he had spent more than half of 2024 and significant amounts of time in 2023 and 2022 in China. *See* Gov. Ex. G12 (travel log). Defendant's wife is a Chinese citizen with limited English proficiency. Defendant's stepdaughter still lives in China. Despite Defendant's claim that his "motivation . . . is to rejoin his family," Mot. at 5, his most immediate family (his wife, minor daughter, and stepdaughter) have much stronger connections to China than to the United States. If Defendant were able to return to China, he likely will be welcomed with open arms and resume his lucrative position at Fudan University.

Defendant also has significant resources in China that would make it easy to return to his life there. Before Defendant was arrested in January 2025, more than $750,000 had been deposited into his Chinese bank account between 2022 and 2024. This is in addition to the approximately $75,000 per year that Defendant receives from his Board pension. The Government has very

limited insight into Defendant's finances in China. What it does know is that he has a bank account in China, Hummin Lee has access to that account, hundreds of thousands of dollars were transferred from that Chinese bank account into Defendant's U.S. bank account six months before he was arrested, and Defendant had a very lucrative position at Fudan University and a large and prestigious Chinese government research grant before he was arrested. Moreover, over $50,000 in cash was discovered in his apartment when he was arrested. This is a significant amount of cash to have on hand and even if it belonged to Ms. Liu, Defendant had access to it and could use similar bulk cash upon release to flee the United States in a manner that would be difficult for law enforcement to detect and stop.

When Defendant's family and community ties in the D.C. area are considered in conjunction with his family and community ties in China, employment, financial resources, and recent length of residence in China, Defendant has not shown by clear and convincing evidence that these aspects of his history and characteristics warrant release.

*Lastly*, Defendant argues that he has no criminal record or history of drug or alcohol abuse. Mot. at 5.[5] The Government agrees that these aspects of his history and characteristics counsel against detention, but they do not show by clear and convincing evidence that he does not pose a flight risk.

    2.    **Other § 3142(g) Factors Defendant Did Not Mention Also Support Detention**

In addition to the aspects of the § 3142(g) factors Defendant raised in his Motion and those that the Government mentioned above, there is additional evidence that the Court heard during trial that further demonstrates that Defendant cannot rebut the presumption of post-conviction

---

[5] Oddly, Defendant also boasts that he "has a flawless record concerning his appearance at court proceedings." Mot. at 5. That is because he has been in jail since he was indicted and arrested in January 2025.

detention and has not carried his burden to prove by clear and convincing evidence that he is not a flight risk.

### a. *History and Characteristics of Defendant – Defendant's Character*

At trial, Defendant committed perjury by lying under oath about a variety of topics, some more germane to the case than others.[6] The Government will describe the full extent of Defendant's perjury in its forthcoming sentencing memorandum, but for the purpose of the pending Motion, Defendant's perjury provides insight into his character under § 3142(g)(3)(A) and demonstrates his "unwilling[ness] to conform his conduct to the dictates of the law." *United States v. Wills*, 311 F. Supp. 3d 144, 1478 (D.D.C. 2018). Defendant was willing to violate his oath to tell the truth in court, *see* Trial. Tr. (Jan. 30, 2026) 29:6-7 (Defendant sworn in before his testimony); likewise, he would be willing to disobey the Court's orders related to any conditions of release.

As one example of his perjury, Defendant lied on the stand about whether he was paid by Shanghai University of Finance and Economics ("SHUFE"). At trial, Defendant first testified on direct examination that he was never paid by SHUFE. Trial Tr. (Jan. 30, 2026) at 79:6-8 ("Q. You're teaching at SHUFE . . . Are you getting paid for that? A. No."). But in an October 18, 2018 WeChat message to Hummin Lee, Defendant stated that Fudan University was paying him 65,000 RMB and SHUFE was paying him 100,000 RMB. Gov. Ex. G3 at Row 2104. And in a January 5, 2019 message to Ms. Liu after he left her in China to return to the United States, Defendant wrote that he "gave" her 130,000 RMB which was "[a]ll of the rmb from [his] teaching

---

[6] For example, Defendant lied on direct examination of when he last had sex with his wife. In an effort to portray himself as, in his counsel's own words, a "dupe" and a "sucker," Defendant claimed he last had sex with his wife in October 2017. Trial Tr. (Jan. 30, 2026) at 85:23-25. Evidence, including videos, obtained from search warrants of electronic devices and accounts (which were turned over in discovery) prove that this is false.

12

at Fudan + SUFE." *Id.* at Row 2321. Based on exchange rates in January 2019, 130,000 RMB was worth approximately $18,000 to $19,000 at that time. Defendant also told the FBI in a May 2021 interview, with his counsel present, that Fudan University and SHUFE each paid him $10,000, for a total of approximately $20,000.

When confronted with this evidence on cross examination, Defendant continued to lie and claimed that he had a "slight correction" to his testimony on direct examination and that he now remembered that SHUFE paid him, but he returned the money. Trial Tr. (Jan. 30, 2026) at 161:3 to 162:13. In addition to contradicting the messages to Ms. Liu from January 2019 that he had already given her the money from Fudan *and* SHUFE, Defendant's "slight correction" makes no sense. Defendant claimed on direct examination that the reason he was unable to be paid by SHUFE was because he did not have the correct visa in China. He claimed, falsely under oath, that SHUFE never paid him, even though he taught there. *Id.* at 79:6 to 80:6. If SHUFE was initially unable to pay Defendant due to a visa issue, then how was Fudan University able to pay him during the same time period and what changed that later allowed SHUFE to pay Defendant?

