UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA : | |
| : | Case No.:  25-cr-00033 (DLF) |
| v. : | |
| : | |
| JOHN HAROLD ROGERS, : | |
| : | |
| : | |
| Defendant. : | |

GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION FOR
JUDGMENT OF ACQUITTAL AND, IN THE ALTERNATIVE,
MOTION FOR A NEW TRIAL ON COUNT 2

Defendant John Rogers' Motion for Judgment of Acquittal and, in the Alternative, Motion for a New Trial ("Motion" or "Mot."), ECF No. 84, falls far short of meeting the heavy burdens imposed by Rules 29 and 33 of the Federal Rules of Criminal Procedure to set aside the jury's guilty verdict and acquit Defendant or grant him a new trial. After witnessing testimony from eleven witnesses, including Defendant, and seeing and hearing over two hundred exhibits, the jury deliberated for more than a day and reached a unanimous verdict, convicting Defendant of making a false statement to the Federal Reserve Board's Office of the Inspector General ("OIG") (Count 2) and acquitting him of conspiracy to commit economic espionage (Count 1). In reviewing Defendant's Motion for Judgment of Acquittal of Count 2, the Court "must view the evidence in the light most favorable to the verdict." *United States v. Campbell*, 702 F.2d 262, 264 (D.C. Cir. 1983). "Typically, the jury's determination will stand unless *no* reasonable juror could have found a defendant guilty beyond a reasonable doubt." *United States v. Ring*, 786 F. Supp.2d 302, 304 (D.D.C. 2011) (emphasis added).[1] Similarly, under Rule 33, "[a] defendant has a heavy burden"

---

[1] Unless otherwise noted, all internal quotation marks and citations have been omitted from this brief.

to vacate a judgment and get a new trial. *Id.* at 310. While the Court has "broad authority to order a new trial, it should be exercised sparingly and limited to situations presenting a serious danger that a miscarriage of justice has occurred—that is, that an innocent person has been convicted." *United States v. Borda*, 786 F. Supp. 2d 25, 32 (D.D.C. 2011). Defendant has neither demonstrated that no reasonable juror could find him guilty beyond a reasonable doubt of Count 2 nor identified any basis to conclude that his trial and conviction constitute a miscarriage of justice. Accordingly, his Motion should be denied.

## ARGUMENT

### A.   The Evidence Supports the Jury's Conviction on Count 2

"Presented with a motion for a judgment of acquittal on the ground that the evidence is insufficient, the Court must consider 'whether, viewing the evidence in the light most favorable to the Government, according the Government the benefit of all legitimate inferences, and recognizing that it is the jury's province to determine credibility and to weigh the evidence, a reasonable jury must necessarily entertain a reasonable doubt on the evidence presented.'" *United States v. Cabrera*, 734 F. Supp. 2d 66, 87 (D.D.C. 2010) (quoting *United States v. Singleton*, 702 F.2d 1159, 1163 (D.C. Cir. 1983)). Here, when viewing the evidence in the light most favorable to the Government and drawing all legitimate inferences in the Government's favor, a reasonable jury could, and did, conclude that Defendant was guilty beyond a reasonable doubt of each element of 18 U.S.C. § 1001.

*First*, the jury had ample evidence to find beyond a reasonable doubt that on or about February 4, 2020, Defendant made a statement or representation. *See* Final Jury Instructions (ECF No. 76) at 36-37 (1001 jury instruction). The jury heard testimony from OIG Special Agent Alan Hershkowitz about the timing and context of the February 4, 2020 interview of Defendant. *See* Trial Tr. (Jan. 23, 2026) at 30:11 to 31:15. Agent Hershkowitz also testified that he believed

