**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | **:** | |
| | **:** | **Case No.:  25-cr-00033 (DLF)** |
| **v.** | **:** | |
| | **:** | |
| **JOHN HAROLD ROGERS,** | **:** | |
| | **:** | |
| | **:** | |
| **Defendant.** | **:** | |

## GOVERNMENT'S SENTENCING MEMORANDUM

On February 3, 2026, a jury convicted defendant John Harold Rogers of willfully making a material false statement to federal investigators in violation of 18 U.S.C. § 1001.  The verdict reflects what the evidence overwhelmingly established: Rogers—formerly a Senior Advisor at the Federal Reserve Board of Governors ("FRB")—looked federal investigators in the eye during a February 2020 interview and categorically denied ever sharing restricted, nonpublic Federal Reserve information with anyone outside the Federal Reserve.  This was a lie.  As the evidence at trial proved, for years the defendant had a close and clandestine relationship with a Chinese spy named Hummin Lee with whom he shared restricted Federal Reserve information under the guise of holding fake "classes" in China.  The jury acquitted the defendant of joining a conspiracy to commit economic espionage with Hummin Lee.  But in convicting Rogers of making a false statement, the jury necessarily had to conclude that Rogers shared Federal Reserve restricted information in China during his clandestine relationship with Hummin Lee.  The law permits and justice demands the Court to consider the totality of Rogers' conduct in fashioning an appropriate sentence.

The defendant compounded his lies to investigators by lying to the Court and the jury at trial.  The defendant took the stand and offered false testimony designed to mislead the jury about his conduct and make him look like a "sucker"—as defense counsel characterized the defendant

in opening statements. The defendant lied about his relationship with Lee, the money he received while in China, and even intimate aspects of his own personal life, among other topics. The defendant perjured himself in part to garner sympathy from the jury and convey a false persona of a clueless, lonely, and desperate figure—himself the actual victim of everyone else's actions—whose worst offense was that he realized that Hummin Lee was a Chinese spy only after he had been charged.

This is an exceptional case that warrants the maximum custodial sentence available under the statute—sixty months. This recommendation is driven by the extraordinary nature and circumstances of the defendant's offense, his flagrant and repeated obstruction of justice including perjury at trial, and the compelling need for general deterrence in cases, like this one, involving espionage and espionage-adjacent activity, including the disclosure of sensitive government information by a U.S. government insider to a foreign adversary that could use that information to harm the national security of the United States. A sentence of sixty months is sufficient, but not greater than necessary, to comply with the purposes of 18 U.S.C. § 3553(a).

I.      **The Court May Consider the Defendant's Years-long Relationship with Chinese Spies to Determine the Guidelines Range and the Appropriate Sentence Under 18 U.S.C. § 3553(a).**

The defendant lied extensively throughout his February 4, 2020 interview with the FRB Office of Inspector General ("OIG") about all aspects of his conduct: from the nature of his interactions with Hummin Lee and his associates, to whether the defendant had taken nude photographs of himself using Federal Reserve equipment in Federal Reserve buildings. At trial, the Government focused on—and the jury convicted the defendant for telling—one of the most egregious lies in that interview. The defendant responded "never" when asked if he had provided restricted Federal Reserve information to anyone outside of the Federal Reserve.

Evidence about the nature of the defendant's relationship with spies working for the government of the People's Republic of China ("PRC")—namely Hummin Lee, Ricky, and "Professor Cui"—was integral to proving the defendant's guilt under § 1001 beyond a reasonable doubt.  The Government's evidence established that after meeting Lee at a conference in China, the defendant formed a deep and personal relationship with Lee that culminated in the defendant meeting with Lee and his colleagues in hotel rooms in China to teach them "classes" about the Federal Reserve.  Lee tasked the defendant to collect specific information from the Federal Reserve that was of interest to the PRC government, including restricted information from other Federal Reserve employees.  Lee sought, and the defendant collected, confidential, forward-looking information about internal decision and policy making at the Federal Reserve.  The defendant obtained the information from colleagues who trusted him and whom the defendant misled about his intentions.

On at least one occasion, the defendant also printed highly sensitive, restricted, and clearly labeled with "**CLASS II FOMC**[1] **– RESTRICTED FR**" documents to take with him on a trip to the PRC in June 2019.  During that June 2019 trip, the defendant met with Hummin Lee.  This was consistent with the defendant's pattern:  shortly after collecting Federal Reserve information that Hummin Lee had requested, the defendant would meet with Lee and his colleagues in hotel rooms in China to "teach" them fake "classes" with the misappropriated information.  Lee then used that information to write reports that the defendant knew were for the PRC government.  In another instance, the defendant emailed labeled Class II FOMC information (stripped of its classification markings) from his Federal Reserve email account to his personal email account, and then from

---

[1] As explained at trial, Class II FOMC information generally consists of Board staff forecasts prepared for the Federal Open Market Committee ("FOMC") and internal information from Board employees about open market operations.

his personal email account to a professor at Fudan University—a PRC state-run university—so that the professor could make a PDF of the information just days before the defendant met Lee for another "class" in China.  *See* Gov't Trial Exs. G420 and G421.

In his objections to the PSR, the defendant argues that, pursuant to U.S.S.G. § 1B1.3, his acquittal of the 18 U.S.C. § 1831 count (Count 1) strips the Court of authority to consider his years-long relationship with Chinese intelligence operatives in calculating his Guidelines range or determining the sentence using the factors in 18 U.S.C. § 3553(a).  He is wrong on both fronts.  As a threshold matter, the defendant's espionage-related conduct is not "acquitted conduct" within the meaning of § 1B1.3(c) because it "establishes, in whole or in part, the instant offense of conviction."  U.S.S.G. § 1B1.3(c); *see also id.* App. Note 10 (where the same conduct underlies both an acquitted count and the offense of conviction, "the court is in the best position to determine whether such overlapping conduct establishes, in whole or in part, the instant offense of conviction and therefore qualifies as relevant conduct.").

