**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No.:  25-cr-00033 (DLF)** |
| **v.** | : | |
| | : | |
| **JOHN HAROLD ROGERS,** | : | |
| | : | |
| | : | |
| **Defendant.** | : | |

**GOVERNMENT'S RESPONSE TO DEFENDANT'S SENTENCING MEMORANDUM**

The jury convicted the defendant John Harold Rogers of willfully lying to federal agents. Contrary to what the defendant told the agents, the jury found—beyond a reasonable doubt—that the defendant had transmitted restricted Federal Reserve information outside the Federal Reserve, to government-affiliated persons in China.  The deceptive nature of the defendant's conduct, the gravity of the investigation he sought to obstruct, and the incessant nature of his lying—including under oath at trial—counsel in favor of a 60-month sentence.

The defendant's Sentencing Memorandum, ECF No. 116 (hereinafter, "Def. Memo."), ignores the trial evidence and minimizes his actions by implying that the defendant's bad conduct in China amounted to nothing more than mistakenly emailing restricted information on a single occasion to a Fudan University co-author for a legitimate purpose.  The evidence shows—at least by a preponderance—that is false.  The defendant's transmission of restricted Federal Reserve information was connected to his inappropriate activities with the Chinese spy Hummin Lee.  The defendant engaged in a years-long, undisclosed relationship with Lee and other spies to "teach" them using information he stole from the Federal Reserve.  He concocted a cover story to conceal those activities and ultimately lied about them when he met with federal investigators on February 4, 2020.  Nor was the email transmission of FOMC Class II information to a Fudan University

professor for an innocent purpose.  The defendant emailed that professor for the sole purpose of having him convert the stolen information into a PDF, in furtherance of his fake "classes" with Lee.  The defendant removed identifying information and classification banners in that email to obscure its source and overcome the Federal Reserve's information-security measures.

The defendant's memo also ignores that the Presentence Investigation Report ("PSR") found that the defendant's conduct subjected him to enhancements for being part of a fraudulent scheme committed outside of the United States using sophisticated means (+6), misappropriation of trade secrets to benefit a foreign instrumentality (+4), abuse of a position of trust (+2), and obstruction of justice (+2)—adding 14 additional points to the defendant's base offense level of 6, more than tripling it.[1]  Under the 18 U.S.C. § 3553(a) factors, a custodial sentence of 60 months is sufficient but not greater than necessary to accomplish the purposes of sentencing.

## I.      The Defendant's February 4, 2020 False Statement to OIG

Post-*Booker*, "the abuse-of-discretion standard of review applies to appellate review of all sentencing decisions."  *Gall v. United States*, 552 U.S. 38, 49 (2007).  Because the Sentencing Guidelines are advisory, "the district court retains the discretion to vary upward or downward from the Guidelines range after considering statutorily prescribed sentencing factors."  *United States v. Khatallah*, 41 F.4th 608, 643–44 (D.C. Cir. 2022).  Under a 2024 amendment to the Guidelines, courts are advised not to consider acquitted conduct in calculating the Guidelines "unless such conduct also establishes, in whole or in part, the instant offense of conviction."  U.S.S.G. § 1B1.3(c).

---

[1] The Government also argues that the defendant's conduct justifies a 12-point enhancement because, at a minimum, the defendant gained between $250,001 and $550,000 as a result of his offense.  If at least six points are added from the gain enhancement, the sophisticated means enhancement declines from six to two points.

The defendant argues that no sentencing enhancements apply because they would have to rely on acquitted conduct. Def. Mot. at 4. To the contrary, as described in the Government's opening brief, the conduct that underlies the defendant's § 1001 conviction is inextricably intertwined with the facts that qualify the defendant for multiple sentencing enhancements. *See* ECF No. 115 at 3–5. Thus, under § 1B1.3(c) the conduct that the Government is asking the Court to consider in applying the various sentencing enhancements "also establishes, in whole or in part, the instance offense of conviction."

