**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No.:  25-cr-00033 (DLF)** |
| **v.** | : | |
| | : | |
| **JOHN HAROLD ROGERS,** | : | |
| | : | |
| | : | |
| **Defendant.** | : | |

**GOVERNMENT'S SUPPLEMENTAL BRIEF REGARDING**
**SENTENCING GUIDELINES CALCULATION**

In response to the Court's May 26, 2026 Minute Order requesting supplemental briefing on the appropriate Sentencing Guidelines calculation in this case, the Government respectfully submits the following supplemental argument:

1.      **U.S.S.G. § 2J1.2 Applies** – The cross-reference in § 2B1.1(c)(3) applies because the defendant was "convicted under a statute prescribing false, fictitious, or fraudulent statements or representations generally" (*i.e.*, 18 U.S.C. § 1001) and "the conduct set forth in the count of conviction establishes an offense specifically covered by another guideline in Chapter Two" (*i.e.*, 18 U.S.C. § 1512(b)(3)).  "To prove a violation of § 1512(b)(3), the government must establish beyond a reasonable doubt that the defendant knowingly and willfully (1) engaged in misleading conduct toward another person, (2) with the intent to hinder, delay or prevent the communication of information to a federal law enforcement officer or federal judge, (3) about the commission or the possible commission of a federal crime."  *United States v. Hawkins*, 185 F. Supp. 3d 114, 124 (D.D.C. 2016).  Here, the defendant knowingly and willfully lied to special agents with the Federal Reserve Board's Office of Inspector General ("OIG") in a February 4, 2020 interview when he replied "never" to the question, "Did you ever provide or share any restricted Board information . . . with anyone else outside of the Board."  Gov't Trial Ex. 2Z at 59.  The evidence at trial proved,

at least by a preponderance of the evidence, that on numerous occasions between 2018 and 2019, the defendant shared restricted Federal Reserve information, including FOMC classified information, with people in China including the Chinese spy Hummin Lee. *See* Gov. Opp'n to Def. Mot. for Judgment of Acquittal and New Trial, ECF No. 103, at 5–9. When the defendant was interviewed in February 2020, he knew that he had improperly shared restricted Federal Reserve information and lied to the OIG agents to "hinder, delay or prevent" federal law enforcement from learning about the defendant's conduct in China, which were potential violations of 18 U.S.C. §§ 1831 (economic espionage); 1832 (theft of trade secrets); 641 (theft of government property); 201 (bribery of a public official); 1343 (wire fraud); and 793 (transmission of documents relating to the national defense).

OIG Special Agent Hershkowitz testified at trial that when he interviewed the defendant on February 4, 2020, he was aware that the defendant had been flagged by a separate working group in the Federal Reserve focused on insider threats and that the defendant had recently reported that he had been subject to blackmail. 1/23/26 Morning Trial Tr. at 30:11 to 33:19. Agent Hershkowitz also testified that during the interview, he was trying to determine whether the defendant's activities and relationships in China were connected to the blackmail threats. *Id.* at 36:7 to 37:5. In other words, was the defendant being blackmailed as a result of his activities in China? At the time, OIG did not yet know that the defendant had shared restricted Federal Reserve information with people in China. OIG did not yet know that the defendant had taught numerous "classes" to Hummin Lee and his colleagues that were never reported to the Federal Reserve, or that the defendant had sent FOMC classified information to his personal email account after removing the classification markings. Nor did OIG know that the defendant had received requests from Hummin Lee for insider Federal Reserve information, including information about whether

2

the Federal Reserve had "a specific plan and timetable" for achieving its objectives related to the value of the U.S. dollar, what "specific measures" with regards to monetary policy the Federal Reserve planned to take to support the trade war with China, and whether the Federal Reserve planned to take any steps to limit the use of Chinese financial technology companies like Alipay and WeChat.  *See* Gov't Trial Exs. 3E and 3F.

If OIG had known in February 4, 2020, that the defendant had shared restricted Federal Reserve information, it would have taken different investigative and protective steps, including ferreting out the true nature of the defendant's relationship with Hummin Lee.  *See* 1/23/26 Afternoon Trial Tr. at 165:5 to 166:15 (Agent Hershkowitz testifying about materiality of false statement).  In its impact statement, the OIG stated that the defendant's false statement caused OIG to "pursue leads that were later determined to be false," "delayed the OIG's identification of relevant witnesses and evidence postponing critical investigative steps," and "prolong[ed] the period during which potential misconduct continued unaddressed."  OIG's Impact Statement (Ex. C), ECF No. 115-3, at 3.  Indeed, even after his interview, the defendant remained employed and paid by the Federal Reserve for another 15 months and, even when he resigned in lieu of termination in May 2021, the fact that he had shared Federal Reserve information with people in China was unknown.  Until that point, the defendant's lie had worked.  He had thwarted the investigation of his activities in China.

