**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No.:  25-cr-00033 (DLF)** |
| **v.** | : | |
| | : | |
| **JOHN HAROLD ROGERS,** | : | |
| | : | |
| | : | |
| **Defendant.** | : | |

**GOVERNMENT'S RESPONSE TO DEFENDANT'S SUPPLEMENTAL BRIEF
REGARDING FACTUAL OBJECTIONS TO PSR AND
U.S.S.G. § 1B1.3(c) (ACQUITTED CONDUCT)**

Per the Court's June 19, 2026 Minute Order, below are the Government's responses to the defendant John Harold Rogers' factual objections to the Probation Office's Presentence Investigation Report ("PSR").  As noted by the Government at the July 18, 2026 sentencing hearing, the majority of the Government's responses below are contained in the Government's prior sentencing briefing, *see* ECF Nos. 115, 120, 124, 130, but for ease of reference, the Government is listing each of its responses next to the defendant's corresponding factual objection. The Government also identifies additional relevant circuit and district court case law applying the recent Guidelines addition of U.S.S.G. § 1B1.3(c) considering acquitted conduct, and responds to the other arguments the defendant raises in his Motion in Response to Court's June 19 Minute Order (hereinafter, "Def. Mot."), ECF No. 129.

I.     **Responses to Defendant's Factual Objections to the PSR**

The Government's responses to the defendant's objections below are broken into two categories: the defendant's May 6, 2026 factual objections to the draft PSR (labeled objections #1 through 23 below) and the defendant's supplemental objections in its June 25, 2026 filing (labeled objections #24 through 28 below).  In addition to the Probation Office's responses to the

defendant's objections and the Government's prior sentencing briefing, the Government responds

as follows:

***Defendant's Objection #1 (05/06/2026)*** – *As a general matter, and with respect to specific paragraphs enumerated below, Dr. Rogers objects to the Probation Office's use throughout the draft report of conduct of which the jury acquitted Dr. Rogers.*

*In footnote 4, the Probation Office references the correct, newly revised definition of relevant conduct under the Sentencing Guidelines—and that it "does not include conduct for which the defendant was charged and acquitted in federal court, unless such conduct also establishes, in whole or in part, the instant offense of conviction." U.S.S.G § 1B1.3(c); see also App. C Supp., Amend. 826. The draft report nonetheless then goes on to calculate Dr. Rogers's sentence based primarily on conduct of which Dr. Rogers was acquitted and which did not establish the offense of conviction. The government's failed allegation that Dr. Rogers engaged in espionage in China—of which the jury found him not guilty—is factually distinct from making a false statement to the Federal Reserve Office of Inspector General agents, which was the offense of conviction.*

*Dr. Rogers was convicted of making a false statement to the Federal Reserve OIG on February 4, 2020, in Washington, D.C., in the context of an interview that he requested and initiated about blackmail attempts and threats against him and his then 18-month-old daughter. The evidence at trial, the government's closing argument, and the jury's verdict support the conclusion that Dr. Rogers's statement that he had "never" shared sensitive information outside of the Federal Reserve was false because he had shared such information with a co-author at a Chinese university who was not and had not been connected to Hummin Lee or the allegations in count one of the indictment. See ECF No. 102.*

*Despite the fact that Dr. Rogers's offense of conviction is distinct from, and is not established by, the conduct underlying count one of which he was acquitted, the Probation Office repeatedly advocates increasing Dr. Rogers's guidelines range based on acquitted conduct. U.S.S.G § 1B1.3(c) prohibits this, and if the Court were to do so, it would violate the clear import of the Guidelines. Moreover, we take the position that if the Court were to consider acquitted conduct in any way in determining Dr. Rogers's sentence, it would violate Dr. Rogers's constitutional rights, including to due process and against double jeopardy.*

**Government's Response** – This is legal argument, not a factual objection.  For the purpose of calculating the Guidelines, relevant conduct includes acquitted conduct that "also establishes, in whole or in part, the instant offense of conviction."  § 1B1.3(c).  The conduct that the Probation Office considers in the PSR establishes in part the defendant's 18 U.S.C. § 1001 conviction.  *See* ECF Nos. 115 at 3–5; 120 at 2–8; 124 at 4 n.1.  Moreover, many of the facts that the Probation Office references when analyzing the Guidelines are not facts precluded from consideration because of the defendant's acquittal of conspiracy to commit economic espionage under 18 U.S.C. § 1831.  Contrary to the defendant's argument, his acquittal of the economic espionage conspiracy count does not excise from consideration everything that happened before his OIG interview on February 4, 2020.  In cases like this where the acquitted conduct is intertwined with the conduct that underlies the count of conviction and other *uncharged conduct*, the court can, and should, consider that intertwined conduct.  For example, the evidence at trial proved that the defendant shared restricted Federal Reserve information, including trade secrets, with people in China who were associated with the Chinese government.  Just because the jury concluded that reasonable

doubt existed as to whether the defendant conspired to misappropriate trade secrets to benefit the Chinese government does not mean that the court is precluded from considering the defendant's misappropriation of trade secrets as it relates to his false statement conviction. Nor did the jury acquit the defendant of other intertwined, but uncharged conduct, such as theft of government property or violating an official duty in exchange for a thing of value. Therefore, the Probation Office did not err in considering aspects of the defendant's relationship with Hummin Lee and activities in China when calculating the Guidelines. The Probation Office sought advice from the Sentencing Commission on this issue and the Sentencing Commission advised there "there appears to be some overlap between the conspiracy and the conduct of making a false statement." PSR at 25. Moreover, as Probation notes, even the Guidelines note that under 18 U.S.C. § 3661, in determining the sentence, the "court may consider, without limitation, any information concerning the background, character and conduct of the defendant, unless otherwise prohibited by law." *Id.* (citing § 1B1.4).

***Defendant's Objection #2 (05/06/2026)*** – *Dr. Rogers objects to paragraph 7 because it appears that the Probation Office drafted its report based on information and argument from the government without providing Dr. Rogers a fair opportunity to be heard or respond. Dr. Rogers requests notice of "the information provided by the Government as evidence proven at trial" on which the Probation Office relied when drafting the report.*

**Government's Response** – This is legal argument, not a factual objection. The Probation Office lists the information that it relied on in drafting the PSR, including the indictment, briefs and court orders, trial transcripts, and other pieces of evidence. PSR ¶ 7. If the defendant objects to any factual assertion made in the PSR, the defendant can object to that factual assertion, which he has done extensively.

***Defendant's Objection #3 (05/06/2026)*** – *Dr. Rogers objects to the inclusion of paragraphs 9-12, because they describe facts relevant only to count one of the indictment, of which Dr. Rogers was acquitted. The draft report does not explain in paragraph 13—the only paragraph describing the offense of conviction—how these preceding paragraphs are relevant to it. The offense of conviction was Dr. Rogers's statement to Federal Reserve OIG agents on February 4, 2020, that he had never transmitted Federal Reserve sensitive information outside of the agency, when he had transmitted one such document to an academic co-author at Fudan University. This co-author had no connection to Hummin Lee or the alleged conspiracy of which the jury acquitted Dr. Rogers.*

**Government's Response** – This is legal argument, not a factual objection. See above the Government's response to Defendant's Objection #1, which concerns the acquitted conduct amendment to the Guidelines and the intertwined nature of the conduct underlying the defendant's count of conviction and count of acquittal. Also, as the Court stated in its denial of the defendant's Motion for Judgment of Acquittal and a New Trial, the evidence supported the inference that the defendant sent the Fudan University professor the FOMC Class II Federal Reserve information so that the professor could convert that information into a PDF that the defendant could share with Hummin Lee. Defendant had previously asked another Fudan University employee to place other Federal Reserve information on a thumb drive so that the defendant could share that information with Hummin Lee.