In another example, Defendant perjured himself when describing his relationship with the Chinese spy, Hummin Lee. Defendant testified on direct examination that his meetings with Hummin Lee were independent studies where he and Hummin taught Ph.D. students from Shandong University of Finance and Economics. Trial Tr. (Jan. 30, 2026) at 42:14 to 22 and 66:9 to 67:15. Defense counsel emphasized this point in his opening statement. *Id.* (Jan. 21, 2026) at 193:11 to 194:16. Defendant's messages with Hummin Lee, though, showed Hummin Lee discussing the homework he was doing for Defendant and the reports that Defendant was helping Hummin Lee write for the Chinese government. Moreover, this is not the story that Defendant told the Court when he initially opposed the Government's Motion for Pretrial Detention in

13

February 2025. In that brief, Defendant repeatedly described Hummin Lee as "the defendant's student" and one of "his students." ECF No. 12 at 3-4.

Defendant also falsely implied in that brief that his work with Hummin Lee was related to his teaching job at Fudan University and that his instructions to Hummin Lee to make the "classes" look legitimate "demonstrate[d] the defendant's commitment to do the teaching which he was hired to do." *Id.* at 3.[7] But on direct examination at trial, Defendant testified that he was never hired or paid by Hummin Lee or Shandong University of Finance and Economics, which, according to him, explains why he never sought Board approval for any of his activities related to Hummin Lee and Shandong University of Finance and Economics.

These are but two examples of Defendant's perjury at trial, but they demonstrate Defendant's character as it pertains to his truthfulness with this Court and his willingness to ignore its dictates. This additional information militates in favor of detention.

      **b.**     ***History and Characteristics of Defendant – Financial Resources***

Defendant's testimony at trial further detailed his extensive financial resources in China that he could use to flee. He testified that between 2022 and 2024, Fudan University paid him $600,000 in salary. Trial Tr. (Jan. 30, 2026) 97:8 to 98:21. He also testified that in 2023, he received a three-year $300,000 research grant from the Chinese government that was paid in full upfront. *Id.* 98:22 to 99:16. The fact that Defendant has substantial funds in foreign bank accounts

---

[7] Defendant's briefing also repeats a minor, but false statement about the day Defendant was arrested. In his initial opposition to the Government's Motion for Pretrial Detention and Defendant's pending Motion for Presentencing Release, Defendant emphasizes that he was arrested upon returning home from taking his daughter to the bus stop. Mot. at 4 ("Defendant had just returned from taking his daughter to the bus stop."); ECF No. 12 at 2 ("The defendant was in fact returning from taking his daughter to the bus stop when he was arrested by FBI agents . . ."). But on the day Defendant was arrested, his daughter Shushu had stayed at home because she was sick, and Defendant had walked a neighbor's child to the bus stop before he was arrested. This is a minor point, but it is another example of Defendant's unreliability and untrustworthiness.

that are beyond the control of U.S. law enforcement is another reason that he has failed to show by clear and convincing evidence that he is not a flight risk. *See, e.g.*, *United States v. Saani*, 557 F. Supp. 2d 97, 99 (D.D.C. 2008) (finding that substantial money in foreign bank accounts counsels in favor of detention).

## CONCLUSION

Defendant's Motion fails to carry the "heavy statutory burden" that Congress imposed under 18 U.S.C. § 3143(a)(1) to secure his pre-sentencing release. *Chansley*, 2021 WL 4133655, at *4; *see also United States v. Olis*, 450 F.3d 583, 585 (5th Cir. 2006) ("A convicted defendant has no constitutional right to bail. Thus, as the parties acknowledge, any putative right to bail derives from 18 U.S.C. § 3143, which establishes a presumption against its being granted.") (internal quotation marks and citations omitted). Based on the nature and circumstances of Defendant's conviction (including a possible five-year prison sentence and significant fine), his significant family ties to China, his recent and extensive residence in China, his lucrative position at a prestigious university in China, his substantial financial resources in foreign bank accounts, and his character for disobeying his oath to the Court to tell the truth, Defendant has not shown by clear and convincing evidence that he does not pose a flight risk. Accordingly, his Motion should be denied and he should continue to be detained.

                                          Respectfully submitted,

                                          JEANINE FERRIS PIRRO
                                          United States Attorney

                                          */s/ Adam P. Barry*
                                          ADAM P. BARRY
                                          Cal. Bar No. 294449
                                          Thomas N. Saunders
                                          N.Y. Bar No. 4876975
                                          Assistant United States Attorneys
                                          National Security Section

601 D Street, NW
Washington, D.C. 20530
Office: 202-252-7793
Email: adam.barry@usdoj.gov;
thomas.saunders@usdoj.gov

Nicholas O. Hunter
D.C. Bar No. 1022355
Yifei Zheng
N.Y. Bar No. 5424957
Trial Attorneys
National Security Division
U.S. Department of Justice
950 Pennsylvania Ave, NW
Washington, D.C. 20530
Telephone: (202) 353-3434
E-mail: nicholas.hunter@usdoj.gov;
yifei.zheng@usdoj.gov