Defendant lied about numerous topics during the February 4, 2020 interview, including Defendant's statements regarding whether he ever shared restricted Federal Reserve information. *Id.* at 98:11 to 99:13.[2] The jury also heard clips from a recording of the interview itself, including the clip where Defendant said "never" in response to the questions, "did you ever provide or share any restricted Board information? . . .you know, restricted FR, restricted controlled, internal FR, FOMC information of any class, did you ever share or provide any of this information with anyone else outside of the Board?" Gov. Ex. 2P at 0:14 to 0:35. Agent Hershkowitz further testified that the person whose voice was heard in the audio recording saying "never" in response to Agent Hershkowitz's questions was Defendant. Trial Tr. (Jan. 23, 2026) at 48:9-10. Defendant himself, on direct examination, confirmed that he told the OIG investigators "never" in response to their questions about him ever sharing restricted Federal Reserve information on February 4, 2020. Trial Tr. (Jan, 30, 2026) at 106:24 to 107:10. This element, like most of the elements of § 1001, was essentially uncontested at trial. Thus, the evidence on this element reasonably permitted a juror to conclude that the Government proved this element beyond a reasonable doubt.

*Second*, the jury had ample evidence to find beyond a reasonable doubt that the February 4, 2020 statement or representation was material. Defendant made the false statement in the context of the OIG investigators trying to determine two things: (1) were the people who were blackmailing Defendant after he sent them nude photographs related to Defendant's activities in

---

[2] Defendant notes that the indictment did not specify which of Defendant's statements from the February 4, 2020 was false. Mot. at 2. That is technically true, but earlier in the indictment, in the overt acts portion of the conspiracy count, the indictment stated, "on or about February 4, 2020, when asked 'So did you ever provide or share restricted Board information . . . did you share or provide any of this information with anyone else outside of the Board?' ROGERS responded 'Never.'" ECF No. 1 (Indictment) ¶ 17oo. The indictment also alleged all the elements of an 18 U.S.C. § 1001 violation. *Id.* ¶ 19. This was sufficient to "fairly apprise the [Defendant] of the conduct allegedly constituting the offense so as to enable him to prepare a defense against those allegations." *United States v. Dale*, 782 F. Supp. 615, 621 (D.D.C. 1991) (citations omitted).

China; and (2) had Defendant shared restricted Federal Reserve information with outsiders who could later use that information to harm the Federal Reserve. As Agent Hershkowitz said in the interview, he was trying to determine whether if the threats "were to escalate some more" or the blackmailers came at Defendant "from a different angle," did the blackmailers have restricted Federal Reserve information that they could use to harm Defendant or the Federal Reserve. Gov. Ex. 2P at 0:00 to 0:15. Agent Hershkowitz testified at trial that Defendant's lie about never sharing restricted Federal Reserve information was capable of influencing, and did, in fact, influence, the investigation because it led the investigators "in the wrong direction." Trial Tr. (Jan. 23, 2026) at 165:1 to 165:13. If Defendant had told the truth, OIG "would have been able to identify more quickly the records that he had taken" and OIG's investigation would have taken a different path. *Id.* at 165:5 to 166:3.

Moreover, Agent Hershkowitz testified that if Defendant had told the truth in February 2020, Defendant likely would have been fired earlier (instead of more than a year later) and the Federal Reserve "would have been able to change some of the security procedures" to protect against similar threats. *Id.* The Federal Reserve's OIG would have saved "a lot of time and effort" if Defendant had been honest in the beginning. *Id.* To satisfy the element of materiality, the Government needed to prove that the false statement had "a natural tendency to influence, or is capable of influencing, the decision of" the OIG. ECF No. 76 (Final Jury Instructions) at 36; *see also United States v. Moore*, 612 F.3d 698, 701 (D.C. Cir. 2010) ("We now join the other circuits in holding a statement is material if it has a natural tendency to influence, or is capable of influencing, either a discrete decision or any other function of the agency to which it was addressed."). Agent Hershkowitz's testimony, and the context of the interview as demonstrated through the interview recording itself, allowed a reasonable jury to conclude beyond a reasonable

doubt that Defendant's lie that he "never" shared restricted Federal Reserve information was material to the OIG's investigation.