Evidence of the nature of the defendant's relationship with PRC spies was an essential part of the proof for the 18 U.S.C. § 1001 (Count 2) conviction.  It put the lie to the defendant's statement that he had "never" shared restricted information outside the Federal Reserve and showed why the defendant's lie was material to law enforcement.  Evidence of the full scope of that relationship—including the defendant's responsiveness to taskings from Lee and meeting for fake "classes" over many years—was strong evidence that the defendant had, in fact, shared restricted information outside the Federal Reserve.  Spies, after all, are in the business of gathering non-public political, military, and economic information from their intelligence assets.

Evidence of the full scope of the defendant's conduct with Hummin Lee was also important evidence of the defendant's motive to lie to the Federal Reserve OIG.  The defendant sought to

hide the full scope and true nature of his improper relationship with Lee. That motive evidence thus helped prove that the defendant's lies to OIG were knowing and willful. Accordingly, the Court can and should consider all of the defendant's conduct presented at trial in determining the Guidelines range and fashioning an appropriate sentence. Both D.C. Circuit caselaw and the Guidelines permit the Court to do so.

Moreover, there is no logical inconsistency in considering the conduct associated with Count 1 as part of the conduct of conviction associated with Count 2. The evidence supporting the economic espionage conspiracy count was intended to show that the defendant *agreed* with Hummin Lee and other PRC spies to provide them with restricted, non-public, and sensitive Federal Reserve information for the benefit of the PRC government. The evidence supporting the false statements count showed that the defendant *actually did provide* such information to Lee and others associated with the Chinese government and then lied about it to federal investigators. The same evidence and conduct was relevant to proving both counts.

In all events, even if the acquitted conduct is not relevant conduct for the purpose of calculating the Guidelines, it can still be considered under the 18 U.S.C. § 3553(a) factors. "No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." 18 U.S.C. § 3661. And the Supreme Court has long permitted sentencing courts to consider acquitted conduct that is proven by a preponderance of the evidence. *See United States v. Watts*, 519 U.S. 148, 152 (1997) (under pre- and post-Guidelines sentencing regimes it is "well established that a sentencing judge may take into account facts introduced at trial relating to other charges, even ones of which the defendant

has been acquitted."); *see also* U.S.S.G. § 6A1.3 commentary ("[N]othing in the Guidelines Manual abrogates a court's authority under 18 U.S.C. § 3661.").

The case *United States v. Dorcely*, 454 F.3d 366 (D.C. Cir. 2006), is particularly instructive. There, the defendant was charged with conspiracy to defraud the United States, conspiracy to commit money laundering, and making a false statement to the FBI. *Id.* at 370. A jury convicted the defendant of the false statement count and acquitted him of the two conspiracy counts. *Id.* At sentencing, the district court found that the Government had proven by a preponderance of the evidence that the defendant had participated in the conspiracies and sentenced him to 24 months' imprisonment. *Id.* at 370-71. On appeal, the defendant argued that the district court's consideration of his acquitted conduct at sentencing violated his Sixth Amendment right to trial by jury and his Fifth Amendment right to due process. *Id.* at 371. The D.C. Circuit rejected those arguments and held that "a sentencing court may base a sentence on acquitted conduct without offending the defendant's Sixth Amendment right to trial by jury." *Id.* at 371. The D.C. Circuit stated that "[t]he Supreme Court has instructed that 'highly relevant—if not essential—to the judge's selection of an appropriate sentence is the possession of the fullest information possible concerning the defendant's life and characteristics.'" *Id.* at 372 (quoting *Williams v. New York*, 337 U.S. 241 (1949)). Accordingly, a sentencing court "may consider a defendant's past criminal behavior, even if no conviction resulted from that behavior, without violating due process." *Nichols v. United States*, 511 U.S. 738, 747 (1994). A sentencing court's consideration of acquitted conduct, especially when proven by a preponderance of the evidence, violates neither a defendant's Sixth Amendment right to trial by jury nor a defendant's Fifth Amendment right to due process. Thus, even if the Court concludes that some of the defendant's acquitted conduct here is not connected to the offense he was convicted of (which it should not), the Court may still "rely on

facts for which a defendant was expressly acquitted by a jury" in applying the § 3553(a) factors. *United States v. Abu Khatallah*, 314 F. Supp. 3d 179, 187 (D.D.C. 2018).

The few out-of-circuit appellate courts to have considered the § 1B1.3(c) acquitted-conduct amendment since it went into effect in November 2024 have held that it does not change binding precedent that permits courts to consider acquitted conduct that is proven by a preponderance of the evidence under the § 3553(a) factors.[2] *See, e.g.*, *United States v. Texidor*, 164 F.4th 248, 254-55 (3d Cir. 2026) ("§ 1B1.3(c) does not preclude courts from considering acquitted conduct when analyzing the factors under 18 U.S.C. § 3553(a) and determining whether and where to impose a sentence within or outside of the Guidelines range."); *United States v. Ware*, 141 F.4th 970, 974 n.2 (8th Cir. 2025) ("[T]he [amended] Guideline [§ 1B1.3(c)] does not prohibit a court from considering acquitted conduct when analyzing the factors from § 3553(a)"); *United States v. Ralston*, 110 F.4th 909, 921 (6th Cir. 2024) ("[T]he 'amendment precludes consideration of acquitted conduct in the context of *calculating the [G]uidelines*,' but . . . a court may still consider acquitted conduct when 'imposing a sentence.'") (quoting Vice Chair Claire Murray, Remarks at United States Sentencing Commission Public Meeting, Apr. 17, 2024); *see also United States v. Pharms*, No. 24-14191, 2026 WL 311607, at * 4 (11th Cir. Feb. 5, 2026) ("[W]e have no occasion to question our precedents or those of the Supreme Court . . . As two other federal courts of appeals have reasoned, this [§ 1B1.3(c)] amendment to the Guidelines does not limit the scope of conduct a sentencing court can consider under § 3553(a), i.e., the sentencing court's sentencing authority separate from calculating the Guideline range.").