Even if the Court were to conclude that some of the conduct that the Government is asking it to consider is acquitted conduct, the Court has the discretion to consider that conduct under the § 3553(a) factors. *See United States v. Watts*, 519 U.S. 148, 152 (1997) (per curiam); *United States v. Dorcely*, 454 F.3d 366, 371–72 (D.C. Cir. 2006). Indeed, at sentencing the Court should independently evaluate the evidence and determine whether the Government has proven facts by a preponderance that can be considered during sentencing. *Watts*, 519 U.S. at 156; *Dorcely*, 454 F.3d at 372–73. The Court need not divine the jury's verdict, but should make its own factual findings. *See United States v. Settles*, 530 F.3d 920, 923 (D.C. Cir. 2008) ("[T]he Supreme Court has 'never doubted the authority of a judge to exercise broad discretion in imposing a sentence within a statutory range.'") (quoting *United States v. Booker*, 543 U.S. 220, 233 (2005)).

a. ***The Government Proved that the Defendant Knowingly and Willfully Lied to OIG in February 2020***

After more than a day of deliberations, the jury convicted the defendant of violating 18 U.S.C. § 1001. Notwithstanding the jury's verdict, the defendant continues to fight his conviction. As he did at trial, the defendant claims that when he told the OIG investigators that he "never" shared restricted Federal Reserve information, he "did not remember" sending a Class II FOMC document to a Fudan University professor. Def. Memo. at 3. The jury rejected this explanation

and found that the defendant knowingly and willfully lied to OIG investigators.  To convict the defendant of the § 1001 count, the jury had to conclude that the defendant's denial of ever sharing restricted Federal Reserve information was "committed . . . with the bad purpose to disobey or disregard the law."  *See* Final Jury Instructions, ECF No. 76, at 37.  The defendant's repeated efforts to mischaracterize his false statement as an accident involving a single event that he forgot about, Def. Memo. at 5, relitigates an issue that the jury has already resolved.  The jury convicted the defendant of the § 1001 count which necessarily means that they found his false statement to OIG to have been made knowingly and willfully.

The defendant also argues that under 18 U.S.C. § 3553(a)(1), the "difficult circumstances" of the interview are mitigating because the defendant was worried about the "alarming blackmail threats that he was receiving against him and his then-toddler."  Def. Memo. at 5.  The facts belie this claim.  At no point in the interview did the defendant tell the investigators that the scammers had the nude photos of the defendant because *the defendant* had given them to the scammers in the course of sexting with the scammers.  The defendant also failed to tell the investigators that he had shared photos of his family with the scammers.  Indeed, the scammers' threat to disclose the nude photos of *the defendant* to the Vice Chair of the FOMC is what caused OIG to get involved, because that threat potentially implicated the Federal Reserve and the defendant in his role as a Federal Reserve employee, instead of simply as a victim of cybercrime.  The defendant's failure to tell the investigators how the blackmailers got the photos in the first place strongly suggests that his primary motive in the interview was not, as he now claims, to help the investigators identify the blackmailers and protect against their threats.

**b.**    ***The Government Proved that the Defendant's Statement was False Because He Shared Restricted Federal Reserve Information with Hummin Lee on Numerous Occasions***

The defendant argues that "the only evidence that the government pointed to in support" of the § 1001 conviction was the defendant's March 2019 email to a Fudan University professor that contained FOMC Class II information. Def. Memo. at 3. This ignores the evidence and arguments presented at trial. In its opening statement, the Government stated that when the defendant answered "never" in the OIG interview, that "was a lie because he knew he had been sharing this information with Hummin and with Ricky." 1/21/26 Afternoon Trial Tr. at 172:14 to 173:2. The defendant "was lying because he knew what he had done was wrong, was criminal, and he was trying to conceal his activities." *Id.* Throughout the trial, the Government argued that the § 1001 count was related to the defendant's relationship with Hummin Lee. Indeed, in its closing argument, the Government acknowledged the interwoven nature of the proof and argued that the defendant's false statement was false because the defendant "conducted classes so that he could transfer information to Hummin Lee" and that, in at least one instance, he emailed FOMC Class II information to a Fudan University professor in furtherance of his "classes." 2/2/26 Morning Trial Tr. at 81:12 to 82:11. At no point during the trial was the Government's false statement count predicated solely on the defendant's March 2019 transmission of Class II FOMC information to the Fudan University professor. *See, e.g.*, Gov. Opp'n to Def. Mot. for Judgment of Acquittal and New Trial, ECF No. 103, at 5–9 (detailing direct and circumstantial evidence proving that the defendant's statement was false, including a June 2019 instance where the defendant printed Class II FOMC information the night before traveling to China to teach Hummin Lee a "class," and other instances of the defendant sharing restricted Federal Reserve information with Hummin Lee).