The defendant's conduct of conviction satisfies the elements of 18 U.S.C. § 1512(b)(3). *First*, the defendant's knowing false statement and intentional concealment of material facts during his February 4, 2020 OIG interview constituted "misleading conduct" under 18 U.S.C. § 1512(b)(3).  *See Hawkins*, 185 F. Supp. 3d at 125 (holding that knowingly making false statement to FBI agents was "misleading conduct" under 1512(b)(3)).  *Second*, the defendant's

3

misleading conduct was directed "toward another person," including at least the OIG agents and potentially other federal law enforcement officers like the FBI. It does not matter that the defendant's misleading conduct was directed at the OIG agents instead of a third party. *See Hawkins*, 185 F. Supp. 3d at 125–26 ("Nothing in the statutory language appears to restrict the definition of 'another person' to any non-federal law enforcement officer, and courts interpreting the provision have concluded that 'another person' is commonly understood to mean 'any person.'"). *Lastly,* as described above, the defendant had the intent to hinder, delay, or prevent the communication of information to a federal law enforcement officer about the commission or the possible commission of a federal crime. The defendant intended to prevent, hinder, and delay his own communication of truthful information to OIG agents about his illegal activities in China with Hummin Lee and his colleagues. *See id.* at 125 ("Defendant clearly intended to 'prevent,' 'hinder,' and 'delay' the communication of the truthful information he had on these topics.").

The "conduct set forth" in the defendant's 1001 conviction "establishes" a violation of 18 U.S.C. § 1512(b)(3);[1] therefore, under § 2B1.1.(c)(3), the Court can apply the Guideline for a violation of 18 U.S.C. § 1512(b)(3), which is U.S.S.G. § 2J1.2. *See* Appendix A; *see also United States v. Nguyen*, 801 F. App'x 788, 789–90 (D.C. Cir. 2020) (applying § 2J1.2 for 1001 conviction) (citing *Hawkins*, 185 F. Supp. 3d 119–27); *United States v. Wilson*, 143 F.4th 647, 665–66 (5th Cir. 2025) (applying § 2J1.2 for 1001 conviction); *United States v. Ochoa*, 291 F.

---

[1] The Court does not need to rely on acquitted conduct to conclude that the defendant's 1001 conviction establishes a violation of 18 U.S.C. § 1512(b)(3), because the facts that prove by a preponderance of the evidence that the defendant also violated 18 U.S.C. § 1512(b)(3) "establish[], in whole or in part, the instant offense of conviction." U.S.S.G. § 1B1.3(c). *See, e.g.,* Gov. Sentencing Memo., ECF No. 115, at 2–5 & Gov. Response Sentencing Memo., ECF No. 120, at 2–8

4

App'x 265, 266–67 (11th Cir. 2008) (holding the same and affirming 60-month sentence).  Under § 2J1.2, the base offense level is 14.

As an alternative, even if the Court were ultimately to conclude that §§ 2B1.1(a) and (b) apply, the Court could still look to the Guidelines calculation under § 2J1.2 when analyzing the 18 U.S.C. § 3553(a) factors.  In seeking to avoid unwarranted sentence disparities among defendants who have been found guilty of similar conduct, *see* 18 U.S.C. § 3553(a)(6), the Court could consider what the Guidelines range would be under § 2J1.2 and what similarly situated defendants have been sentenced to under § 2J1.2.  If the Court were to consider the Guidelines range under § 2J1.2 for the purpose of avoiding unwarranted sentencing disparities under 18 U.S.C. § 3553(a)(6), the substantive reasonableness of the Court's sentence would be reviewed under an abuse of discretion standard.  *See Gall v. United States*, 552 U.S. 38 (2007).  Thus, regardless of whether the Court ultimately decides that § 2B1.1 or § 2J1.2 applies, the Court should still consider what the Guidelines range would be under § 2J1.2 when analyzing the § 3553(a) factors.  *See, e.g.*, *United States v. Reffitt*, 2024 WL 1577941, at *5 (D.D.C. Apr. 10, 2024) (applying upward variance under § 3553(a) factors to avoid unwarranted sentencing disparities related to inapplicability of certain Guidelines enhancements).