3

***Defendant's Objection #4 (05/06/2026)*** – *Dr. Rogers objects to paragraph 10 as factually inaccurate, because it conflates Dr. Rogers's belief that Hummin Lee was an academic working within the Chinese educational system with the later revelation that Hummin Lee was a Chinese spy. Dr. Rogers believed that Hummin Lee was a professor who wrote economic reports for a Chinese provincial government, and did not understand until seeing the government's evidence at trial that Lee was an intelligence operative. See, e.g., Trial Tr. 166:7-11, 1/30/26 PM (Dr. Rogers: "Those were the same types of reports I knew he wrote for his research institute. And those reports were read by the Chinese government, just like scholars at the Brookings Institution write economic reports and those reports are read by the U.S. government"). Although the government introduced evidence at trial relating to the Chinese government's control of universities in China, it did not establish that Dr. Rogers was aware of this.*

**Government's Response** – When the defendant was interviewed by OIG on February 4, 2020, he stated that he knew that Hummin Lee and his colleagues "do a lot of reports for the provincial government" and that "the Chinese, they're watching everything that the U.S. does."  Gov. Ex. G2Z at 33.  He said that he was "sure" that the Chinese were "doing espionage" but that he did not "confront that," even though they were interested in the "Fed['s] thinking" and that he thought they viewed him as "a well trained economist" and a "pretty good [guy]" to have.  *Id.* at 33–34; *see also* Jan. 28, 2026 AM Trial. Tr. at 61:7–12 (FBI Agent Ayris testifying that it was alerting to the FBI that the defendant stated in his OIG interview that he "was aware that Lee worked at an institute that [writes] reports for the Shandong provincial government"); Jan. 30, 2026 PM Trial Tr. at 138:15–22 (Defendant admitting that he knew the institute that Hummin Lee worked for wrote research reports that were read by the Shandong Provincial government).

***Defendant's Objection #5 (05/06/2026)*** – *Dr. Rogers objects to paragraph 11 as factually inaccurate. Dr. Rogers did not share restricted economic information and trade secrets with Mr. Lee. See ECF No. 102 at 7-8 (demonstrating that none of the documents cited in the draft report constituted restricted economic information or trade secrets). The government did not prove that Dr. Rogers transferred to Hummin Lee a November 2018 DesiGov Book with "Nonpublic Information" and "Do Not Disseminate" labels removed by the defendant, a June 2019 Class II FOMC pre-FOMC briefing script and post-briefing notes, or a March 2019 Class II FOMC staff analysis of the European Central Bank announcement.*

**Government's Response** – The direct and circumstantial evidence at trial proved that on numerous occasions the defendant shared restricted Federal Reserve information with unauthorized recipients in China, including Hummin Lee.  Below is a table summarizing the documentary evidence proving this fact.

| **Restricted Fed Information** | **Summary of Supporting Evidence** |
|---|---|
| June 2019 Class II FOMC pre-briefing script and post-briefing notes for June 19, 2019 FOMC meeting | Gov. Exs. G334 (defendant receives on 6/10/2019 FOMC pre-briefing script at Fed email account, including hyperlink to internal SharePoint site containing FOMC briefing materials; notes and cover email are marked "Class II FOMC – Restricted FR"); G335 (attached pre-briefing script); G333 (post-briefing notes marked "Class II FOMC-Restricted FR" available at |

| Restricted Fed Information | Summary of Supporting Evidence |
|---|---|
| | internal SharePoint site); G358 at rows 5282 and 5283 (data loss prevention log shows the defendant printing FOMC Class II pre-briefing script and post-briefing notes at 5:13PM and 5:14PM on June 13, 2019); G12 (defendant's travel records show him boarding a plane to China on June 14, 2019); G3 at lines 2470 to 2624 (WeChat messages between the defendant and Hummin Lee discussing Hummin Lee paying for the defendant's June 2019 trip to China and meeting on June 16, 2019, including photographs of the defendant meeting with Hummin Lee, Ricky, and others in hotel room in China for "class" with the defendant displaying material on a projected computer screen and possessing hard copy papers); *id.* at rows 2645 to 2651 (on June 19, 2019 when FOMC publicly announces monetary policy decision, Hummin Lee messages the defendant "Same as you predicted!" to which the defendant responds "Exactly!!!!"). |
| March 2019 Class II FOMC staff analysis of European Central Bank ("ECB") announcement | Gov. Exs. G336 (defendant receives at Fed email account internal Fed analysis of ECB announcement labeled "CLASS II FOMC – RESTRICTED FR//FRSONLY"); G420 (defendant removes Class II FOMC markings and emails internal Fed analysis of ECB announcement from Fed email account to personal email account, including internal forecasting data); G421 (defendant forwards Class II FOMC internal Fed analysis from his personal email account to Fudan University professor with request to turn material into PDF); G3 at rows 2400 to 2408 (WeChat messages between the defendant and Hummin Lee discussing meeting for a "class" a few days after the defendant sent Class II FOMC information to Fudan professor and requested it be made into PDF); Jan. 30, 2026 PM Trial. Tr. at 134:1–135:9 (defendant testifying on cross-examination that he removed the markings and met with Hummin Lee shortly after sending the Class II FOMC document to the Fudan professor to turn into a PDF). |
| November 2018 DesiGov Book | Gov. Exs. G413 (defendant emailing DesiGov Book from Fed email account to personal email account after other Fed employee removed the defendant's personal email account from email chain before sending the defendant the DesiGov book); G413A (attached DesiGov book containing full-page warnings that book contained "Nonpublic Information" was "FOR YOUR USE ONLY" and instructing Fed readers "DO NOT DISSEMINATE"); G3 at rows 2083 to 2225 (WeChat messages between the defendant and Hummin Lee discussing meeting for a "class" during time period when the defendant sent DesiGov book to himself). |

| **Restricted Fed Information** | **Summary of Supporting Evidence** |
|---|---|
| October 2018 internal washing machine tariff research report and tables | Gov. Exs. G353 (email from Fed employee to the defendant marked "INTERNAL FR/OFFICIAL USE//FRSONLY" and stating that while the data is publicly available, the Fed employee is "not sure whether material that has been submitted through the chain is thereby restricted from sharing outside the system. I assume you would know those rules better than I."); G353A and G353B (attached washing machine tariffs report and charts); G581 (defendant removing "INTERNAL FR" header, emailing report from his Fed email account to his personal email account, forwarding attachment from his personal email account to the Fudan University employee's account, and then to Hummin Lee with a note that the report "does not contain any restricted content" but requesting that Hummin Lee not share the report "physically with anyone else"); G581A (attached report); G582 (Hummin Lee acknowledging receipt and stating that he will meet with the defendant at his home in China); G411 (defendant emailing washing machine tariff report from his Fed account to his personal account); G411A (attached washing machine tariff report); G412 (defendant removing "INTERNAL FR" header, emailing charts from his Fed email account to his personal account and then forwarding to a Fudan University employee's account with a request to copy file to thumb drive); *see also* G3E and G3F (in May 2018, Hummin Lee sending the defendant a two-page list of request for information about the Fed's internal decision making, prospective monetary policy decisions, forecasting information, and other confidential and restricted Fed information, especially information relating to trade policy between the U.S. and China); Jan. 30, 2026 PM Trial. Tr. at 135:11–137:11 (defendant testifying on cross-examination that after sending the washing machine tariff research report from his Fed account to his personal account, he met with Hummin Lee and discussed the topic of the report). |
| April 2018 DesiGov Book China Section | Gov. Exs. G351 (email from Fed employee to the defendant marked "NONCONFIDENTIAL//FRSONLY"); G351A (attached DesiGov Book China Section); G352 and G352A (defendant changing email header to "NONCONFIDENTIAL//EXTERNAL" and emailing DesiGov Book China Section to himself and then to Hummin Lee). |

Multiple government witnesses testified about the sensitive nature of the restricted Fed documents that the defendant shared, including FOMC Secretary Joshua Gallin (who testified about the FOMC classification system generally and why FOMC classified information is sensitive); Fed employee Jeremy Cannon (who testified about the other Fed restriction markings, including "FRSONLY," "INTERNAL FR," and "RESTRICTED FR"); Fed employee Ruth

Judson (who testified that she drafted and classified the June 2019 FOMC briefing materials and why they were sensitive); former Treasury securities trader Scott Kistler (who testified that pre-public information about the Fed's monetary policy decision making could earn a trader enormous amounts of money); economist Dr. Brad Setser (who testified that China's central bank is extremely interested in what the Fed is going to do and that China holds trillions of dollars in U.S. Treasury securities); and economist Robert Greene (who testified that China's monetary policy is part of its geopolitical competition with the United States).