*Third*, the jury had ample evidence to find beyond a reasonable doubt that the February 4, 2020 statement was false, fictitious, or fraudulent. Defendant does not dispute that he shared restricted Federal Reserve information with a professor at Fudan University in March 2019. Mot. at 3 ("[I]t was undisputed, that Defendant did in fact share a Class II document (G-336) with a co-author at Fudan University."). He effectively concedes that this alone gave the jury sufficient evidence to conclude that his February 4, 2020 statement was false. Defendant takes his argument too far, however, by claiming that the "government presented *no* evidence that Defendant shared any restricted information with Hummin Lee." Mot. at 3 (emphasis added). In the first instance, the false statement alleged by the Government was that Defendant lied when he stated that he "never" shared "restricted FR, restricted controlled, internal FR, FOMC information of any class . . . with anyone else **outside of the Board**." Gov. Ex. 2P at 0:14 to 0:35 (emphasis added). And while Hummin Lee is certainly someone "outside of the Board," the Government's theory of the false statement did not require proof that Defendant provided restricted information to Hummin Lee specifically.

But the evidence presented at trial was more than sufficient to demonstrate that Defendant did provide restricted information to Hummin Lee. As detailed in the Government's Opposition to Defendant's Motion for Release from Detention Pending Sentencing, Defendant's argument "ignores the exhibits and testimony that showed multiple instances where Defendant shared restricted Federal Reserve information with people outside the Federal Reserve," ECF No. 98 at 6, including, among other examples, (1) the April 2018 DesiGov Book section on China that Defendant emailed to Hummin Lee; (2) the October 2018 internal Federal Reserve washing

5

machine tariff analysis that Defendant emailed to Hummin Lee; (3) the November 2018 DesiGov Book with the "Nonpublic Information" and "Do Not Disseminate" labels that Defendant removed from the Federal Reserve email account to his personal email account shortly before meeting with Hummin Lee for "class"; (4) the June 2019 Class II FOMC pre-FOMC briefing script and post-briefing notes that Defendant printed the night before he flew to China to meet with Hummin Lee for "class"; and (5) the March 2019 Class II FOMC staff analysis of the European Central Bank announcement that Defendant removed from his Federal Reserve email account to his personal email account and then sent to a Fudan University professor's email account in China shortly before meeting with Hummin Lee for "class." *See* Gov. Opp. to Mot. for Post-Conviction Release from Detention, ECF No. 98 at 6-9 (highlighting some of the evidence supporting conclusion that Defendant's statement that he "never" shared restricted Federal Reserve information was false); *see also* Gov. Exs. 334, 335, 336, 351, 351A, 351B, 352, 352A, 353, 353A, 353B, 411, 411A, 412, 413, 413A, 414, 414A, 415, 420, 421, 581, 581A, and 582.

The evidence at trial also proved that Defendant had a pattern of responding to Hummin Lee's requests for information about the Federal Reserve by asking his Federal Reserve colleagues for information on the topics Hummin Lee requested and then meeting with Hummin Lee in late-night hotel rooms for their "classes" at which Defendant taught Hummin Lee about the Federal Reserve. The jury heard Defendant himself testify that he knowingly emailed Federal Reserve information marked as non-public, which Defendant knew was sensitive, to his personal email account for the purpose of using that information to teach Hummin Lee "classes." Trial Tr. (Jan, 30, 2026) at 74:22 to 75:1 and 136:10 to 137:11. From this, a reasonable juror could have concluded that, in addition to emailing restricted Federal Reserve information to people outside of

the Federal Reserve System, Defendant also shared restricted Federal Reserve information with Hummin Lee in person.