---

[2] The government is aware of no D.C. Circuit case that has considered the November 2024 amendment.

Accordingly, under binding Supreme Court and D.C. Circuit precedents, at sentencing, the Court can and should consider all of the defendant's conduct evinced at trial when analyzing the § 3553(a) factors, regardless of the Count 1 acquittal. "[A]cquittal on criminal charges does not prove that the defendant is innocent; it merely proves the existence of a reasonable doubt as to his guilt." *Watts*, 519 U.S. at 155. Moreover, the court need not grapple with whether the jury found certain facts but not others. "[I]t is impossible to know why a jury found a defendant guilty on a certain charge." *Id.* Instead, the Court is permitted to determine for itself what facts the Government proved at trial by a simple preponderance of the evidence. *See id.* at 156; *United States v. Settles*, 530 F.3d 920, 923 (D.C. Cir. 2008) ("[L]ong-standing precedents . . . establish that a sentencing judge may consider uncharged or even acquitted conduct in calculating an appropriate sentence, so long as that conduct has been proved by a preponderance of the evidence. . . ."); U.S.S.G. § 6A1.3 & cmt.

## II.    The Appropriate Guidelines Range is 63 to 78 Months' Imprisonment.

Aside from the application of an additional enhancement for the illicit gains the defendant obtained from his conduct, described below, the Government agrees with the Guidelines calculation set forth by the Probation Office in its draft Presentence Investigation Report ("PSR").[3]

For the reasons described in the Government's objections to the draft PSR (Ex. A) (attached hereto), an additional 8-level increase to the offense level proposed in the draft PSR is warranted under U.S.S.G. § 2B1.1(b)(1).[4] That increase is necessary to account for the illicit financial gains

---

[3] The enhancement for a gain greater than $250,000 up to $550,000—as suggested by the Government—is +12. U.S.S.G. § 2B1.1(b)(1). Relative to the calculation in the PSR, that increase reduces the level of the enhancement for sophisticated means, U.S.S.G. § 2B1.1(b)(10), which the PSR calculates as +6 because, with the gains adjustment, the offense level is now greater than 12.

[4] The Government has also attached, as Exhibit B, a more detailed analysis of the other aspects of the Guidelines calculation that is consistent with Probation's recommendation.

the defendant realized from his sharing of restricted Federal Reserve information in the PRC.  The Government conservatively estimated the defendant's actual financial gains tied to the conduct in China about which he lied to OIG investigators.  That is, the Government limited its calculation to the defendant's gains from his work for Hummin Lee and Fudan University, which are the two relationships in which the Government proved the defendant shared restricted Federal Reserve information.  The Government's estimate is conservative because it does not include an estimate of the enormous value *to the PRC government* of the Federal Reserve restricted information that the defendant shared.

Given all of the evidence, and for the reasons stated in the PSR and the Government's objections to it, the appropriate Guidelines calculation is as follows:

| Guideline | |
|---|:---:|
| Base Offense Level (§ 2B1.1(a)(2)) | 6 |
| Actual Gains Greater than $250,000 up to $550,000 (§ 1B1.1(b)(1)) | +12 |
| Sophisticated Means / Foreign Commission (§ 2B1.1(b)(10)(B),(C)) | +2 |
| Misappropriation of Trade Secret / Foreign Government Benefit (§ 2B1.1(b)(14)(B)) | +4 |
| Abuse of Position of Trust (§ 3B1.3) | +2 |
| Obstruction of Justice (§ 3C1.1) | +2 |
| Zero-Point Offender Adjustment (§ 4C1.1) | -2 |
| **Total Offense Level** | **26 (63-78 months)** |

9

### III.    A Sentence of 60 Months is Sufficient but not Greater than Necessary under the 18 U.S.C. § 3553(a) Factors.

A. *The Nature and Circumstances of the Offense Warrant a Significant Penalty Due to the Harm to U.S. Economic and National Security that the Defendant Caused and Concealed.*[5]

The defendant lied to FRB OIG investigators about transferring restricted Federal Reserve information outside the Federal Reserve to conceal his improper activities with PRC government officials and spies. He sought to obstruct investigators from determining the extent to which he had placed his own personal interests above those of the Federal Reserve, and compromised restricted U.S. government information about the FRB's and the FOMC's internal deliberations.

The national security implications of the defendant's conduct are significant. In 2022, the United States Senate Committee on Homeland Security and Governmental Affairs published a report about the exact threat posed by people like the defendant titled, "China's threat to the Fed: Chinese Influence and Information at U.S. Federal Reserve Banks."[6] As stated in that report, "[t]he Federal Reserve System is at the Center of U.S. monetary policy and is key to the stability of our nation's financial system." Portman Report at 7. "[P]rotecting the Federal Reserve from malicious foreign interference is critical to ensuring the security of the American financial system." *Id.* China, in particular, "has made no secret of its goal to supplant the U.S. as the global economic leader and end the U.S. dollar's status as the world's primary reserve currency." *Id.* at i. Many of the Government's witnesses at trial, including FOMC Secretary Joshua Gallin and the Government's experts, expounded on the critical role the Federal Reserve plays in protecting and promoting the health of the U.S. economy and national security.