The defendant also argues that the "government did not establish that this specific exchange by Dr. Rogers with the Fudan co-author bore any connection to the conspiracy it alleged with Hummin Lee in Count One." Def. Memo. at 3. Again, this ignores evidence admitted at trial. The Government's theory at trial was that the defendant sent the March 2019 Class II FOMC document to the professor at Fudan University so that the professor could convert it into a PDF for the defendant to later use during his "class" with Hummin Lee that occurred a few days later. *See, e.g.*, 2/2/26 Morning Trial Tr. at 68:11 to 69:18 (arguing that the defendant's March 2019 email to the Fudan University professor was in furtherance of teaching his "classes" with Hummin Lee).

Also, OIG Special Agent Hershkowitz testified that before the defendant sent the Class II FOMC document to his personal email account (and then to the Chinese professor's email account), he stripped off the classification banner markings and made substantive changes to the body of the document. 1/23/26 Morning Trial Tr. at 106:3 to 111:23. Agent Hershkowitz testified that removing a restricted document like the Class II FOMC document from the Federal Reserve's secure systems to a personal email account, let alone the email account of a professor at a Chinese university, violated Federal Reserve policies, and that, at the time, stripping the classification markings from the document would prevent the Federal Reserve's data loss prevention tool from flagging the email. *Id.*

The defendant testified at trial that he shared the Class II FOMC document with the Fudan University professor because he "was interested in the factual details of the ECB policy announcement itself, public information, and [he] was just lazy in not just kind of copying the actual details of this public announcement." 1/30/26 Morning Trial Tr. 103:14-19. But as the Government argued, this was inconsistent with his actions at the time he sent the Class II FOMC document to the Fudan University professor. For example, in addition to stripping the

classification markings and using two different email accounts to exfiltrate the restricted information, the defendant changed the content of the document, including changing "Comparison of ECB and <u>Board staff</u> forecasts" to "Comparison of ECB and <u>outside</u> forecasts." *Compare* Gov. Ex. G336, *with* Gov. Ex. G421 (emphasis added). He also left in the underlying economic forecasts for economic growth in 2020 and 2021, including the Federal Reserve's internal projections, but deleted references to the forecasts as coming from the "FRB." *Id.* These changes are indicative of an attempt to conceal the removal of the restricted information from the Federal Reserve systems, not laziness as the defendant claimed at trial.

These aspects of the defendant's March 2019 transmission of Class II FOMC document, along with other evidence presented at trial, are sufficient for the Court to conclude, to a preponderance level, that the defendant's March 2019 transmission was related to his broader activities in China and relationship with Hummin Lee. *Watts*, 519 U.S. at 156 (sentencing court empowered to consider facts proven by a preponderance of the evidence); *Dorcely*, 454 F.3d at 372–73 (same).

c.      ***The Government Proved that the Defendant's False Statement was Material Because It Related to His Relationship and Activities with Hummin Lee***

At trial, the Government proved that the defendant's false statement was material because OIG would have taken different investigative and protective steps had it known in 2020 that the defendant had shared restricted Federal Reserve information with Hummin Lee. *See, e.g.*, 2/2/26 Morning Trial Tr. at 81:25 to 82:11 ("The statement was also material. Agent Hershkowitz talked about why it was material to his investigation. They could have taken different steps. If they were in the mode of protecting information that they knew had gone out the door, their investigation would have been different. They would have been trying to figure out how to minimize the damage instead of figuring out if damage had been done in the first place. And then after that, it took years

to figure out what actually happened in those secret hotel room meetings in China.  It took years to figure out if the defendant had actually transmitted evidence outside of the Federal Reserve."); *see also* 1/23/26 Afternoon Trial Tr. at 165:5 to 166:15 (Agent Hershkowitz testifying about materiality of false statement).