According to the Judiciary Sentencing Information (JSIN), defendants' whose primary guideline provision was § 2J1.2 and had a final offense level of 21 received an average sentence of 37 months' imprisonment.  As previously described by the Government, the nature and circumstances of the defendant's conduct and offense warrant an above-average sentence.  The defendant is not a garden variety obstructor of justice.  He obstructed a national security investigation involving his own illicit activities, breached his oath of office, lied to investigators, and perjured himself at trial.  A 60-month sentence avoids sentencing disparities for defendants

with § 1001 convictions related to their espionage or espionage-adjacent activities. *See United States v. Mallory*, 40 F.4th 166, 173 (4th Cir. 2022); *United States v. Ji Chaoqun*, No. 1:18-CR-0061(1), Dkt No. 409 (N.D. Ill. Feb. 3, 2023).

    **2.**    **The "Substantial Interference" Enhancement Applies (§ 2J1.2(b)(2))** – Under § 2J1.2(b)(2), if the defendant's offense resulted in substantial interference with the administration of justice, the offense level should be increased by three levels. The Commentary to § 2J1.2 defines "substantial interference with the administration of justice" as including, among other things, "a premature or improper termination of a felony investigation" or "the unnecessary expenditure of substantial governmental or court resources." § 2J1.2 cmt. n.1. As used in § 2J1.2(b)(2), the phrase "administration of justice" means "the operations of a judicial or quasi-judicial tribunal that applies the force of the state to determine the legal rights of individuals and entities, as well as to related investigations conducted by government officials." *United States v. Brock*, 94 F.4th 39, 52 (D.C. Cir. 2024). In this context, for § 2J1.2(b)(2) to apply based on the unnecessary expenditure of governmental resources, such an expenditure must be of "investigative, prosecutorial, or judicial resources in relation to a potential or pending investigation or a judicial or quasi-judicial proceeding." *Id.* at 58.

    Here, the evidence presented at trial proved by at least a preponderance that the defendant's false statement to OIG in February 2020 led to the unnecessary expenditure of substantial investigative resources. *First*, the defendant's false statement misdirected OIG agents to unnecessarily pursue leads that were later determined to be false. OIG's Impact Statement (Ex. C), ECF No. 115-3, at 3. For example, because of the defendant's lies, the OIG investigators spent resources to determine whether the blackmail threats directed at the defendant were related to his activities in China and relationship with Hummin Lee. Based on the defendant's lies in the

6

February 2020 interview, the OIG investigators did not even know how the blackmailers obtained the nude photographs of the defendant or targeted him in the first place (he voluntarily provided them to the blackmailers during a sexting relationship). Federal investigators also spent significant resources translating and reviewing thousands of messages in Chinese, interviewing over a dozen witnesses, identifying and retaining experts, and obtaining and reviewing travel and Federal Reserve Board records of the defendant, all in an effort to recreate the defendant's activities in China before his February 2020 interview. This alone was thousands of hours of time by OIG investigators, FBI agents, in-house lawyers, prosecutors, paralegals, analysts, and linguists, and at least tens of thousands of dollars in expenditures.

*Second*, the defendant's false statement delayed OIG's identification of relevant witnesses and evidence, which postponed critical investigative steps. *Id.* For example, OIG did not discover that the defendant had emailed restricted Federal Reserve information from his personal email account to other people in China, including Hummin Lee and the Fudan University professor, until investigators were able to establish probable cause to obtain a warrant to search the defendant's personal email account. *See* 1/23/26 Afternoon Trial Tr. at 100:3 to 101:16. Investigators then had to obtain additional search warrants to investigate the defendant and Hummin Lee. If the defendant had told the truth in 2020, investigators would not have had to spend countless resources trying to determine who Hummin Lee truly was and why he had struck up a relationship with the defendant.

*Third*, the defendant's false statement caused OIG investigators to initially focus on the defendant's various policy and ethics violations, including using Board equipment to take nude photographs of himself at work, instead of the more pressing concerns regarding his handling of restricted Federal Reserve information and the Chinese intelligence services' targeting of Federal

Reserve employees. The defendant's misdirection caused the OIG investigators to pursue legal process, review materials, and interview witnesses that were unnecessary had they known the truth from the beginning. This unnecessary expenditure of government resources warrants the addition of three points under § 2J1.2(b)(2). *See, e.g.*, *United States v. Rodriguez*, 499 F. App'x 904, 907–08 (11th Cir. 2012) (per curiam) (applying § 2J1.2(b)(2) because defendant's false accusation of sexual assault by corrections officer led to the government's unnecessary expenditure of substantial government resources, including the identification and interviews of several witnesses, review of the defendant's records, and reconvening of a grand jury).