Documentary and testimonial evidence also established that the defendant had been trained on the various FOMC and Fed classification and handling requirements and had agreed to abide by the Fed's policies regarding how to handle such documents. *See* Gov. Exs. G327 to G332 (FOMC classification trainings); G347, G362 to G365 (FOMC classification policies); G366 and G367 (the defendant's FOMC training logs and agreement to abide by FOMC classification policies); G377 to G380 (Fed security trainings); G344 (defendant's security training records); *see also generally* J. Gallin's testimony (discussing the defendant's FOMC training and policies); J. Cannon's testimony (discussing the defendant's Fed security training and policies).

***Defendant's Objection #6 (05/06/2026)*** – *Dr. Rogers objects to footnote 3 in paragraph 11 as factually inaccurate. The footnote states that "during direct and cross examination that [the defendant] told Mr. Lee not to share the tariff analysis with anyone, because he knew it was sensitive." On direct examination, Dr. Rogers answered the following question: "Now, did you have an opinion as to whether [the tariff analysis] had sensitive information or not?" Answer: "Yes. I came to the opinion that it did not." Trial Tr. 74:15-17, 1/30/26 AM. In cross examination, Dr. Rogers explained that he told Hummin Lee not to physically share the document because Dr. Rogers knew it was sensitive. Trial Tr. 136:23-137:4, 1/30/26 PM. But these answers use the word "sensitive" in two different ways; when Dr. Roger stated that he did not understand the tariff analysis to contain sensitive information, he meant that it did not use non-publicly available data. When he explained why he asked Hummin Lee not to physically share it, he meant that it was "sensitive" because the paper itself had not been published.*

**Government's Response** – This is argument, not a factual objection. The defendant testified at trial that he understood that the document was sensitive. The distinction he now makes between his use of the word "sensitive" in two different contexts is not part of the trial record. Moreover, as described above in the Government's response to Defendant's Objection # 5 regarding the washing machine tariff report, the contemporaneous documentary evidence shows that when the defendant's colleague sent him the washing machine tariffs report, he marked the email as "INTERNAL FR/OFFICIAL USE//FRSONLY," and that the defendant removed that warning from the email before sending the report from his Fed email account to his personal email account, and then onto Hummin Lee. The defendant also acknowledged the sensitivity of the document when he told Hummin Lee not to share it with anyone else. If the defendant did not believe the document was sensitive, then why did he remove the classification markings, send it to his personal email account before forwarding it on to Hummin Lee, and tell Hummin Lee not to share it with anyone else?

***Defendant's Objection #7 (05/06/2026)*** – *Dr. Rogers objects to paragraph 12 as factually inaccurate. Dr. Rogers did not receive benefits in exchange for providing Hummin Lee restricted*

7

*economic information and trade secrets and the government did not prove that Dr. Rogers provided either restricted economic information or trade secrets to Lee.*

**Government's Response** – During their multi-year relationship, the defendant received significant pecuniary and non-pecuniary benefits from Hummin Lee, including travel, lodging, and dining expenses; cash payments to his wife; and significant relationship assistance with his wife, including help with immigration paperwork, divorce negotiations with the defendant's wife's ex-husband, and financial management of the defendant's Chinese bank account. *See, e.g.*, Gov. Exs. G3 at row 2097 (Hummin Lee sending money to the defendant's wife); *id.* at rows 2411 and 2412 (Hummin Lee flying to another city in China to complete immigration exit paperwork for the defendant and his daughter); *id.* at row 2267 (Hummin Lee taking the defendant's pregnant wife to doctor's appointments); *id.* at row 2424 (Hummin Lee purchasing travel for defendant). The defendant also obtained teaching positions at Chinese universities with Hummin Lee's assistance. The pecuniary benefits that the defendant received from Hummin Lee are detailed in the Government's objections to the PSR. *See* ECF No. 115-1 (objections to draft PSR including chart detailing pecuniary benefits the defendant received). The defendant failed to disclose the majority of these benefits to the Fed and never received permission from the Fed to accept these benefits from Hummin Lee.

The Government's response to Defendant's Objection #5 lists evidence proving that the defendant shared restricted Fed information, including trade secrets, with Hummin Lee.

***Defendant's Objection #8 (05/06/2026)*** *– Dr. Rogers objects to the inclusion of paragraph 14 because it is irrelevant to the charge of conviction. Additionally, Dr. Rogers would note that he resigned from the Federal Reserve Board in 2021 not 2022.*

**Government's Response** – The Probation Office corrected the defendant's resignation date, so that objection is moot. The rest of the paragraph is relevant to understanding the context of defendant's criminal conduct.

***Defendant's Objection #9 (05/06/2026)*** *– Dr. Rogers objects to paragraphs 15 and 16 because he did not commit perjury at trial. See ECF No. 102 at 9.*

*Dr. Rogers told the truth to the best of his recollection when he said he did not get paid by Shanghai University of Finance and Economics (SHUFE) in the plain meaning of "get paid"— meaning that Dr. Rogers did not keep money from SHUFE. On direct examination and in the context of payment for teaching on sabbatical, Dr. Rogers explained that he did not get paid for his sabbatical teaching at SHUFE, because of visa issues. Trial Tr. 78:13-80:6, 1/30/26 AM. Dr. Rogers subsequently signed a separate employment contract with SHUFE on January 29, 2019, for prospective work if approved by the Federal Reserve. Dr. Rogers ultimately never did any work related to that employment contract and cancelled it. Trial Tr. 106:1-23, 1/30/26 AM. Unbeknownst to Dr. Rogers, SHUFE paid money into Dr. Rogers's Bank of China account, to which he had no access to in the United States. Tr. 161:15-162:10, 1/30/26 PM. When Dr. Rogers became aware of the payments, he asked Hummin Lee to return all of the money to SHUFE. Dr. Rogers subsequently played no part in discussions with SHUFE regarding the repayment. Electronic messages indicate that Hummin Lee corresponded with officials from SHUFE, discussing the logistics of the transfer and the actual amount of money to be returned, and that ultimately all but 10,000 RMB (approximately $1,464) was returned in May 2021. Gov. Ex. 0003*

8

*lines 2773-78; 2783-95. Dr. Rogers believed that all of the money had been returned and only after considering the messages referenced above realized his error.*

*Dr. Rogers did not perjure himself when describing his relationship with Hummin Lee. Dr. Rogers explained at trial that he was working with Hummin Lee to teach Hummin Lee's students, and Hummin Lee was serving as an assistant. See Trial Tr. 172:15-174:1, 1/30/26 PM. As explained in the defense's reply to the government's opposition to release pending sentencing, ECF No. 102 at 9, the government then and the Probation Office now is unfairly attributing to Dr. Rogers as a lie a good-faith misstatement—that Hummin Lee was Dr. Roger's "student"—that undersigned counsel made in a filing in February 2025, immediately after being retained.*

**Government's Response** – The defendant perjured himself at trial on multiple occasions. The details of his perjury, including supporting citations to the record, are contained in the Government's prior sentencing briefing. *See* ECF Nos. 115 at 14–19, 120 at 16–17, 124 at 10–11. Based on the defendant's demeanor and inconsistent testimony during trial, his prior lies and concealment to the OIG and his Fed colleagues, and his 1001 conviction, the Court should not find his explanation of "good-faith misstatements" credible.