As one example, the Government admitted circumstantial evidence at trial that allowed a reasonable jury to conclude beyond a reasonable doubt that Defendant shared restricted information regarding an upcoming June 2019 FOMC meeting with Hummin Lee *before* the FOMC June 2019 decision was made public.  The night before Defendant traveled to China, he printed two FOMC Class II briefing documents that contained, among other things, the views of a Board Governor leading up to the June 2019 FOMC decision regarding interest rates.  *See* Gov. Exs. G334 (June 2019 FOMC Briefing Notes); G335 (June 2019 FOMC Briefing Text); G358 (data loss prevention log showing Defendant printing Exs. G334 and G335); G12 (Defendant's Travel Summary Chart).  Defendant's WeChat messages with Hummin Lee showed that before Defendant printed the documents, Hummin Lee asked him for information about the Federal Reserve's thinking regarding "the U.S. economic situation of first half in 2019."  Gov. Ex. G3 at Row 2474.  Hummin Lee's request was consistent with prior requests he had sent to Defendant asking for inside Federal Reserve information and the Federal Reserve's economic forecasting outlook, including questions about whether the Federal Reserve was satisfied with the current trend of the dollar, what its expectation was for the future trend of the dollar, what the Federal Reserve's "specific plan and timetable" was to achieve its goals regarding the dollar, and what the Federal Reserve expected regarding China's financial liberalization efforts.  *See* Gov. Exs. G3E and G3F.  Hummin Lee's WeChat messages also contained photographs showing Defendant meeting with Hummin Lee and his associates in a hotel room in China where Defendant appeared to be sharing paper documents and documents on a computer screen.  Gov. Ex. 3 at Rows 2619 to 2624.  Then,

7

after the FOMC's public June 2019 announcement, Hummin Lee sent Defendant a WeChat message that stated, "Same as you predicted!" *Id.* at Row 2646.

Defendant argues that the jury's acquittal of the economic espionage conspiracy count necessarily means that the jury found that Defendant had only shared the single restricted Board analysis regarding a European Central Bank decision with the Fudan University professor and that the "government produced no evidence at trial that Defendant delivered any restricted Federal Reserve information to Hummin Lee." Mot. at 3. That is one inference from the jury's verdict, but it is not the only inference, especially when, at the Rule 29 stage, the Court must view the evidence in a light most favorable to the government and accord the government the benefit of all legitimate inferences. *United States v. Weisz*, 718 F.2d 413, 437-38 (D.C. Cir. 1983).

Another reasonable inference from the jury's verdict is that while it found that the government had not proven beyond a reasonable doubt that Defendant knowingly and willfully joined the economic espionage conspiracy that Hummin Lee and his fellow spies were operating, it found that the Defendant had shared restricted Federal Reserve information with Hummin Lee and the professor at Fudan University, such that his February 2020 denial was false. The jury had sufficient evidence to draw this inference after weighing the evidence and determining the credibility of witnesses, including Defendant himself. On a post-verdict motion for a judgment of acquittal, the Court "must assume the truth of the Government's evidence and give the Government the benefit of all legitimate inferences to be drawn therefrom." *Bailey v. United States*, 416 F.2d 1110, 1112 (D.C. Cir. 1969). Accordingly, based on the evidence presented at trial, a reasonable juror could conclude beyond a reasonable doubt that Defendant's February 4, 2020 denial of ever sharing restricted Federal Reserve information was false, fictitious, or fraudulent. And even if the jury doubted whether Defendant had shared restricted information with Hummin Lee, by

Defendant's own admission, he shared restricted information with a professor at Fudan University, who was also most certainly "outside the Board."

*Fourth*, the jury had ample evidence to find beyond a reasonable doubt that the false, fictitious, or fraudulent statement was made knowingly and willfully by Defendant. The jury had recorded clips of the February 4, 2020 interview itself, from which the jury could evaluate Defendant's demeanor and tone, as well as the clarity of the questions to which Defendant responded. *See* Gov. Ex. 2P. The jury also knew about the broader context of the interview from the other clips and excerpts from the interview transcript, *see* Gov. Exs. 2A to 2Z, as well as Agent Hershkowitz's testimony regarding his perception that Defendant was being evasive during the interview. Trial Tr. (Jan. 23, 2026) at 85:19 to 86:1 ("It seemed . . . a large part of Dr. Rogers's interview with us was a lot of misdirection . . ."). For example, the jury heard that while Defendant claimed on direct examination that he went to OIG to obtain "protection of [his] family," Trial Tr. (Jan. 30, 2026) at 90:22 to 91:3, he lied to the OIG investigators and never told them that the blackmailers got the photos of his daughter because Defendant had voluntarily sent those photographs to the blackmailers when he was exchanging nude photographs with them. The jury also heard Defendant make inconsistent statements under oath between his direct and cross examinations, from which they could draw reasonable inferences regarding Defendant's credibility and his statements at trial that he never shared restricted Federal Reserve information and that he did not remember sending the Class II FOMC document relating to the European Central Bank to a professor in China or anyone else.