---

[5] 18 U.S.C. § 3553(a)(1).

[6] *Available at* https://www.hsgac.senate.gov/imo/media/doc/HSGAC%20Report%20-%20China%20Threat%20to%20the%20Fed.pdf (hereinafter, the "Portman Report").

Because of its critical role, the Federal Reserve is a prime target for PRC espionage efforts. As Dr. Brad Setser testified at trial:

> [I]f I were . . . the head of China's central bank, I would probably want to know one thing above all when I woke up every morning, and that is, more or less, what's going to happen to U.S. interest rates, and what's going to happen to the U.S. dollar. And no institution has a bigger impact on the dollar and on U.S. interest rates than the Fed.

1/30/26 Morning Trial Tr. at 10. The defendant provided that exact type of information to Hummin Lee in China. He provided internal Federal Reserve documents that were not authorized for release, including documents at the FOMC Class II level, which is the second-highest level of classification in the Federal Reserve. He provided insider, advance predictions about how the FOMC would change interest rates before the FOMC made its widely anticipated announcements. The defendant did all that knowing that Lee was writing reports for the PRC government using the information he provided. And the defendant knew that the PRC could use the restricted information he provided to make enormous sums of money trading its massive holding of U.S. Treasuries and related instruments.

The defendant went to great lengths to conceal his activities, because he knew they were wrong. Most notably, he lied repeatedly to the Federal Reserve OIG during his February 4, 2020 interview. Per the count of conviction, the defendant falsely claimed that he never shared restricted FRB or FOMC information outside the Federal Reserve. But he also misled investigators about the true nature of his relationship with Hummin Lee and his colleagues, including "Professor Cui." After admitting in the interview that he knew Hummin Lee and Professor Cui wanted to get "inside" information about the Federal Reserve from him, the defendant claimed he "removed" himself from the situation by refusing to accept the packets of $100 dollar bills that Lee and Cui offered him after a late-night dinner. Gov't Trial Ex. G2Z at 34. Later in the interview, the

defendant claimed he "removed" himself from such interactions with Lee and Cui by "just pointing them" to the Federal Reserve's website when they sought secret information. *Id.* at 57. But that, too, was false. Not once did the defendant disclose to OIG that he frequently met with Hummin Lee for purported "classes" in hotel rooms. As the trial evidence showed, those "classes" were the forum for the defendant to "teach" Hummin Lee using restricted information from the Federal Reserve—the same type of information the jury found the defendant lied about "never" transferring outside the Federal Reserve.

Prior to the OIG interview, the defendant and Hummin Lee went to great lengths to conceal their conduct in the PRC. Using traditional spycraft, the defendant and Hummin Lee created the false cover story of "classes" to obfuscate the true purpose of their meetings: to exchange restricted, inside information about the FRB and the FOMC. The defendant orchestrated that cover story. In WeChat messages from September 2018, the defendant set forth how to make his fake classes appear "legitimate in the eyes of the Fed.":

| 1832 | 9/5/2018 3:57:53 PM | John Rogers | Hummin Lee | Next week would be fine, yes, and the topic is fine too. But there has to be a lot more done to make this legitimate in the eyes of the Fed. Remember, it has to be teaching and not consulting. The difference is extremely important to the Fed. I am only allowed to teach. Here is a list of things that we need to try and do, to satisfy the definition of this being a course: (1) A course title. Even something like "Topics in International Finance and Macroeconomics" would be fine. (2) A list of students taking the course. Even if it is only 2 or 3, that would be fine. (3) Credit or "points" should be awarded to students taking it. (4) The course should be listed at SDUFE. (5) I should produce a course syllabus, showing readings, exams, and homework. (6) A grade should be given to students taking the course officially. |
|------|---------------------|-------------|------------|---|
| 1833 | 9/5/2018 3:59:05 PM | John Rogers | Hummin Lee | I know this sounds like a lot. But think about what would happen if I was asked to produce information on any one of those 6 items and I had no answer. That would cause me a lot of trouble! |

Gov't Trial Ex. G3. No syllabus or other materials evidencing a legitimate class have ever been found. Nor did the defense introduce any at trial. The defendant and Lee manufactured a cover story about "classes" to obfuscate the nature of their conduct if it ever came to light. Put

differently, the defendant prepared to lie to the Federal Reserve about his activities in the PRC long before his February 4, 2020 interview with the FRB OIG.

The defendant sold out the Federal Reserve and his colleagues for personal gain and gratification. Through Hummin Lee, the PRC provided the defendant with a new wife, a new family, money, friendship, and professorships at prestigious universities. The defendant told investigators that he "owe[d] everything to [Hummin Lee]." Gov't Trial Ex. G2Z at 15, 31. He told a family member that he was "forever indebted" to Hummin Lee. Gov't Trial Ex. G408. The defendant repaid those debts by providing Lee with restricted information from the Federal Reserve and then lying about it when the OIG came looking.