The defendant's attempt to cabin the conduct relevant to his § 1001 to only the March 2019 email ignores the substantial evidence presented at trial.  There is more than sufficient evidence for the Court to conclude by a preponderance of the evidence that the defendant's statement to OIG was false because he shared restricted Federal Reserve information with Hummin Lee and others.  As a result, the defendant's conduct during that relationship should be considered when calculating the Guidelines and applying the § 3553(a) factors.

## II.    The Guidelines Calculation Results in an Offense Level of 26 (63 to 78 Months)

The parties agree that under Guideline § 2B1.1(a)(2), the base offense level is six. *Compare* Gov. Sentencing Memo. at 9, *with* Def. Memo. at 4.  The PSR recommends four enhancements: being part of a fraudulent scheme committed outside of the United States using sophisticated means; misappropriation of trade secrets to benefit a foreign instrumentality; abuse of a position of trust; and obstruction of justice.  The Government also recommends these enhancements, as well as an enhancement for the defendant's gain.  Despite being aware of Probation's and the Government's Guidelines recommendations before filing its Sentencing Memo, the defendant argues only that the enhancements are based on acquitted conduct that the Court cannot consider under § 1B1.3(c) and does not substantively dispute whether the enhancements apply.  Def. Mot. at 4.  For the reasons stated in the Government's opening brief and below, the following sentencing enhancements apply:

    **a.**      ***Between \$250,001 and \$550,000 in Gains Resulted from the Defendant's Offense (§ 2B1.1(b)(1))***

The defendant's false statement caused at least three types of actual pecuniary loss. *First*, it caused the Federal Reserve, including OIG, to spend significant resources to determine what, if any, restricted Federal Reserve information had been compromised and whether the Chinese intelligence services had been targeting the Federal Reserve. The defendant's lie misdirected OIG's investigation into the larger threat from China and prevented OIG from identifying the true threat posed by the Chinese government in a timely manner. These were not resources used to investigate the defendant and his potential criminal activity, but rather resources that OIG unnecessarily expended to improve the effectiveness of the Federal Reserve and satisfy its mission to improve public trust in the institution. *See* Ex. C (OIG impact statement).

*Second*, as a result of the defendant's false statement, the Federal Reserve paid the defendant's salary for an additional fifteen months despite the fact that he had committed multiple federal ethics and Federal Reserve policy violations that would have justified his termination in February 2020. Had the Federal Reserve known in February 2020 that the defendant had shared restricted Federal Reserve information with Hummin Lee and others in China on numerous occasions, it likely would have terminated him much earlier than May 2021. As a result of his false statements, the defendant was unjustly enriched by approximately \$390,000 in additional salary and bonus payments between February 2020 and May 2021. In addition to receiving the salary and bonus payments, the defendant also received approximately \$47,000 in supplemental pension payments between 2021 and 2025 that he would not have been entitled to had he truthfully told OIG in February 2020 that he had shared restricted Federal Reserve information with Hummin Lee during their "classes." Only now that the full truth has come to light has the Federal Reserve been able to initiate the process to terminate the defendant's supplemental pension benefits. Thus,

the defendant caused at least $437,000 in additional loss to the Federal Reserve through salary, bonus, and pension payments that he would not have been entitled to had he told the truth in February 2020.

*Third*, had the defendant told the truth in February 2020, the Federal Reserve would not have had to spend significant resources investigating the defendant's improper use of Board equipment and facilities to take nude photographs of himself.  Had the defendant told the truth in February 2020, the Board likely would have concluded that his sharing of restricted Federal Reserve information with Hummin Lee and others was a basis to terminate him, and would not have had to spend the resources over the next year to investigate what truly happened during the blackmail scheme and whether the defendant had violated any federal ethics regulations or Board policies as it related to that conduct.  Had the defendant told the truth in 2020, the Board also would not have had to spend as many resources negotiating the defendant's retirement in lieu of termination.