3.     **The +2 Enhancement Under § 2J1.2(b)(3)(A) and (C) Applies** – A 2-level enhancement is also available under § 2J1.2(b)(3)(A) because the defendant's offense involved the alteration and fabrication of documents. As the trial evidence showed, the defendant altered at least one FOMC classified document prior to sending it to a professor in China. The defendant removed specific identifying information and classification markings from the document to evade detection and obstruct future efforts to determine the nature of his activities in China. The defendant also planned with Hummin Lee to fabricate an entire fake "class," complete with fake homework assignments, fake exams, a fake syllabus, fake grades, and a fake class list. *See* Gov't Trial Ex. G6 line 1832.

The same 2-level enhancement is also available under § 2J1.2(b)(3)(C) because the defendant's offense was otherwise extensive in scope, planning, or preparation. As described in its prior sentencing briefs, *see* ECF Nos. 115 at 14–15 & 120 at 12–13, while the defendant's use of the word "never" during his February 4, 2020 interview was limited, the activities he undertook with Hummin Lee which made his statement false were sophisticated and extensive. The defendant maintained a clandestine relationship with Hummin Lee for years during which he

shared restricted Federal Reserve information with Lee and his colleagues.  The defendant shared much of this information with Hummin Lee halfway around the world, in China, during numerous late-night "classes" in hotel rooms.  For each of these "classes" to occur, Hummin Lee had to arrange for the defendant's travel to China, Hummin Lee and the defendant had to plan a time and location for their meeting, the defendant and Hummin Lee had to decide on the topics for their "class," and the defendant had to obtain original Federal Reserve information related to those topics so that he could "teach" that information to Hummin Lee.  For example, the WeChat messages introduced at trial showed that in advance of each "class," the defendant and Hummin Lee engaged in extensive logistical, travel, and security planning to facilitate the "classes" during which the defendant shared restricted Federal Reserve information.

Moreover, for some of the restricted information that the defendant shared, he surreptitiously removed the information from protected computer systems by removing classification markings, printing documents late at night, and exfiltrating documents first from his work email account to his personal email account, and then to Hummin Lee or others in China. The defendant also shared restricted Federal Reserve information with multiple people including at least Hummin Lee, "Ricky," and the Fudan University professor.

In terms of length of activity, logistical complexity, number of people involved, and foreign locations of the activity, the defendant's offense was extensive in scope, planning, and preparation. Therefore, two additional points should be added under § 2J1.2(b)(3)(C).  *See, e.g.*, *Rodriguez*, 499 F. App'x at 908–09 (applying enhancement to prison inmate who preserved semen stain on her clothing and falsely claimed she was sexually assaulted by a corrections officer); *United States v. Jensen*, 248 F. App'x 849, 851–52 (10th Cir. 2007) (applying enhancement to prison guard who repeatedly traded sexual favors or money for clean drug tests); *see also United States v. Holland,*

9

22 F.3d 1040, 1046 (11th Cir. 1994) ("[T]his circuit does not employ a precise definition for the 'otherwise extensive' standard, [but] there are a number of factors relevant to the extensiveness determination, including the length and scope of the criminal activity as well as the number of persons involved.").

  **4.**   **The Abuse of Position of Trust (§ 3B1.3) and Obstruction (§ 3C1.1) Adjustments Apply** – As described in the Government's earlier briefing, the abuse of position of trust (§ 3B1.3) and the obstruction (§ 3C1.1) adjustments also apply. *See* ECF Nos. 115 at 9, 14–19 & 120 at 15–17. For the abuse of position adjustment, as the Board's ethics officer Sean Croston testified at trial, the defendant was an officer at the Board, which is similar to the Senior Executive Service in other federal agencies. 1/29/26 Morning Trial Tr. at 73:4 to 73:14 and 76:17–18. As an officer, the defendant was a member of the Board's senior cadre and had greater responsibilities and autonomy than other Board employees. His seniority allowed him to work and travel with little oversight, and gave him access to restricted Federal Reserve information, including FOMC classified information, which significantly allowed him to facilitate his crime. His seniority and position as an officer also allowed him to conceal his crime because other employees often deferred to him and assumed that he was fulfilling his obligations at the Board.