***Defendant's Objection #10 (05/06/2026)*** *– Dr. Rogers objects to paragraph 17 and the proposed 2 levels added. It is factually and legally incorrect that "his access to restricted Board information allowed him to abuse a position of trust and significantly facilitated the commission of the offense." In this paragraph, the Probation Office clearly advocates increasing Dr. Rogers's sentence based on acquitted conduct that does not establish the offense of conviction, which was a false statement that occurred in Washington, D.C., on February 4, 2020. This enhancement is prohibited by U.S.S.G § 1B1.3(c).*

**Government's Response** – This is a legal argument, not a factual objection. The parties' briefing on the Guidelines addresses this issue.

***Defendant's Objection #11 (05/06/2026)*** *– Dr. Rogers objects to the paragraph 20 adjustment for obstruction of justice for the reasons described in the objection above at 9, regarding paragraphs 15 and 16.*

**Government's Response** – This is a legal argument, not a factual objection. The parties' briefing on the Guidelines addresses this issue.

***Defendant's Objection #12 (05/06/2026)*** *– Dr. Rogers objects to paragraph 25 and the proposed 6 additional levels added. It is factually and legally inaccurate that "a substantial part of a fraudulent scheme was committed from outside the United States" or that the offense of conviction involved sophisticated means. In this paragraph, the Probation Office clearly advocates increasing Dr. Rogers's sentence based on acquitted conduct that does not establish the offense of conviction, which was a false statement that occurred in Washington, D.C., on February 4, 2020. This enhancement is prohibited by U.S.S.G § 1B1.3(c).*

**Government's Response** – This is a legal argument, not a factual objection. The parties' briefing on the Guidelines addresses this issue.

***Defendant's Objection #13 (05/06/2026)*** *– Dr. Rogers objects to paragraph 26 and the proposed 4 additional levels added. It is factually and legally inaccurate that the offense of conviction involved misappropriation of a trade secret or that the defendant knew or intended that the offense would benefit a foreign government. In this paragraph, the Probation Office clearly advocates increasing Dr. Rogers's sentence based on acquitted conduct that does not establish the offense of conviction, which was a false statement that occurred in Washington, D.C., on February 4, 2020. This enhancement is prohibited by U.S.S.G § 1B1.3(c).*

**Government's Response** – This is a legal argument, not a factual objection.  The parties' briefing on the Guidelines addresses this issue.

***Defendant's Objection #14 (05/06/2026)*** *– Dr. Rogers objects to paragraph 28. It is unclear why the Probation Office has applied this adjustment, but to the extent that it relates to acquitted conduct, Dr. Rogers objects for the reasons described above.*

**Government's Response** – This is a legal argument, not a factual objection.  The parties' briefing on the Guidelines addresses this issue.

***Defendant's Objection #15 (05/06/2026)*** *– Dr. Rogers objects to paragraph 29 for the reasons described above at 9, 11.*

**Government's Response** – This is a legal argument, not a factual objection.  The parties' briefing on the Guidelines addresses this issue.

***Defendant's Objection #16 (05/06/2026)*** *– Dr. Rogers objects to paragraph 33 because for the reasons stated above, the accurate total offense level is 4.*

**Government's Response** – This is a legal argument, not a factual objection.  The parties' briefing on the Guidelines addresses this issue.

***Defendant's Objection #17 (05/06/2026)*** *– Dr. Rogers objects to paragraph 52 because it is incomplete. Dr. Rogers would add that around 1990 he also had been diagnosed with diabetic retinopathy for which he had eye surgery.*

**Government's Response** – The Probation Office added the defendant's information about his 1990 diagnosis so this objection is moot.

***Defendant's Objection #18 (05/06/2026)*** *– Dr. Roger objects to paragraph 69 as factually inaccurate. Dr. Rogers's annual salary was $300,000, but he received $150,000 when he worked for only half of the year.*

**Government's Response** – The Government's response to this objection is described in greater detail in its own objection.  *See* ECF No. 115-1 at 3–4.

***Defendant's Objection #19 (05/06/2026)*** *– Dr. Rogers objects to paragraph 74's recitation that he estimated a $5,000 fair market value of his Honda CRV. Undersigned counsel's memory of the*

10

*discussion with the Probation Office regarding the used car's value is that Dr. Rogers, having no access to the Kelley Blue Book or other reference guide, did not know what value to attribute to it, and undersigned counsel guessed at the $5,000 figure. Dr. Rogers takes no issue with the Kelley Blue Book value in the draft report and we request that the claim that he underestimated the car's value be removed.*

**Government's Response** – The Probation Office addressed this objection so it is moot.

***Defendant's Objection #20 (05/06/2026)*** *– Dr. Rogers objects to paragraph 76 as factually inaccurate because the student loans referenced, for which he is responsible, are his second youngest daughter's.*

**Government's Response** – The Probation Office addressed this objection so it is moot.

***Defendant's Objection #21 (05/06/2026)*** *– Dr. Rogers objects to paragraph 82 because for the reasons stated above, based on the corrected total offense level of 4, combined with a criminal history category of I, the correct guideline imprisonment range is 0-6 months.*

**Government's Response** – This is a legal argument, not a factual objection.  The parties' briefing on the Guidelines addresses this issue.

***Defendant's Objection #22 (05/06/2026)*** *– Dr. Rogers objects to paragraph 89 because for the reasons stated above, the correct guideline range for Dr. Rogers is 0-6 months, which would make him eligible for probation.*

**Government's Response** – This is a legal argument, not a factual objection.  The parties' briefing on the Guidelines addresses this issue.

***Defendant's Objection #23 (05/06/2026)*** *– Dr. Rogers objects to paragraph 104 because for the reasons stated above, the correct total offense level for Dr. Rogers is not 18. Accordingly, other defendants whose total offense level is 18 are not appropriate comparators.*

**Government's Response** – This is a legal argument, not a factual objection.  The parties' briefing on the Guidelines addresses this issue.

***Defendant's Objection #24 (06/25/2026)*** *– As an initial matter, we note that the Probation Office did not address the defense's objection to Paragraph 7 or respond to our request for notice of the "information provided by the Government as evidence proven at trial." See ECF No. 117, Final PSR at ¶ 7. The defense continues to object to the PSR to the extent that it was drafted based on factual and/or argumentative submissions from the government that the defense did not have equal opportunity to make.*

**Government's Response** – This is a legal argument, not a factual objection and is addressed above in the Government's response to Defendant's Objection #2.