Defendant argues that "[t]here is nothing to suggest that Defendant recalled sharing a document with a co-author almost a year before," and that, therefore, there was insufficient evidence for a reasonable jury to conclude that Defendant's February 4, 2020 false statement was

9

made knowingly and willfully.  Mot. at 3.  Such an argument ignores the evidence recited above, as well as the testimony and documentary evidence at trial showing that, on prior occasions, Defendant used personnel at Fudan University to prepare documents and information for Defendant to later use for his "classes" with Hummin Lee.  *See, e.g.*, Trial Tr. (Jan. 30, 2026) at 136:10 to 136:11 (testifying that in advance of a "class" with Hummin Lee, Defendant sent the sensitive Federal Reserve document to a Fudan University employee to place on a thumb drive).

Moreover, the jury heard substantial evidence about Defendant's efforts to conceal from the Board his work with Hummin Lee, money and other pecuniary benefits he received in China, and details of his relationship with Hummin Lee.  From this, the jury could reasonably infer that Defendant knew his activities with Hummin Lee were wrong and that he, therefore, knowingly and willfully sought to conceal them, including during his February 2020 OIG interview.  For example, the jury heard testimony from the Federal Reserve Board's ethics officer Sean Croston about Defendant's failure to report and seek pre-approval for his work at Shandong University of Finance and Economics, even though Defendant had sought such approval for his work at Georgetown University, Fudan University, and Shanghai University of Finance and Economics.  Trial Tr. (Jan. 29, 2026) at 143:8 to 143:19.  The jury also heard Defendant's shifting stories between direct examination and cross examination about whether he ever, in fact, was paid by Shanghai University of Finance and Economics.  *Compare* Trial Tr. (Jan. 30, 2026) at 79:6-8 ("Q. You're teaching at SHUFE, so the Shanghai University of Finance and Economics.  Are you getting paid for that?  A.  No."), *with id.* at 161:16 to 162:13 ("Q. On direct examination you told Mr. Gitlen you never got any money from Shanghai University of Finance and Economics and the Shanghai Institute, correct?  A. That is what I said earlier this morning.  There is a slight correction . . . Q. So now your testimony is that you actually were paid by one of the Shanghai universities .

. .? A. For this – for the year 2019 . . . I was paid by them. Q. So . . . now you remember you got paid by one of the Shanghai universities?  A. That's correct."). From this inconsistency, the jury could have legitimately concluded that Defendant's prior false statement to OIG was made knowingly and willfully.

The jury also could have concluded from Defendant's extensive training in how to properly handle restricted Federal Reserve information, including FOMC classified information, that his denial to OIG of ever sharing restricted Federal Reserve information was knowing and willful because, at the time of the interview, Defendant knew that his prior conduct was wrong, violated Board policies, and could get him in trouble, including possible termination from the Board. FOMC Secretary Joshua Gallin, Board cybersecurity analyst Jeremy Cannon, and Agent Hershkowitz testified about the annual training that Defendant took which taught him how he should handle and safeguard restricted Federal Reserve information, including FOMC classified information. Trial Tr. (Jan. 22, 2026) at 64:24 to 66:9; *id.* (Jan. 23, 2026) at 40:5 to 40:17; *see also* Gov. Exs. G366 and G344 (Defendant's training records). Defendant's training records provided the jury with additional evidence from which to reasonably conclude that when Defendant lied to OIG on February 4, 2020 about whether he ever shared restricted Federal Reserve information, he lied knowingly and willfully.