The nature and circumstances of the defendant's conduct in the PRC and the lies he told to federal investigators have significant implications. The PRC has described its economic competition with the United States as a "financial war."[7] One of the battlefields in that war is international trade and monetary policy, which is substantially influenced by the decisions of the Federal Reserve. The defendant served as a field lieutenant in that war, and then lied to federal investigators about what he had done. His lies were material and affected the United States' ability to fight back and protect the Federal Reserve. The OIG described some of the immediate effects on the OIG investigation in its victim impact statement. (Ex. C) (attached hereto). But even more broadly, espionage and counter-intelligence investigations are notoriously difficult, especially when they involve a sophisticated actor like the PRC government. As here, the relevant conduct and exchange of secret information often occurs overseas, in hotel rooms, with actors who use false cover stories and are trained to avoid detection by U.S. law enforcement.

---

[7] *E.g.*, Julian Gewirtz, *Look Out: Some Chinese Thinkers are Girding for a 'Financial War'*, POLITICO (Dec. 17, 2019), https://www.politico.com/news/magazine/2019/12/17/look-out-some-chinese-thinkers-are-girding-for-a-financial-war-086610.

Ultimately, the buck stops with the government employees and contractors with access to America's secrets.    Federal agencies entrust employees to protect sensitive and non-public information from foreign adversaries, and to use that information to protect the American people. When that information is compromised, the federal government needs to trust that its employees will tell the truth so that the damage can be mitigated.  The defendant did neither.  A 60-month sentence is necessary and appropriate given the nature and circumstances of his conduct.

B. *The Defendant's Sophistication Regarding U.S.-China Economic Relations and His History of Manipulation, Lying, and Perjury Counsel in Favor of the Statutory Maximum Sentence.[8]*

The defendant is a highly educated and sophisticated man who occupied a position of trust in the U.S. government and knew that his actions in the PRC were wrong.  The defendant served in increasingly senior roles at the Federal Reserve for decades and had access to policy makers and the information, documents, and staff that informed their decisions about U.S. monetary and economic policy.  And he knew the rules for protecting FRB and FOMC information.  He took extensive annual training on it.  Indeed, part of his responsibilities at the Federal Reserve included reviewing the work of other economists to ensure the protection of restricted Federal Reserve information.  Gov't Ex. G2Z at 28.  The defendant abused his position of trust when he conveyed restricted Federal Reserve information to individuals in the PRC and then lied to FRB OIG investigators about it.

The defendant was uniquely situated to understand how his illicit actions would benefit the PRC in its economic competition with the United States.  The defendant's research at the FRB focused on that very issue.  He understood the economy of the PRC.  (*E.g.*, Exs. D (economics

---

[8] The facts described in this section also go to the defendant's history and characteristics under 18 U.S.C. § 3553(a)(1).

paper titled "The Effect of the China Connect" authored by the defendant and two co-authors) & E (economics paper titled "U.S.-China Tension" authored by the defendant and two co-authors)). And he wrote papers and taught legitimate classes at Georgetown about how changes in monetary policy affect markets. *E.g.*, Gov't Trial Exs. G402, G503A. He knew that the restricted information he provided to the PRC government could allow it to make untold sums of money by trading with its roughly $1.5 trillion in U.S. Treasury securities and related instruments. *See, e.g.*, 1/30/26 Morning Trial Tr. at 9.

The defendant has also shown a willingness to lie whenever it suits him and to avoid taking responsibility for his own actions. At trial, the defendant perjured himself extensively. His perjury included core issues like the nature of his fake "classes" with Lee and the payments he received from Lee and PRC universities. But he also lied about his personal life and character in an attempt to paint himself a fool. The defendant—a highly intelligent, world-renowned economist—designed those lies to portray himself as someone who was too immature and naïve to have realized that Hummin Lee was a spy, to have conspired with him to commit economic espionage, or to have knowingly and willfully lied to federal investigators about sharing restricted Federal Reserve information with people in China.

Instances of the defendant's perjury at trial included, but were not limited to, the following:

1.  **<u>Receiving No Payments from SHUFE / SUFE</u>**: The defendant testified multiple times at trial that he never received payment from the Shanghai University of Finance and Economics ("SHUFE" or "SUFE"). *See* 1/30/26 Morning Trial Tr. at 79-80 ("Q: And the reason for that was because you didn't get paid? A: Right."); *id.* at 106 ("Q: Did you ever get compensated from this contract [with SHUFE]? A: No."); 1/30/26 Afternoon Trial Tr. at 161-162 ("When I discovered that [SHUFE] was paying me, in my Chinese bank account, I had the money

returned."). The trial evidence, however, proved that the defendant received payment from SHUFE, hid it from the FRB, and lied to the FRB's ethics official—Sean Croston—about whether he even worked at SHUFE at all. Relevant trial exhibits proving the defendant's perjury include:

- **Gov't Trial Ex. G3 (WeChats, lines 2081, 83)**: The defendant told Hummin Lee on 10/16/2018 "I don't think [the Fed legal office] even know about SUFE even."

- **Gov't Trial Ex. G3 (WeChats, line 2104)**: The defendant told Hummin Lee on 10/18/2018 that "Fudan is paying 65,000 rmb and SUFE 100,000 rmb."

- **Gov't Trial Ex. G3 (WeChats, line 2321)**: The defendant sent Hummin Lee a screenshot on 1/5/2019 of a message to Yu Liu (his wife) stating "I gave you 130,000 rmb. That is all of the money I have. All of the rmb from my teaching at Fudan + SUFE and all of the US dollars I have. 130,000 rmb. That is a lot of money. It is all of the money I have."

- **Sean Croston Testimony** (1/29/26 Trial Tr. at 146): Sean Croston testified that the defendant "told me that he just decided to not teach [at SUFE] at all."