In total, the defendant's offense caused the Federal Reserve Board to lose hundreds of thousands of dollars in personnel expenses, salary and bonus payments, and retirement benefits. This was a significant loss, but it would be difficult to calculate with any degree of certainty because it is unknown how long, if the defendant had told the truth in February 2020, he would have continued to receive a salary and pension benefits, or how long it would have taken OIG to investigate the Chinese intelligence services' efforts to target the Federal Reserve and recommend additional protective measures.  Because the actual loss from the defendant's offense cannot reasonably be determined, under the commentary to § 2B1.1(b)(1), the Court should use the gain that resulted from the defendant's offense as an alternative measure of loss.

10

As explained in the Government's objections to the PSR, *see* Ex. A, in theory, the Chinese government could have gained hundreds of millions of dollars as a result of the defendant's crime. It could have realized these gains if it made prudent investment decisions related to its massive holdings of U.S. Treasury securities based on the inside Federal Reserve information the defendant provided. The Government does not know, however, how the Chinese government used the information that the defendant provided. Thus, the Government recommends that the Court look to the personal pecuniary gains that the defendant enjoyed as a result of his offense when calculating the gain figure for § 2B1.1(b)(1).

As a result of the defendant's offense, including his unauthorized disclosure of restricted Federal Reserve information to Hummin Lee and the professor at Fudan University, the defendant gained at least $531,529.84 in the form of travel and lodging expenses, cash payments to his wife, and university fees from Shandong University of Finance and Economics and Fudan University. *See* Ex. A (objection to PSR and chart itemizing gains). This is a conservative estimate and does not include (a) pecuniary benefits that Hummin Lee provided to the defendant (as reflected in their WeChat conversations), but that do not have a reasonably calculated associated value; (b) payments to the defendant from Shanghai University of Finance and Economics; (c) the full salary, stipend, housing, and grant payments that the defendant received from Fudan University and the Chinese government; and (d) the $50,000 in cash that the Government found in the defendant's home. The true amount of pecuniary benefits that the defendant received as a result of his offense is likely greater than $531,529.89, but because the defendant committed most of his illegal activities in China and used Chinese bank accounts, the Government has a limited ability to paint a complete picture. Thus, as a minimum, the defendant gained between $250,001 and $550,000 as a result of his offense, which under § 2B1.1(b)(1), adds 12 additional offense levels. *Cf. United*

*States v. Bolla*, 346 F.3d 1148, 1151–53 (D.C. Cir. 2003) (affirming district court's calculation of intended loss for § 1001 conviction).

> **b.** ***A Substantial Part of the Fraudulent Scheme was Committed Outside the United States, the Offense involved Sophisticated Means, and the Defendant Intentionally Engaged in Conduct Resulting in Sophisticated Means (§ 2B1.1(b)(10)(B) and (C))***

The Government agrees with Probation's recommendation that the sophisticated means and outside the United States enhancements under §§ 2B1.1(b)(10)(B) and (C) apply. As discussed above, the Government proved by at least a preponderance of the evidence that the defendant's statement was false, in part, because he shared restricted Federal Reserve information with unauthorized recipients in China, including Hummin Lee. While the defendant's false statement to OIG occurred in Washington, D.C., a substantial part of his crime occurred in China. He met with Hummin Lee in hotel rooms in China to teach "classes." He sent emails containing restricted Federal Reserve information from his Federal Reserve email account to his personal Google account and then to email accounts in China. He received money in China from Hummin Lee in exchange for the restricted information. And he lived in China during his sabbatical and traveled there frequently afterwards to continue his relationship with Hummin Lee.

The defendant also used sophisticated means to commit his offense. Leading up to his February 2020 OIG interview, the defendant had already laid the groundwork to conceal the true nature of his relationship with Hummin Lee. The defendant created a cover story of teaching "classes" to Hummin Lee and his associates and made a fake paper trail of homework assignments, student lists, and a syllabus. The defendant also used his legitimate academic teaching in China, including attending conferences and collaborating with Chinese economists, to conceal his illegitimate activities with Hummin Lee. At times, he traveled to China for a legitimate engagement and tacked on a day or two to meet with Hummin Lee. This comingling made it

difficult for investigators to distinguish the defendant's legitimate activities from his illegitimate activities in China.