  For the obstruction adjustment, the defendant perjured himself multiple times at trial. He lied about the nature of his relationship with Hummin Lee, the nature of his "classes" with Hummin Lee and his colleagues, the money he received while in China, and aspects of his personal life that he used to falsely portray himself as a dupe who was incapable of knowingly committing the crimes of conspiracy to commit economic espionage and making false statements.

  Even if the Court applies the § 2J1.2 Guideline, the additional adjustment under § 3C1.1 is warranted because it covers conduct distinct from the defendant's 2020 false statement. The

defendant's perjury at trial in 2026 is why he should be further punished under § 3C1.1. *See, e.g.,* *United States v. Bledsoe*, 2024 WL 341159, at *1 (D.D.C. Jan. 30, 2024) (applying § 3C1.1 for perjury at trial after applying § 2J1.2 to underlying offense); *see also United States v. Calhoun*, Case No. 1:21-cr-00116-DLF, ECF No. 190 at 17–18 (same).

Accordingly, if Guideline § 2J1.2 governs instead of § 2B1.1, and the substantial interference enhancement, otherwise extensive enhancement, abuse of position adjustment, and obstruction adjustment apply, the offense level is 23. After a two-point reduction for first-time offender under § 4C1.1, the total adjusted offense level is 21 (37 to 46 months).

5.      **An Upward Variance to 60 Months Is Warranted** – Under the 18 U.S.C. § 3553(a) factors, an upward variance to 60 months is warranted because of the nature and circumstances of the offense, the need to reflect the seriousness of the offense, and the need to afford adequate general deterrence. Specifically, the defendant's false statement involved the sharing of trade secrets with an agent of the Chinese intelligence services. Unlike under § 2B1.1, the Guidelines calculations under § 2J1.2 do not account for these aspects of the criminal conduct, which distinguish it from more run-of-the-mill obstruction or false statement cases. *See* § 2B1.1(b)(14) (applying 4-point enhancement if the offense involved misappropriation of trade secret and the defendant knew the offense would benefit a foreign instrumentality).

"The greatest long-term threat to our nation's information and intellectual property, and to our economic vitality, is the counterintelligence and economic espionage threat from China. It's a threat to our economic security—and by extension, to our national security."[2] Indeed, Retired

---

[2] Former FBI Director Wray, *The Threat Posed by the Chinese Government and the Chinese Communist Party to the Economic and National Security of the United States* (July 7, 2020), *available at* https://www.fbi.gov/news/speeches-and-testimony/the-threat-posed-by-the-chinese-government-and-the-chinese-communist-party-to-the-economic-and-national-security-of-the-united-states.

U.S. Army General Keith Alexander, who served as the director of the National Security Agency, described China's theft of intellectual property from the United States as "the single greatest transfer of wealth in history."[3]  The stakes and consequences of the defendant's criminal conduct could hardly be greater.  He should be justly punished and other U.S. government insiders should be deterred from succumbing to the lures of foreign intelligence services.  When, early in their relationship, Hummin Lee and Professor Cui offered the defendant packets of hundred-dollar bills late at night in China, the defendant should have said "no thank you," ended the relationship, and reported the interactions to the Board's security team.  The defendant chose a different path, but a 60-month sentence in this case would encourage other public servants to do the right thing instead of putting personal gratification and desires above the security of the United States.  Thus, under the § 3553(a) factors, for the reasons stated above and in the Government's prior sentencing briefing, the Court should vary upward and impose a sentence of 60 months.

Respectfully submitted,

JEANINE FERRIS PIRRO
United States Attorney

 /s/ Adam P. Barry
Adam P. Barry
Cal. Bar No. 294449
Assistant United States Attorney
National Security Section
601 D Street, NW
Washington, D.C. 20530
Office: 202-252-7793
Email: adam.barry@usdoj.gov

JOHN A. EISENBERG
Assistant Attorney General

---

[3] Prepared Statement of General (Ret) Keith B. Alexander on the Future of Warfare before the U.S. Senate Armed Services Committee (Nov. 3, 2015), *available at* https://www.armed-services.senate.gov/imo/media/doc/Alexander_11-03-15.pdf.

National Security Division

Nicholas O. Hunter
D.C. Bar No. 1022355
Yifei Zheng
N.Y. Bar No. 5424957
Trial Attorneys
National Security Division
U.S. Department of Justice
950 Pennsylvania Ave, NW
Washington, D.C. 20530
Telephone: (202) 353-3434
E-mail: nicholas.hunter@usdoj.gov
yifei.zheng@usdoj.gov