***Defendant's Objection #25 (06/25/2026)*** – *Paragraph 10: We object to the inaccurate claim that Dr. "Rogers knew that Mr. Lee and his university colleagues were associated with the Chinese government and wrote reports for the Chinese government using information provided by the defendant." Dr. Rogers did not know that Hummin Lee was associated with the Chinese government. As he explained at trial, he understood that Hummin Lee's work was reviewed by the provincial government and that the Chinese government reviewed academic reports like Hummin Lee's in the way that the U.S. Government reviews academic work by the Brookings Institution and similar organizations. See, e.g., 1/30/26 PM Trial Tr. 138:17-19; 166:7-11. Dr. Rogers's lack of understanding that Hummin Lee was associated with the Chinese government is further underscored by the fact that in his efforts to comply with his post-employment restrictions on meeting with individuals associated with the Chinese government, he told Hummin Lee that he could not meet with a government official. 1/30/26 AM Trial Tr. 101:1-11 Overall, the government did not establish even by a preponderance of the evidence that Dr. Rogers knew that Hummin Lee was associated with the Chinese government.*

**Government's Response** – This is a rehash of Defendant's Objection #4, so the Government's response to that objection is incorporated here.  Moreover, the defendant's recitation of the facts here is inconsistent with the trial record.  When he was interviewed by OIG in February 2020, the defendant said that he knew Hummin Lee and his colleagues "do a lot of reports for the provincial government."  Gov. Ex. G2Z at 33.  The defendant said this in response to the OIG investigator's question about whether the defendant thought that Hummin Lee's generosity and kindness was genuine.  *Id.*  The full exchange on that topic is pasted below:

| | |
|---|---|
| Agent: | So you think his generosity and kindness was genuine? |
| Defendant: | Totally genuine. There's something in it for them, too ... |
| Agent: | Sure. |
| Defendant: | ... but, you know, and l did have to be careful about my role in the Fed. |
| Agent: | Sure. |
| Defendant: | Cause they wanted to know, they being the institute he works for ... |
| Agent: | Okay. |
| Defendant: | ... so l met some of his colleagues. And I had to make it very clear to them that, you know, I, I, I can't write this report. They do a lot of reports for the provincial government, they're in Shandong Province, and boy the Chinese, they're watching everything that the U.S. does. l don't mean that in an espionage way, I'm sure they are doing espionage but I don't confront that. They just want to know what's, what's the Fed thinking. So a Fed guy, you know, pretty good to have in, they knew a well trained economist. But, you know, I, I was offered money, they'd come out with packets of hundred dollar bills ... |
| Agent: | Wow. |
| Defendant: | . .. and I just said I, I would have to argue with them, midnight after dinner, I, I cannot take this, I'm, I'm not allowed to accept this money. And, and finally they just kind of got that straight. I'm, I'm happy my, my employer takes good care of me, trust me. Oh it would be an honor, you know, a dishonor, da, da, da, da, da. You know, so that was very uncomfortable for a while but they finally got that straight, you know, that I just don't want to deal with this. |
| Agent #2: | Why not just remove yourself from that situation? |

Defendant:     No, I, I did.
Agent #2:      You did?
Defendant:     Well for sure. No, no, no, for sure I did, yeah, yeah.
Agent #2:      So you never met with the same people again?
Defendant:     No, no, no, no, I mean Hummin was, it was Hummin and his, his institute. No, no, I set them straight. Don't put this money in front of me.

The defendant's responses to the OIG's questions contain a mix of half-truths and lies, but even by his own admission, he believed that he could not write reports for Hummin Lee and his institute and could not accept money from them. Despite appearing to convey to the OIG investigators that he found his early interactions with Hummin Lee suspicious, the defendant admitted that he continued to meet with Hummin Lee and his colleagues, but only after the OIG investigators pushed him on that point. Regardless, the evidence unequivocally proved that the defendant knew that Hummin Lee was "associated" with the Chinese government and that Hummin Lee wrote reports for the Chinese government in Shandong province. The defendant's objection seems to be more about what the word "associated" means, but that is a matter of inference over which the parties can argue. The PSR as written is factually accurate and the defendant's objection should be overruled.

The defendant's actions after retiring in lieu of termination do not support his inference that he did not know Hummin Lee was associated with the Chinese government. The defendant's citation to the trial transcript (*i.e.*, 1/30/26 AM Trial Tr. 101:1-11) concerns Sean Croston's testimony about ethics training, not the defendant's post-Board employment activities. To the extent that the defendant intended to cite to Mr. Croston's testimony regarding the defendant's interactions with Mr. Croston about accepting a job with Fudan University in 2021, those interactions show that Mr. Croston and the defendant explicitly acknowledged in at least April 2021 that Fudan University was associated with the Chinese government. In response to the defendant's question about the Fudan University job offer, Mr. Croston reminded the defendant, among other things, that for a year after his retirement date, the defendant could not represent or advise the Chinese government. *See* Gov. Ex. G315. This is consistent with Mr. Croston's trial testimony that he discussed with the defendant the fact that Chinese public universities were different than other countries' public universities, because there might not be the same type of separation between the universities and the foreign government as one might expect in the U.S. or in other non-communist countries. *See* Jan. 29, 2026 AM Trial. Tr. at 83:14–84:9 (including testimony that Mr. Croston advised the defendant that "he should be careful, you know, because it might be that Fudan University would be considered to be a part of the Chinese government"). Mr. Croston's testimony was consistent with his contemporaneous email from April 2021 that he sent a colleague in which he summarized his conversation with the defendant in which they discussed the "lines between Fudan University and the Chinese government." Gov. Ex. G317.

Common sense and the defendant's own actions before he got in trouble with the OIG also prove his understanding that Hummin Lee was associated with the Chinese government. First, the defendant had worked in China for years and, as Professor Barry Naughton testified, it is common knowledge among academics that China is governed by a communist government and that Chinese universities are associated with the Chinese government. Moreover, as early as May 2018, Hummin Lee was asking the defendant for information about internal Fed policymaking that was consistent with the type of information the Chinese government wanted to know. *See* Gov. Exs. G3E and G3F (Hummin Lee asking for information about, among other topics, whether the Fed

13

would adjust monetary policy to "cooperate with the trade war" with China and what "specific measures" the Fed would take). It belies common sense (and the evidence) to believe that the defendant had no idea that Hummin Lee and his institute were associated with the Chinese government.

Second, on numerous occasions before the defendant's April 2021 conversation with Sean Croston, the defendant and Hummin Lee discussed Hummin Lee's connections to various Chinese government officials. *See, e.g.*, Gov. Exs. G550 (Oct. 26, 2017 email from the defendant to Hummin Lee where the defendant asked Hummin Lee to use his "connections at The Shanghai Consulate" to try to get the defendant's then-girlfriend and daughter visas to travel to the U.S.); G3 at row 2883 (Jan. 5, 2022 WeChat message from Hummin Lee to the defendant where Hummin Lee tells the defendant that he called an official of the Chinese Basketball Association to request details about attending a basketball game). This is strong evidence that even if the defendant did not know that Hummin Lee was a spy, he knew that he was connected to the Chinese government in some way and could ask for favors.

Lastly, the defendant's claim at trial that he thought, at the time of his relationship with Hummin Lee, that the institute that Lee was associated with was similar to the U.S. non-profit institution the Brookings Institution is not corroborated by any other pieces of evidence, including the defendant's statements to OIG in 2020. This appears to be a post-hoc explanation. Based on the totality of evidence, the defendant's testimony at trial about his understanding of Hummin Lee's association with the Chinese government should be given little to no weight.