In short, sufficient direct and circumstantial evidence was presented at trial to allow the jury to find beyond a reasonable doubt that Defendant's false statement in the February 2020 OIG interview was made knowingly and willfully. While different inferences can be drawn from the evidence, in light of the jury's verdict, the Court must draw all inferences in favor of the Government, draw "no distinction between direct and circumstantial evidence," and give "full play

to the right of the jury to determine credibility, weigh the evidence and draw justifiable inferences of fact." *United States v. Purdy*, 2025 WL 219111, at *1 (D.D.C. Jan. 14, 2025).

*Lastly*, the jury had ample evidence to find beyond a reasonable doubt that Defendant's February 4, 2020 statement or representation was made in a matter within the jurisdiction of the executive branch of the United States government. Agent Hershkowitz testified that the Federal Reserve Board's OIG was part of the executive branch of the U.S. government, and that he interviewed Defendant on February 4, 2020 as part of his OIG duties. Trial Tr. (Jan. 23, 2026) at 29:7 to 30:24. Defendant does not challenge the sufficiency of evidence regarding this element.

Ultimately, the jury had abundant evidence to convict Defendant of making a false statement to the Federal Reserve's OIG on February 4, 2020. The Court's review of the jury's verdict is "highly deferential" and the Court "must accept" the verdict if "any rational trier of fact could have found the elements of the crime beyond a reasonable doubt." *United States v. Williams*, 836 F.3d 1, 6 (D.C. Cir. 2016). When examining Defendant's Motion for Judgment of Acquittal "through this deferential lens," it fails and should be denied. *Id.* at 6.

B.     **Defendant Is Not Entitled to a New Trial**

Defendant argues, in the alternative, that the interest of justice requires that he be given a new trial on Count 2. Mot. at 4. In a single page, he makes two arguments, neither of which carries the heavy burden that Rule 33 imposes to set aside a jury verdict and order a new trial. *First*, Defendant argues that when he was asked on February 4, 2020 whether he ever shared restricted Federal Reserve information outside of the Board, he thought the question was limited to whether he ever shared restricted Federal Reserve information with Hummin Lee. Mot. at 4. This argument fails.

Defendant is impermissibly rearguing what inference should be drawn from the evidence presented at trial and ignoring the evidence that contradicts his defense. As phrased, Agent

12

Hershkowitz's testimony was not limited to whether Defendant shared information *only* with Hummin Lee. In fact, Agent Hershkowitz phrased the question broadly in the context of whether he should be concerned that the people blackmailing Defendant would escalate their behavior and begin to threaten to share restricted Board information that Defendant had previously given to them. *See* Gov. Ex. 2Z at USA-ROG-0361639. Agent Hershkowitz testified at trial that at the time of the February 2020 interview, he did not know whether the blackmail activity was related to Defendant's relationship with Hummin Lee or anyone else in China. That is why he asked Defendant whether he "ever provide[d] or share[d] any restricted Board information" with "*anyone else* outside of the Board." *Id.* (emphasis added).

Moreover, as described above, *supra* at 5-8, the jury had ample evidence to conclude that Defendant shared restricted Federal Reserve information with Hummin Lee specifically, so even if the Court accepted Defendant's contorted interpretation of Agent Hershkowitz's question, there was still sufficient evidence to convict Defendant on the false statement count.

*Second*, Defendant argues that the Government misstated the evidence in closing argument when it suggested that there was a connection between Hummin Lee and Defendant emailing the Class II FOMC document relating to the European Central Bank to a professor at Fudan University to make Defendant a PDF. Mot. at 4. This was not a misstatement of the evidence or improper argument. As discussed above, Defendant had on prior occasions sent material to people with Fudan University email accounts with requests to convert the material into a different format (*e.g.*, place on a thumb drive) so that Defendant could use the material during his "classes" with Hummin Lee.