The defendant perjured himself at trial about payments from SHUFE because he wanted an innocent explanation for deceiving the FRB about his relationship with SHUFE. The defendant failed to disclose his teachings at SHUFE to the FRB, and the income he received from it. And he lied to the FRB about it when he stated that he never even taught at SHUFE during his sabbatical. The defendant likely concealed his affiliation with SHUFE from the FRB because he knew that PRC intelligence officials—namely "Professor Cui"—were coordinating with SHUFE about using the defendant to obtain secret information from the Federal Reserve. *See* Gov't Trial Ex. G3 at line 1766-67 (Hummin Lee states "[Prof Cui] also has interest in your teaching at SHUFE, do you mind to let us know which school you will teaching at and who has invited you."). In the defendant's mind, disclosing that relationship could have raised red flags about his relationships in the PRC and his compromise of restricted Federal Reserve information.

2.      **Hummin Lee Was A Professor Who Brought His Own Graduate Student to Learn from the Defendant in their "Classes"**: The defendant testified that Lee was not a student

in the fake hotel room "classes" the defendant taught. Instead, the defendant testified that Lee was a professor with two graduate students—Ricky and "Jack"—whom Lee advised. According to the defendant, Ricky and "Jack" were the students in the fake classes, and Hummin Lee was a co-teacher who simply arranged the "classes" for them. *See* 1/30/26 Trial Tr. At 166, 169. The trial evidence, however, established that Hummin Lee was a fake student in the fake "classes" in which the defendant conveyed the restricted Federal Reserve information he later lied to federal agents about sharing. The defendant helped Lee with topics that Lee was interested in, with the reports Lee needed to draft for the Chinese government, and with the purported class "homework":

- **Ex. G3** (WeChats, lines 1673-76):

  | | |
  |---|---|
  | John Rogers: | How is it going with the essay you are required to write? |
  | Hummin Lee: | I'm collecting some questions for my report, I'll send to you later, thank you for your support! |
  | John Rogers: | I have an idea for a topic for you: analysis of why the Fed did not pursue negative interest rates. |

- **Ex. G3** (WeChats, line 2104):

  | | |
  |---|---|
  | Hummin Lee: | And here are some questions I collected as below: |
  | | [Lee sending photos of papers with questions regarding the Federal Reserve policy, trade war, etc.] |
  | Hummin Lee: | I'm wondering if you could help us to collect answers from your colleagues or documents, and teach us when we met.[Smile] |
  | Hummin Lee: | Meet |
  | John Rogers: | These are good questions. |
  | John Rogers: | I will try to answer but of course cannot State any official Fed policies. Our usual problem! That is why I was hoping that your essay would be more analytical. |
  | Hummin Lee: | Understand, thank you for your support! |

John Rogers:      Try to write up some answers yourself first, even if they are guesses. Then I can comment on your answers. This is a much better way to proceed.

- **Ex. G3** (WeChats, line 1818):  Hummin Lee messaged the defendant: "Could you please do me a favor on my report? Currently I'm working on 2 topics, 1st is the trend of global exchange rate risks, particularly for emerging economies. 2nd is the trend of US monetary policy, in the background of US economy growing faster at the second quarter of this year. No need to write, just help to find some reference or literature is fine, which you believe is right. Many thanks!"

- **Ex G3** (WeChats, line 1886): The defendant messaged Hummin Lee: "Can you write down here the questions you want to write about for Homework 1? I want to add that to the syllabus now."

- **Ex G3** (WeChats, line 2024): The defendant messaged Hummin Lee: "Please think of a trade policy uncertainty topic that you wish to write a report on.  I will add that to the syllabus as Homework 2."

- **Ex G3** (WeChats, line 2230): Hummin Lee messaged the defendant: "Have you read some articles recently which is regarding to U.S. economy assessment of 2018 and predictions of 2019?  If you have, could you please recommend some literatures for my report?  I need to finish this before the end of this month, many thanks!"

The WeChat messages leave no doubt that even under their fake cover story, Hummin Lee was the defendant's student, not a PhD advisor to Ricky and Jack.

The defendant invented this narrative about teaching PhD students studying under Lee because there was a flaw in the defendant's cover story about "classes."  At trial, the defendant needed an innocent explanation for those classes, which were the forum he used to convey restricted Federal Reserve information to Lee.  The defendant testified that Lee earned his PhD in 2016 and thereafter become a professor at Shandong University of Finance and Economics. 1/30/26 Morning Trial Tr. at 42.  Because Lee himself was supposedly a professor—not a student— it would not make sense for the defendant to teach Lee.  The cover story had a hole.  The defendant

18

tried to patch that hole at trial with more material lies that he hoped would explain why Lee—a

purported professor of economics in Shandong—was participating in "classes" with the defendant

in Shanghai hotel rooms.[9]

C. *A Sentence of 60 Months is Necessary to Reflect the Seriousness of the Offense, Promote Respect for the Law, and Provide Just Punishment.[10]*

The defendant sat with federal investigators after he asked them for help with his blackmail

situation and then lied to them. He lied to them about how he was blackmailed in the first place.