The defendant also used an overseas encrypted messaging application to communicate with Hummin Lee. Because this application was hosted overseas, it was beyond the reach of U.S. law enforcement. The defendant even used sophisticated methods to remove the restricted information from Federal Reserve systems before sharing it with Hummin Lee. The defendant removed any classification banners or markings that would have triggered the data loss prevention software and, on multiple occasions, also first moved the restricted documents to his personal email account before sending them on to Hummin Lee or the Fudan University professor at another email account. While any one of these actions may not seem sophisticated when viewed "piecemeal," when "considered in the broader context at play," they demonstrate "efforts at concealment that go beyond" the concealment inherent in the February 2020 false statement. *United States v. Milligan*, 77 F.4th 1008, 1014 (D.C. Cir. 2023). Accordingly, §§ 2B1.1(b)(10)(B) and (C) apply and two additional points should be added to the defendant's offense level.

c. ***The Offense Involved Misappropriation of a Trade Secret and the Defendant Knew the Offense Would Benefit a Foreign Government or Instrumentality (§ 2B1.1(b)(14)(B))***

The Government agrees with Probation's recommendation that § 2B1.1(b)(14)(B) applies because the defendant's offense involved the misappropriation of Federal Reserve trade secrets and the defendant knew that the offense would benefit a foreign government or instrumentality. The evidence at trial proved that some of the restricted Federal Reserve information that the defendant shared with Hummin Lee and the Fudan University professor were trade secrets as defined under 18 U.S.C. § 1839(3). Specifically, testimony and documents proved that the Federal Reserve took reasonable measures to keep restricted Federal Reserve information, especially

FOMC classified information, secret.  And expert witness testimony proved that the restricted information that the defendant shared, including internal economic forecasting data, had significant independent economic value to parties trading financial products linked to interest rates, such as U.S. Treasury securities.  Expert witness testimony also proved that the Chinese government is the world's largest holder of U.S. Treasury securities and could benefit enormously if it had inside information about what the Federal Reserve was going to do before it did it.

The Government also proved at trial that the defendant knew that sharing restricted Federal Reserve information with Hummin Lee and the Fudan University professor would benefit a foreign government or instrumentality.  During the February 2020 interview and again at trial, the defendant admitted that he knew Hummin Lee wrote reports on his "classes" with the defendant for the provincial Chinese government.  The defendant also knew that Fudan University and the Shandong University of Finance and Economics (where Hummin purported to work) were instrumentalities of the Chinese government.  As Professor Barry Naughton testified at trial, it is well known in academia that Chinese universities, like Fudan University and the Shandong University of Finance and Economics, are controlled by the Chinese government through the Ministry of Education.  1/29/26 Morning Trial Tr. at 48:20 to 52:25.  As someone who traveled to China extensively, worked in numerous Chinese universities, studied the Chinese economy, and recruited economists (some of whom likely were educated at Chinese universities) to join the Federal Reserve, the defendant surely knew that Fudan University and the Shandong University of Finance and Economics were substantially controlled, sponsored, and managed by the Chinese

government.  Accordingly, § 2B1.1(b)(14)(B) applies and four additional offense levels should be added.[2]

> **d.      *The Defendant Abused a Position of Public Trust in a Manner that Significantly Facilitated the Commission or Concealment of the Offense (§ 3B1.3)***

The Government agrees with Probation's recommendation that § 3B1.3 applies because the defendant abused a position of public trust that significantly facilitated the commission and concealment of his offense.  As a senior Federal Reserve officer, the defendant had a significant amount of discretion in his job and largely worked independently on his research interests.  As a senior advisor, the defendant was trusted to perform his duties and given substantial freedom to perform those duties, including a sabbatical in China.  Based on tenure and title, the defendant was one of the most senior economists in the International Finance Division at the Federal Reserve Board.  Commensurate with his experience, duties, and the trust placed in him, the defendant was given access to all levels of FOMC classified information.  That placed the defendant in a select and trusted category of the Federal Reserve system, for only about 10% of the approximately 26,000 employees in the Federal Reserve system have access to FOMC classified information. 1/22/26 Morning Trial Tr. at 29:9-30:20.