***Defendant's Objection #26 (06/25/2026)*** – *Paragraph 11: We object to the inaccurate claim that Dr. Rogers's relationship with Hummin Lee involved sharing "restricted economic information and trade secrets" with Hummin Lee. We take the documents cited in the PSR in turn:*

- *April 2018 DesiGov Book section: Dr. Rogers asked colleagues for documents that he could share with Chinese colleagues and students, and Dr. Rogers shared with Hummin Lee only an attachment that he received in return that did not carry an INTERNAL FR identifier.[1] In Gov. Ex. 351, Dr. Rogers asked colleagues for "something that I can*

---

[1] [Also from the defendant's objection] *In its oral ruling on Dr. Rogers's post-trial motions, the Court stated the following:*

*The government presented ample evidence of the defendant sharing restricted Federal Reserve documents with both Hummin Lee and individuals at Fudan University, all of whom were in China and outside of the Board. Evidence at trial showed that the defendant e-mailed a DesiGov book section on China marked "internal FR" to Hummin Lee—see Government Exhibits 352, 352A—and an analysis on washing machine tariffs marked "internal FR," again to Hummin Lee. See Government Exhibits 353, 581, 581A. The defendant printed out sensitive materials in his office at the Federal Reserve before flying to China to meet with Hummin. See government's opposition 6 through 7, citing trial exhibits, Docket 103. And the defendant e-mailed restricted documents twice to individuals at Fudan University while he was in China asking them to save the attachments on a thumb*

*appropriately share" with Chinese academics interested in the Fed. Colleague Anna Wong replied and attached two documents, including a "desigov note prepared for the nominated Fed governors on China" of which Dr. Wong said she thought "it should be ok to share the views in there." The attachments to Dr. Wong's response were Gov. Ex. 351A, which bore an "Internal FR" identifier, and Gov. Ex. 351B, which did not contain an "Internal FR" identifier or any other restriction markings. When Dr. Rogers then sent Hummin Lee an email that included part of what Dr. Wong had sent him, Dr. Rogers sent only the second attachment, which did not contain an internal FR identifier. See Gov. Ex. 352, 352A. In summary, the DesiGov section that Dr. Rogers sent to Hummin Lee was one that a Federal Reserve colleague had told him was "ok to share" and that was not a restricted Federal Reserve document.*

- *Washing Machine Tariff Analysis: Dr. Rogers asked a colleague for information that could be shared and when the colleague provided the Washing Machine Tariff Analysis and explained that it was publicly available material, he deferred to Dr. Rogers on its sensitivity. In Gov. Ex. 353, Dr. Rogers exchanged professional emails with a colleague, Aaron Flaaen, and Dr. Rogers asked Dr. Flaaen for "anything in writing that is allowed to be shared," to which Dr. Flaaen provided charts and a paper. Gov. Exs. 353A, 353B. Regarding them, Dr. Flaaen wrote, "All the material in what I've attached is from publicly available data. From that perspective, there are no constraints on sharing," and Dr. Flaaen then deferred to Dr. Rogers's professional judgment regarding sharing the documents. Gov. Ex. 353. The documents that Dr. Flaaen shared with Dr. Rogers did not contain markings or identifiers indicating that they were restricted. See Gov. Ex. 353A, 353B. And as government witness Joshua Gallin testified at trial, subject matter experts like Dr. Rogers could determine a sensitivity designation. See 1/22/26 Trial Tr. 53:13-22 ("If they are an expert and they feel comfortable . . . they can change it themselves").*

---

*drive or convert them to a PDF. See government's Exhibits 336, 412, 421. 6/18/26 Hrg. Tr. at 11:20-12:10.*

*The defense respectfully submits that the record indicates that this is mistaken as to three documents. First, the DesiGov material that Dr. Rogers sent to Hummin Lee did not contain an "Internal FR" marking. See Gov. Exs. 352, 352A. Second, the same is true of the Washing Machine Tariff document that Dr. Rogers shared with Hummin Lee—it did not contain any restrictive labeling. See Gov. Exs. 353A, 353B, 582. Third, one of the two documents that Dr. Rogers shared with an individual at Fudan was the same Washing Machine Tariff document that did not bear any restrictive marking. See Gov. Ex. 581. Accordingly, the only restricted document that Dr. Rogers sent outside of the Federal Reserve was Gov. Ex. 336, which he admitted to sending to his Fudan co-author during trial.*

*These facts further support the defense's position that the jury could only have convicted Dr. Rogers of Count Two based on Dr. Rogers's email to his Fudan co-author—because it is the only document that proves that his "never" statement to the Federal Reserve OIG was false. Nonetheless, under the new acquitted conduct Guideline, regardless of what proof the jury considered in reaching its guilty verdict, Dr. Rogers's acquitted conduct cannot be considered in calculating his advisory Guidelines range.*

15

*Therefore, given Dr. Flaaen's message informing Dr. Rogers that the document was publicly available information and deferring to Dr. Rogers, the lack of Federal Reserve restrictive markings, and Dr. Rogers's academic expertise and leadership responsibilities over research conducted at the Federal Reserve, Dr. Rogers determined he could share the document with Hummin Lee.*

- *Otherwise, the PSR's assertions that Dr. Rogers "sent Mr. Lee . . . a November 2018 DesiGov Book with "Nonpublic Information" and "Do Not Disseminate" labels removed by the defendant, a June 2019 Class II FOMC pre-FOMC briefing script and post-briefing notes, and a March 2019 Class II FOMC staff analysis of the European Central Bank announcement" are inaccurate and unsupported by the evidence. The government's theory at trial was that Dr. Rogers "orally" transmitted the information contained in these documents to Hummin Lee, not that he sent them, because there is no evidence that Dr. Rogers sent them.*

  *Furthermore, the government failed to establish its theory of oral transmission even by a preponderance. Several factors make it just as likely as not that Dr. Rogers was printing and sending himself these documents for his own legitimate purposes. First, Dr. Rogers was continuing to do his work at the Federal Reserve while he was traveling back and forth to China and was required to review sensitive Federal Reserve documents in the course of his official responsibilities. Second, the restrictions on accessing Federal Reserve systems while in China prompted Dr. Rogers to print materials and send them to his personal email (an imprudent and regrettable violation of policy) in order to be able to access them in furtherance of his work and professional responsibilities. Third, throughout Dr. Rogers's communications with Hummin Lee, there are multiple instances of Dr. Rogers providing Hummin Lee with open source materials (see, e.g., 1/28/26 AM Trial Tr. at 104:2-14) and informing Hummin Lee that he could not provide non-public documents (see, e.g., 1/28/26 AM Trial Tr. at 71:5-7 (Rogers writing, "I will try to answer but of course cannot state any official Fed policies."). The fact that the only Federal Reserve documents that Dr. Rogers did send Hummin Lee were the April 2018 DesiGov book section and Washing Machine Tariff Analysis, which bore no markings and which Dr. Rogers was told or exercised his professional discretion to determine were not sensitive, strongly supports the equally likely inference that Dr. Rogers was careful not to provide Hummin Lee with documents that he understood to be restricted.*

- *Finally, with respect to the document that Dr. Rogers sent to his Fudan co-author, Gov. Ex. 421, the PSR and government's claims that Dr. Rogers was removing or manipulating information for nefarious reasons is unavailing. A comparison of what Dr. Rogers sent to his Fudan co-author (Gov. Ex. 421) and the ECB Class II memo that he received internally at the Federal Reserve (Gov. Ex. 336) makes it just as likely that Dr. Rogers, knowing that the content that he had received internally was public, was attempting to remove what he, as a subject matter expert, considered sensitive before emailing it to himself and outside of the Federal Reserve. Indeed, this is what Dr. Rogers tried to explain during trial that he was doing: trying to use the factual details of the public announcement based on what was already in his inbox. See 1/30/26 AM Trial Tr. at 103:16-19.*

16

**Government's Response** – This is a lengthier version of Defendant's Objection #5. Thus, the Government incorporates its response to Defendant's Objection #5. Moreover, the defendant's objections reargue factual issues that the jury and the Court already decided during jury deliberations and the Court's denial of the defendant's Motion for Judgment of Acquittal and a New Trial.

To the extent that the defendant's objection is to the Probation Office's use of the word "sent," the Government does not object to replacing the phrase "the defendant sent Mr. Lee" with the phrase "the defendant shared with Mr. Lee."