The method and timing of Defendant's email to the Fudan University professor also supported an argument that Defendant sent the European Central Bank document to his Fudan

13

University contact to be used during his meetings with Hummin Lee. Defendant emailed the Class II FOMC document to the Fudan University professor on March 8, 2019. Gov. Ex. G421. Before emailing the document to the Fudan University professor, Defendant removed the Class II FOMC labels and headers and removed the document from the Board's protected systems by first emailing the document to his personal email account. *Id.*; *see also* Trial Tr. (Jan. 30, 2026) at 134:1 to 135:9 (Defendant admitting that he removed the Class II FOMC Restricted header before emailing the document from his Federal Reserve email account to his Google account and then to the Fudan University professor). Defendant also admitted on cross examination that he met with Hummin Lee shortly after sending the document to the Fudan University professor to be made into a PDF. *Id.* From this evidence, a reasonable jury could have concluded that Defendant sent the European Central Bank document to the Fudan University professor to assist Defendant in his meetings with Hummin Lee. This was a reasonable inference based on Defendant's past practice of removing restricted Federal Reserve documents using his personal email account and his willingness to continue to meet with Hummin Lee and his colleagues even after realizing that they were asking him for non-public insider information about the Federal Reserve.

The jury also could have reasonably concluded that if Defendant was, as he now argues, simply sending the European Central Bank document to a co-author for an innocuous purpose, why did he first strip the Class II FOMC markings (which prevented the Board's data loss prevention tool at the time from flagging the email) before sending the email from his Federal Reserve email account to his personal email account and then to the Fudan University professor. The jury could have reasonably concluded that if Defendant did not believe he was doing anything wrong, why did he not simply email the document from his Federal Reserve email account to the Fudan University professor's email account.

14

The jury's rejection of Defendant's interpretation of the evidence is not a situation "in which the substantial rights of the defendant have been jeopardized by errors or omissions during trial." *United States v. Wheeler*, 889 F. Supp. 2d 64, 69 (D.D.C. 2012). The Government's argument in closing that Defendant asked the Fudan University professor to make a PDF of the restricted European Central Bank document so that he could teach the information to Hummin Lee was supported by the circumstantial evidence admitted in the trial. But even if the Court concluded otherwise, Defendant forfeited any objection to that argument by not making it at the time. *See Smith v. Kmart Corp.*, 177 F.3d 19, 25 (1st Cir. 1999) ("when no timely objection is made, claims of improper closing argument are forfeited . . . and thus amenable to review for plain review"). Additionally, any resulting error from the Government's statement was harmless and does not warrant a new trial. *See Wheeler*, 889 F. Supp. 2d at 70 ("[A] new trial should be granted only if the defendant has shown that the error was substantial, not harmless, and that the error affected the defendant's substantial rights."). As detailed above, the jury had plenty of other evidence to convict Defendant of the § 1001 count. Defendant has neither identified a true trial error nor explained why what he characterizes as an error had a substantial effect on the verdict. Therefore, Defendant's Motion for a New Trial should be denied.

## CONCLUSION

For the reasons stated above, Defendant's Motion for Judgement of Acquittal or, in the Alternative, a New Trial on Count 2 (false statement) should be denied.

> Respectfully submitted,
>
> JEANINE FERRIS PIRRO
> United States Attorney
>
> */s/ Adam P. Barry*
> ADAM P. BARRY
> Cal. Bar No. 294449

Thomas N. Saunders
N.Y. Bar No. 4876975
Assistant United States Attorneys
National Security Section
601 D Street, NW
Washington, D.C. 20530
Office: 202-252-7793
Email: adam.barry@usdoj.gov;
thomas.saunders@usdoj.gov

Nicholas O. Hunter
D.C. Bar No. 1022355
Yifei Zheng
N.Y. Bar No. 5424957
Trial Attorneys
National Security Division
U.S. Department of Justice
950 Pennsylvania Ave, NW
Washington, D.C. 20530
Telephone: (202) 353-3434
E-mail: nicholas.hunter@usdoj.gov;
yifei.zheng@usdoj.gov