And when asked about whether he had ever shared restricted Federal Reserve information outside

the Board, he falsely stated "never" without hesitation. The defendant intended that single word

to bury the truth about years of secret meetings in China, the tens of thousands of dollars in benefits

he received, the damage he caused the Federal Reserve, and the immense benefits he conveyed to

the United States' foremost economic adversary. The defendant's lie was not a moment of panic

or poor judgment. It was the culmination of years of deliberate deception, cover stories, secret

hotel-room    meetings,    stripped    classification    markings,    and    carefully    choreographed

---

[9] As noted in the Government's Opposition to Defendant's Motion for Post-Conviction Release, ECF No. 98 at 12 n.6, the defendant also lied under oath about various aspects of his personal life, including the frequency with which he had sex with his wife and his desire (or lack thereof) to start a new family. The defendant perjured himself at trial about these otherwise highly personal aspects of his life in an effort to blunt the prejudicial effect of the sexual conduct that precipitated his OIG interview. The defendant had been sending nude photos (taken in Federal Reserve facilities, using his FRB-issued phone) to scammers he thought were women online, soliciting sex and sexual conversations. The defendant blamed the purported lack of sex in his marriage as his reason for that behavior by testifying he was "seek[ing] comfort elsewhere." 1/30/26 Morning Trial Tr. at 86. Scammers blackmailed the defendant using those photos, and threatened to reveal them to his employer, which ultimately caused the defendant to seek out the OIG's help. The defendant went so far as to claim that he did not knowingly and willfully lie to OIG because he was too distraught about potential threats to his child, even though he never told the OIG investigators how the scammers got the compromising photos in the first place. The defendant's lies at trial about intimate aspects of his personal life can be easily disproven by uncontroverted evidence (like date-stamped videos).

[10] 18 U.S.C. § 3553(a)(2)(A).

misdirection—all designed to protect the defendant's relationship with the people in China with whom he shared restricted Federal Reserve information in exchange for pecuniary and non-pecuniary benefits. A sentence that fails to reflect the full gravity of that conduct would diminish the seriousness of the offense and send the wrong message to employees at the Federal Reserve and other government institutions who find themselves tempted by the lures of PRC intelligence operations.

Congress has made clear that in certain circumstances, a false statements conviction warrants up to five years in prison. *See* 18 U.S.C. § 1001. False statements made in national security investigations that involve foreign intelligence services hostile to the United States are such a circumstance. For example, in *United States v. Mallory*, 40 F.4th 166, 173 (4th Cir. 2022), the court sentenced the defendant, a former U.S. intelligence officer, to a 60-month sentence for his 1001 conviction that was to run concurrently with his 240-month conviction for spying for the Chinese government. Similarly, in *United States v. Ji Chaoqun*, No. 1:18-CR-0061(1), Dkt No. 409 (N.D. Ill. Feb. 3, 2023), the court sentenced the defendant, a U.S. Army Reservist, to 60 months in prison for his § 1001 conviction to run concurrently with his 96-month sentence for conspiring to act and acting as an agent of the PRC government without notifying the Attorney General, in violation of 18 U.S.C. §§ 371 and 951. *See also id.* Dkt No. 283 (superseding indictment describing charges).

The defendant's acquittal for the conspiracy to commit economic espionage count does not diminish the need for a substantial sentence. The acquittal reflects only that the jury did not find evidence beyond a reasonable doubt that the defendant had fully joined a conspiracy to commit economic espionage. *Watts*, 519 U.S. at 155. But the jury found beyond a reasonable doubt that the defendant had, in fact, conveyed restricted Federal Reserve information to individuals in the

PRC—the conduct that made his statement to investigators false and material.  That conveyance, and the lie the defendant told the OIG about it, harmed the Federal Reserve and benefited the United States' most formidable economic adversary.

Promoting the defendant's respect for the law requires no less than the maximum sentence of 60 months.  The defendant did not merely lie once and recant.  He lied extensively throughout his OIG interview about the nature of his activities, the character of his relationship with Chinese intelligence operatives, and the benefits he received from them.  He even went so far as to describe the cash payments they offered him late at night as an "honorarium."  He then doubled down at trial by perjuring himself with respect to many aspects of his life and relationship with Hummin Lee.  The defendant lied to the court and the jury to create the false impression that he was a dupe who could not possibly have understood the nature and consequences of his own activities or those of Hummin Lee, Ricky, and Professor Cui.

D. *A Sentence of 60 Months is Necessary to Deter the PRC's Systematic Infiltration of U.S. Economic Institutions.*[11]

The need for general deterrence in this case is acute and extends far beyond the defendant. The PRC's campaign to recruit current and former U.S. government officials with access to sensitive economic, scientific, and national security information is well-documented, ongoing, and ever-growing.  The recruitment pattern the evidence established in this case—a foreign intelligence service cultivating a target over years through the gradual development of personal affection and indebtedness, before progressively tasking the target with increasingly sensitive intelligence collection—is not unique to the defendant.  It is a well-known and systematic methodology used by the PRC's intelligence apparatus against the United States.

---

[11] 18 U.S.C. § 3553(a)(2)(B).

The defendant's conduct highlighted that the PRC's intelligence-collection efforts are not limited to traditional military or Intelligence Community targets. The PRC's intelligence-collection efforts extend to all manner of government agencies—including economic ones like the Federal Reserve—that are a source of the United States' economic strength. A significant sentence is necessary to raise awareness and deterrence among employees in such agencies who are not as accustomed to dealing with counterintelligence threats as employees in the military and Intelligence Community.