The defendant's access to restricted Federal Reserve information, including FOMC classified information, is what allowed him to commit his offense, that is, share restricted Federal Reserve information with people in China, including Hummin Lee, and then lie to OIG investigators about doing so.  Accordingly, § 3B1.3 applies and two additional offense levels should be added.  *See, e.g.*, *United States v. Bikundi*, 926 F.3d 761, 799–800 (D.C. Cir. 2019)

---

[2] At a minimum, two offense levels should be added under § 2B1.1(b)(14)(A) because the defendant knew that the trade secrets would be transmitted out of the United States to China when he shared them with Hummin Lee and the Fudan University professor.

(affirming application of § 3B1.3 where defendant exercised substantial discretion); *United States v. Shyllon*, 10 F.3d 1, 5 (D.C. Cir. 1993) (affirming application of § 3B1.3 because, in part, the government employee defendant "obtained important information [from his job with the government] that assisted him in committing the crime"); *see also United States v. Kingsbury*, 107 F.4th 879, 881–82 (8th Cir. 2024) (applying § 3B1.3 where FBI analyst used security clearance to access and mishandle classified information); *United States v. Ford*, 288 F. App'x 54, 60–61 (4th Cir. 2008) (per curiam) (same for NSA employee).

e.    ***The Defendant Willfully Obstructed the Administration of Justice with Respect to the Prosecution and the Obstructive Conduct related to the Defendant's Offense of Conviction and Relevant Conduct (§ 3C1.1)***

Lastly, the Government agrees with Probation's recommendation that § 3C1.1 applies because the defendant willfully obstructed, or attempted to obstruct, the administration of justice with respect to the prosecution of the instant offense and the obstructive conduct related to the defendant's § 1001 conviction, other relevant conduct, and a closely related offense, that is, the economic espionage conspiracy. As detailed in the Government's opening brief, the defendant perjured himself multiple times at trial. Gov. Sentencing Memo. at 15–19. The defendant lied about the nature of his relationship with Hummin Lee; the nature of his "classes" with Hummin Lee, Ricky, and Jack; whether Shanghai University of Finance and Economics ever paid him; the last time he had sex with his wife; and whether he wanted his wife to get pregnant. The defendant made these lies knowingly to mislead the jury and obstruct the trial.[3] Accordingly, § 3C1.1 applies

---

[3] The defendant argues that under 18 U.S.C. § 3553(a)(1), the defendant's false statement conviction was "out of character for him." Def. Mot. at 7. The evidence presented at trial contradicts this. The defendant repeatedly lied in his February 2020 OIG interview, his May 2021 FBI interview, and his January 2026 trial. If one's character is truly revealed through his actions, the defendant's actions show that he was willing to lie to the jury and law enforcement—repeatedly—in an effort to avoid being held accountable for his actions.

and two more offense levels should be added, for a total adjusted offense level of 28. With a Criminal History Category of I and two levels subtracted under § 4C1.1, the adjusted total offense level is 26 with a recommended Guidelines sentencing range of 63 to 78 months.

## CONCLUSION

For the reasons stated above and in the Government's opening brief, the Government recommends a custodial sentence of 60 months' imprisonment.

Respectfully submitted,

JEANINE FERRIS PIRRO
United States Attorney


 _/s/ Adam P. Barry_____
Adam P. Barry
Cal. Bar No. 294449
Assistant United States Attorney
National Security Section
601 D Street, NW
Washington, D.C. 20530
Office: 202-252-7793
Email: adam.barry@usdoj.gov

JOHN A. EISENBERG
Assistant Attorney General
National Security Division

Nicholas O. Hunter
D.C. Bar No. 1022355
Yifei Zheng
N.Y. Bar No. 5424957
Trial Attorneys
National Security Division
U.S. Department of Justice
950 Pennsylvania Ave, NW
Washington, D.C. 20530
Telephone: (202) 353-3434
E-mail: nicholas.hunter@usdoj.gov
yifei.zheng@usdoj.gov