The defendant's remaining "objections" are more accurately characterized as arguments about what inferences can be drawn from the evidence. The defendant's post-trial excuses that he *could* have been removing restricted Federal Reserve documents for "his own legitimate purposes" is unsupported by the defendant's own testimony at trial. He did not testify that he printed the two FOMC Class II documents in June 2019 or sent numerous restricted Federal Reserve documents to his personal email account (even after one of his colleagues removed the defendant's personal email account from an email chain) "to be able to access them in furtherance of his work and professional responsibilities." Def. Mot. at 5. Nor did he testify that he "was continuing to do his work at the Federal Reserve while he was traveling back and forth to China and was required to review sensitive Federal Reserve documents in the course of his official responsibilities." *Id.* These are arguments, not facts, and the defendant should not be permitted to shoehorn in additional exculpatory arguments that lack any evidentiary support through his objections to the PSR. Had the defendant testified about these explanations at trial, the Government would have had the opportunity to rebut them.

This same analysis applies to the defendant's post-trial recharacterization of his edits to the Class II FOMC ECB document. It is not "just as likely" that the defendant "was attempting to remove what he, as a subject matter expert, considered sensitive before emailing it to himself." *Id.* at 6. The circumstantial and direct evidence proved that the defendant shared restricted Fed information with unauthorized recipients on numerous occasions, including information that was clearly marked as restricted. The defendant also removed classification markings, exfiltrated restricted information to his personal email account before sending that information to recipients in China, failed to disclose to the Fed his "classes" with Hummin Lee, failed to report to the Fed (until confronted by OIG in February 2020) that Hummin Lee and his colleagues had offered him packets of hundred dollar bills in a late-night dinner, and lied to the OIG about whether he had ever shared restricted Fed information outside the Fed.

***Defendant's Objection #27 (06/25/2026)*** – *Paragraph 12: We object to the PSR's inaccurate statement that Dr. Rogers received benefits "in exchange" for the preceding inaccurate description of Dr. Rogers's relationship with Hummin Lee. The government failed to prove even by a preponderance any quid pro quo exchange of Federal Reserve information for benefits, and the jury acquitted Dr. Rogers of a conspiratorial agreement with Hummin Lee.*

**Government's Response** – The Government incorporates its response above to Defendant's Objection #7.

***Defendant's Objection #28 (06/25/2026)*** – *Paragraphs 15-16: Dr. Rogers did not perjure himself at trial for the reasons set forth in ECF No. 119, Defendant's Response to the Government's Sentencing Memorandum at 12-13. That the government takes semantic issue with Dr. Rogers's*

17

*answers does not make them lies. Furthermore, Dr. Rogers's contentions on these points were fully fleshed out for the jury—through both direct and cross-examination—and the jury credited Dr. Rogers and acquitted him of the count to which they related. The government's continued insistence that Dr. Rogers's truthful testimony was false ignores the jury's verdict and credibility determinations.*

**Government's Response** – The Government incorporates its response above to Defendant's Objection #9.

## II.    Cases Involving the New Acquitted Conduct Guideline (§ 1B1.3(c))

In response to the Court's June 19, 2026 minute order, the Government has identified the unpublished and published cases below discussing the recent § 1B1.3(c) Guideline regarding acquitted conduct.  This list is in addition to the cases cited by the Government and the defendant in prior briefing.  *See* ECF No. 115 at 7 & Def Mot. at 11–13.

| Case | Description |
|---|---|
| *United States v. Brooks*, 2024 WL 4803406, at *3–4 (D. Md. Nov. 15, 2024) | Holding that § 1B1.3(c) does not preclude the court from considering acquitted conduct in assessing the § 3553(a) factors. |
| *United States v. White*, 2025 WL 263337, at *3 (S.D. Ind. Jan. 22, 2025) | Denying post-conviction motion for compassionate release even though the defendant was acquitted of murder and using a firearm during a crime of violence because, as it related to the drug distribution and conspiracy counts of conviction, the PSR noted that sufficient evidence supported a firearms enhancement. |
| *United States v. Spivak*, 2025 WL 1167185, at *2–4 (N.D. Ohio Apr. 22, 2025) (companion case to *United States v. Scott*, 779 F. Supp. 3d 937 (N.D. Ohio 2025)) | In a case with a split verdict that involved conspiracy and substantive counts, applying the "unless" clause of § 1B1.3(c) to calculate the loss amount under the Guidelines and holding that "where the offense of conviction also establishes what would otherwise be acquitted conduct, then the sentencing court may take the acquitted conduct into account in its guideline calculation." |
| *United States v. Coleman*, 138 F.4th 489, 511–13 (7th Cir. 2025) | Discussing § 1B1.3(c), stating that current Supreme Court precedent permits courts to consider acquitted conduct under the § 3553(a) factors, and rejecting the defendant's characterization of the significance of the jury's acquittal. |
| *United States v. Allick*, 2025 WL 1452254, at *1–2 (2d Cir. May 21, 2025) | Considering unlawful possession of a firearm during a drug conviction sentencing even though defendant had been acquitted of a different firearm offense related to the drug conviction. |

| Case | Description |
|---|---|
| *United States v. Eder*, 2025 WL 1696531, at *3 (D. Mont. June 17, 2025) | Rejecting defendant's argument that court improperly considered acquitted conduct at sentencing when the defendant was convicted of second-degree murder count, but acquitted of first-degree murder count, even though both counts related to the same act of violence against a single victim. |
| *United States v. Shipp*, 141 4th 940, 947 (8th Cir. 2025) | Rejecting defendant's argument that court improperly considered acquitted conduct at sentencing when defendant was acquitted of distribution resulting in death, but convicted of conspiracy to distribute heroin resulting in death. |
| *United States v. Myore*, 142 F.4th 606, 613 (8th Cir. 2025) | Holding that the jury's acquittal established "only that the government failed to prove an essential element of an offense beyond a reasonable doubt" and that the court could still consider acquitted conduct under the § 3553(a) factors. |
| *United States v. Glover*, 2025 WL 2963607, at *5–6 (11th Cir. Oct. 21, 2025) | Discussing § 1B1.3(c) in the context of calculating loss before the amendment went into effect, but noting that "a verdict of acquittal does not mean that the defendant is innocent of any particular aspect of the charged criminal conduct; it simply means that the Government failed to prove the defendant guilty beyond a reasonable doubt of the charged offense." |
| *United States v. Parks*, 2026 WL 91416, at *6 (W.D.N.Y. Jan. 13, 2026) | Holding that court can consider drug quantities at sentencing under the § 3553(a) factors that were based on a suppressed traffic stop or acquittal based on venue grounds. |
| *United States v. McDevitt*, 2026 WL 103475, at *3–4 (S.D. W. Va. Jan. 14, 2026) | Analyzing § 1B1.3(c), including "unless" clause, and concluding that the jury's acquittal of a maintaining a drug-involved premises count did not preclude the court from considering facts relating to the drug trafficking enterprise that occurred at the premises as relevant conduct for the distribution of a controlled substance conviction. |
| *United States v. Abbas*, 165 F.4th 659, 668–69 (1st Cir. 2026) | Rejecting defendant's challenge to loss amount calculation on split verdict case because the sentencing court attributed the loss to the counts of conviction. |
| *United States v. Cardenas-Ramirez*, 170 F.4th 936, 937–38 (5th Cir. 2026) | In denial of petition for rehearing en banc, noting that the overlapping nature of an acquitted possession count and a conspiracy conviction based on the same events complicates the acquitted conduct inquiry. |

The defendant argues that the First Circuit's recent opinion in *United States v. Shafa*, 175 F.4th 1 (1st Cir. 2026), is relevant here, but does not specify how it is relevant. Def. Mot. at 11–12. *Shafa* has limited persuasive value since the First Circuit remanded to the district court with instructions that the district court elaborate on the basis for its Guidelines calculation. *Id.* at 31.