Moreover, general deterrence of the conduct the defendant engaged in—sharing non-public, sensitive, and restricted information and lying about it to federal investigators—is especially important. More than many other crimes, espionage and espionage-adjacent crimes are extraordinarily difficult to detect, investigate, and prove. The defendant and Hummin Lee communicated on a secure messaging platform (WeChat) outside the reach of U.S. law enforcement, stripped classification markings from documents before transmission, and met in hotel rooms on the other side of the world. It took years for investigators to piece together what the defendant had done. The practical reality is that for every case like this one that is detected and prosecuted, there are unknown others that are not. "[S]ince deterrent effect depends not only upon the amount of the penalty but upon its certainty, crimes that are less grave but significantly more difficult to detect may warrant substantially higher penalties." *Harmelin v. Michigan*, 501 U.S. 957, 989 (1991) (Scalia, J.); *see also, e.g., United States v. Heffernan*, 43 F.3d 1144, 1149 (7th Cir. 1994) ("Considerations of (general) deterrence argue for punishing more heavily those offenses that either are lucrative or are difficult to detect and punish, since both attributes go to increase the expected benefits of a crime and hence the punishment required to deter it."); *United States v. Zukerman*, 897 F.3d 423, 429 (2d Cir. 2018) (affirming upward variance on fine where

district court "put the most weight" on the need for deterrence). That principle applies with particular force to espionage and clandestine foreign-agent conduct, which is professionally designed to evade detection. *See, e.g., United States v. Ji Chaoqun*, 107 F.4th 715, 736 (7th Cir. 2024) (affirming significant sentence where the district court had considered a combination of factors including "whether the defendant cooperated or pleaded guilty, the extent of the defendant's involvement in espionage, and the extent to which the sentencing court considered the need for specific and general deterrence").

E. *A Sentence of 60 Months is Necessary to Protect the Public from Further Crimes of the Defendant.*[12]

Although the defendant's access to Federal Reserve information ceased upon his forced resignation in 2021, the risk he poses to the public and to U.S. national security has not. The defendant spent the better part of a decade developing deep personal, professional, and financial ties to individuals and entities associated with the Chinese government and its intelligence services. After leaving his employment at the Federal Reserve, the defendant leaned into those relationships, relocating part-time to China and accepting university employment that kept him embedded in the PRC institutions associated with his intelligence contacts. He continued to attempt to coordinate "classes" with Hummin Lee as late as 2022, even after he had been forced to resign from the FRB in lieu of termination. And the defendant continued to pursue other professional opportunities within the Federal Reserve System, including some of the regional Federal Reserve Banks.

The defendant is a sophisticated, highly credentialed economist with decades of knowledge about U.S. monetary policy, FRB institutional practices, and other individuals employed at the

---

[12] 18 U.S.C. § 3553(a)(2)(B).

23

Federal Reserve.    Even without current personal access to restricted FRB information, the defendant's PRC relationships and willingness to exploit his former Federal Reserve colleagues presents an ongoing counterintelligence concern.

F. *A Sentence of 60 Months is Necessary to Avoid Unwarranted Sentencing Disparities.*[13]

The sentencing guidelines are the primary means by which courts seek uniformity in sentencing.    As described above, a fulsome accounting of the defendant's conduct results in a Guidelines sentence of 63-78 months, which is in excess of the statutory maximum for a § 1001 conviction. A 60-month sentence, therefore, promotes uniformity in sentencing by coming as close to the appropriate Guidelines range as allowed for the crime of conviction.

The draft PSR cites statistics from Judiciary Sentencing Information (JSIN) for a lower offense level of 18 (27-33 month imprisonment for Criminal History Category I).  According to JSIN, the average sentence imposed for someone in that range where U.S.S.G. § 2B1.1 was the primary Guideline is 20 months.  For an offense level of 26 (63-78 months imprisonment)—as proposed by the Government—JSIN reports the average length of imprisonment is 48 months:

---

[13] 18 U.S.C. § 3553(a)(6).

RESULT

**FILTER SELECTED:**

| | |
|---|---|
| Guideline: | §2B1.1 |
| Final Offense level: | 26 |
| Criminal History Category: | I |
| Guideline Range: | 63-78 |

Export Result to Word

**FEDERAL DEFENDANTS IN SELECTED CELL**

During the last five fiscal years (FY2021-2025), there were 254 defendants whose primary guideline was §2B1.1, with a Final Offense Level of 26 and a Criminal History Category of I, after excluding defendants who received a §5K1.1 substantial assistance departure. For the 248 defendants (98%) who received a sentence of imprisonment in whole or in part, the average length of imprisonment imposed was 48 month(s) and the median length of imprisonment imposed was 48 month(s).

The defendant, of course, is not a garden-variety fraudster to which those averages apply. He lied to federal investigators about espionage activities that involved him breaching his oath of office and abusing his position of trust at the Federal Reserve. A sentence more than the 48-month average is warranted to account for the serious nature of his offense, his perjury, and the need for specific and general deterrence.

As discussed above, similarly situated defendants whose false statements related to PRC espionage activities have received sentences of 60 months for false statement convictions. *See, e.g., Mallory*, 40 F.4th at 173 (60-month sentence for a 1001 violation); *Ji Chaoqun*, No. 1:18-CR-0061(1), Dkt No. 409 (same). Imposing a 60-month sentence here promotes uniformity among similarly situated defendants convicted at trial of making false statements in national security counter-intelligence investigations.

25

**CONCLUSION**

Given the totality of evidence about the defendant's conduct supporting his conviction under 18 U.S.C. § 1001, the Government recommends the statutory maximum penalty of 60 months' imprisonment.

Respectfully submitted,

JOHN A. EISENBERG
Assistant Attorney General
National Security Division

*/s/ Nicholas O. Hunter*
Nicholas O. Hunter
D.C. Bar No. 1022355
Yifei Zheng
N.Y. Bar No. 5424957
Trial Attorneys
National Security Division
U.S. Department of Justice
950 Pennsylvania Ave, NW
Washington, D.C. 20530
Telephone: (202) 353-3434
E-mail: nicholas.hunter@usdoj.gov
yifei.zheng@usdoj.gov

JEANINE FERRIS PIRRO
United States Attorney

Adam P. Barry
Cal. Bar No. 294449
Assistant United States Attorney
National Security Section
601 D Street, NW
Washington, D.C. 20530
Office: 202-252-7793
Email: adam.barry@usdoj.gov

26