19

Moreover, the First Circuit's focus on trying to discern why the jury reached the verdict that it did in that case, *id.* at 28–29, is inconsistent with the Supreme Court's warning that "it is impossible to know why a jury found a defendant guilty on a certain charge," *United States v. Watts* 519 U.S. 148, 155 (1997). As stated in its opening sentencing brief, ECF No. 115 at 8, the Court should not seek to divine the jury's reasoning, but should instead make its own factual findings and determine what facts the Government proved by a preponderance of the evidence.

## III.    Defendant's Other Arguments

Although the Court requested supplemental briefing on only a few specific issues, the defendant also filed supplemental briefing on other sentencing issues that have already been briefed *ad nauseam*. Nonetheless, the Government offers the following brief responses to the defendant's additional arguments on those issues:

a.    The § 2B1.1(c) Cross Reference – For the reasons stated in its supplemental sentencing briefing on the Guidelines, the Government believes that the cross reference in § 2B1.1(c) applies and the Court should look to § 2J1.2. *See* ECF No. 124. This conclusion is supported irrespective of whether the Court limits its analysis of "the conduct set forth in the count of conviction" to the allegations in the indictment or the evidence presented at trial that supports the defendant's conviction. Moreover, as the Government has previously argued and the defendant's citation to an older version of the Guidelines notes, even if the Court ultimately concludes that the cross reference does not apply and calculates the Guidelines using § 2B1.1, the Court can still consider what the Guidelines under § 2J1.2 would have been in applying the § 3553(a) factors. *Id.* at 5.

b.    Loss and Gain under § 2B1.1(b)(1) – The Fed suffered loss as a result of the defendant's crime. *See* ECF Nos. 120 at 9–10 & 130. The defendant also gained from his offense.

*See* ECF Nos. 115 at 8–9; 115-1; 120 at 11–12.  The defendant's reliance on case law from the wire fraud context, *see* Def. Mot. at 9 (citing *United States v. Guertin*, 67 F.4th 445 (D.C. Cir. 2023) and *United States v. Barrow*, 109 F.4th 521 (D.C. Cir. 2024)) is not relevant to the present question of how to interpret the Sentencing Guidelines.  *See also* ECF No. 130 at 4 n.1.  This is especially true in light of subsequent Supreme Court precedent interpreting the wire fraud statute to clarify that a fraudulent inducement theory of fraud is cognizable under 18 U.S.C. § 1343.  *See generally Kousisis v. United States*, 605 U.S. 114, 124 (2025) ("In short, the wire fraud statute is agnostic about economic loss. . . . Instead, a defendant violates § 1343 by scheming to 'obtain' the victim's 'money or property,' regardless of whether he seeks to leave the victim economically worse off.  A conviction based on a fraudulent inducement thus comports with § 1343").

c.    <u>Abuse of Position of Trust Adjustment (§ 3B1.3)</u> – The Government previously briefed and argued this issue.  ECF No. 120 at 15–16.

d.    <u>Consideration of Acquitted Conduct under the 18 U.S.C. § 3553(a) Factors</u> – The Government has previously briefed why the context and consequences of the defendant's false statement should be considered under the 18 U.S.C. § 3553(a) factors.  *See* ECF Nos. 115 at 10–11 (describing the Chinese government's targeting of the Federal Reserve) & 19–23 (describing the need for deterrence and identifying 60-month sentences in other cases involving foreign intelligence activities); No. 124 at 11–12 (former FBI director describing the Chinese government's theft of America's information and intellectual property as the "greatest long-term threat" to America's national security).  As the Court noted at the June 18, 2026 sentencing hearing, the Court should resist the defendant's attempt to cabin his 1001 conviction to the events of February 4, 2020.  *What* the defendant lied about is a key aspect of taking a holistic approach to the defendant's sentencing under the § 3553(a) factors.  Indeed, even Congress recognized that

21

the nature of a 1001 violation matters by increasing the statutory maximum penalty to eight years if the 1001 offense involved international or domestic terrorism, sexual abuse, or domestic assault by a habitual offender.  *See* 18 U.S.C. § 1001(a).

The defendant's false statement offense here involved the espionage activities of a foreign government and the defendant's compromise of sensitive and restricted information from one of the most important economic institutions in the world.  This is not a run-of-the-mill 1001 case and, despite the defendant's efforts to characterize the case as such, the Court should consider the context and serious consequences of the defendant's crime when determining an appropriate sentence under the § 3553(a) factors.  *See generally* 18 U.S.C. § 3661 ("No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence"); *see also United States v. Dorcely*, 454 F.3d 366, 370–73 (D.C. Cir. 2006) (rejecting defendant's arguments that sentencing court's consideration of acquitted conduct related to conspiracy counts to determine sentence for 1001 conviction violated the defendant's constitutional rights); *United States v. Mohammad*, 89 F.4th 158, 165 (D.C. Cir. 2023) ("If a court may use the preponderance standard to find and rely on acquitted and untried conduct at sentencing, it follows that the same standard applies for conduct that was the subject of a vacated conviction").  "At sentencing, the district court may make findings of fact under a preponderance-of-the-evidence standard, regardless of whether a jury has previously acquitted a defendant of the same conduct, or the conduct is previously untried."  *United States v. Ventura*, 650 F.3d 746, 749 (D.C. Cir. 2011) (internal quotation marks and citations omitted).

The defendant argues that "the most analogous case" cited by either party is *United States v. Koyaki*, Case No. 21-cr-308 (D.D.C.), Def. Mot. at 11, but that is risible.  In *Koyaki*, the

defendant pleaded guilty to a one-count 1001 information and waived indictment. Case No. 21-cr-308, ECF Nos. 1, 3, 6, and 7. The government did not request the defendant's custodial detention pending sentencing, *id.* May 3, 2021 Minute Entry, and, according to the plea agreement, the estimated Guidelines offense level was 4 with a criminal history category of I and an estimated Guidelines range of zero to six months. *See id.* at ECF No. 4 at 3. The context of that defendant's underlying false statement concerned a foreign terrorist organization, but from the docket, it appears that there were significant mitigating factors, including the defendant's young age when he was associated with the foreign terrorist organization, significant passage of time between his false statement and sentencing, and demonstrated rehabilitation, acceptance of responsibility, and disassociation with the foreign terrorist organization during that time period. There is no perfectly analogous case to Dr. Rogers' case, but Congress considers some 1001 violations serious enough to warrant 60 months in prison and this case falls into that category.

## IV.    Conclusion

For the reasons stated above, in the Government's prior sentencing briefing (ECF Nos. 115, 120, 124, 130), and at the June 18, 2026 sentencing hearing, irrespective of where the Court ultimately lands on the Guidelines, the Court should rule on the disputed aspects of the PSR, calculate the Guidelines, and sentence the defendant to 60 months' incarceration after considering the 18 U.S.C. § 3553(a) factors.

Respectfully submitted,

JEANINE FERRIS PIRRO
United States Attorney

 /s/ Adam P. Barry
Adam P. Barry
Cal. Bar No. 294449

23

Assistant United States Attorney
National Security Section
601 D Street, NW
Washington, D.C. 20530
Office: 202-252-7793
Email: adam.barry@usdoj.gov

JOHN A. EISENBERG
Assistant Attorney General
National Security Division

Nicholas O. Hunter
D.C. Bar No. 1022355
Yifei Zheng
N.Y. Bar No. 5424957
Trial Attorneys
National Security Division
U.S. Department of Justice
950 Pennsylvania Ave, NW
Washington, D.C. 20530
Telephone: (202) 353-3434
E-mail: nicholas.hunter@usdoj.gov
yifei.zheng@usdoj.gov