**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 25-cr-033 (DLF)** |
| **JOHN HAROLD ROGERS,** | |
| **Defendant.** | |

**DEFENDANT'S RESPONSE TO GOVERNMENT'S SUPPLEMENTAL SENTENCING
BRIEF REGARDING U.S.S.G. § 2B1.1(b)(1) (LOSS CALCULATION)**

In order to artificially increase defendant John Rogers's advisory Guidelines range, the government manufactures a loss amount that it purports to derive from the defendant's false statement "Never." But to increase a defendant's offense level based on loss, there must be actual or intended loss—and there is neither in Dr. Rogers's case. Accordingly, the Court should decline to include any adjustment for loss in calculating Dr. Rogers's advisory Guidelines range.

Under the applicable Chapter Two Guideline, §2B1.1, loss is a special offense characteristic that can increase a defendant's Guidelines range if there is actual or intended loss. *See* USSG §2B1.1(b)(1)(C) (defining actual loss as "the reasonably foreseeable pecuniary harm that resulted from the offense" and intended loss as "the pecuniary harm that the defendant purposely sought to inflict . . . [which] includes intended pecuniary harm that would have been impossible or unlikely to occur . . . "). In this case, the government has already conceded that there was no intended loss. *See* Gov. Memo, Ex. A at 1 (ECF No. 115-1) ("no evidence was presented at trial indicating that the defendant intended to cause any pecuniary loss to the Federal Reserve").

The government also initially acknowledged that the Federal Reserve suffered no actual loss from Dr. Rogers's alleged sharing of restricted Federal Reserve information. *Id.* More recently,

however, the government reversed its position and proffered three other purported "losses"—1) resources expended by the Federal Reserve to protect the agency from foreign intelligence services as a result of Dr. Rogers's false statement; 2) Dr. Rogers's salary and benefits for the time period after the February 4, 2020 interview during which he made the false statement; and 3) resources expended by the Federal Reserve in investigating Dr. Rogers's conduct leading to the blackmail and threats against him. *See* ECF No. 130, Gov. Supp. Memo on Loss at 1.

The government bears the burden of proving loss by a preponderance of the evidence, *see United States v. Washington*, 115 F.3d 1008, 1010 (D.C. Cir. 1997), and it has failed to meet that burden here. As to the losses that the Federal Reserve allegedly suffered in attempting to protect the agency from foreign intelligence or in investigating Dr. Rogers's conduct, the government effectively concedes its argument and proffers no facts or figures. *See* Gov. Supp. Memo at 1-2 (stating that "[i]t is difficult, however, to determine with any level of certainty which of those steps would have been taken earlier, and therefore saved the Board resources" before arguing exclusively about Dr. Rogers's salary and benefits).[1] And with respect to Dr. Rogers's salary and benefits, the government ignores the fact that the Federal Reserve received the full benefit of Dr. Rogers's employment—and indeed, continues to benefit from his work—meaning that it suffered no loss whatsoever.[2]

I.    **The Federal Reserve Received the Full Benefit of Dr. Rogers's Employment, and the Government Provides no Support for its Claims Otherwise**

Over several decades, the Federal Reserve received the full benefit of Dr. Rogers's work. His duties included research, publication, and recruitment for the Federal Reserve, and he continued to

---

[1] Nonetheless, as we discuss in Sections II and III, *infra*, the Federal Reserve also did not suffer losses as a result of Dr. Rogers's false statement regarding security measures or in investigating the blackmail and threats.

[2] We address below the extent of Dr. Rogers' work for the Federal Reserve during the relevant time period.

fulfill these duties well beyond the date of his Federal Reserve OIG interview on February 4, 2020. Indeed, Federal Reserve scholars and economists throughout the field have cited and relied on Dr. Rogers's work for years after his retirement.  In short, contrary to the government's cursory and unsupported assertion that the Court should consider Dr. Rogers's salary and benefits as loss, the Court should recognize that there was no loss to the Federal Reserve.

A.  The Federal Reserve Received the Full Benefit of Dr. Rogers's Work

For almost thirty years, Dr. Rogers worked as a public servant—an economist at the Board of Governors of the Federal Reserve System.  By the time of his forced retirement, Dr. Rogers had been a Senior Advisor in the International Finance Division for at least ten years, where his responsibilities included oversight of all International Finance Division research, Ph.D. Economics recruiting for the Federal Reserve System, supervision of the working paper series (International Finance Discussion Papers), management of conferences, seminars, and visiting scholar appointments at the Board of Governors, in addition to Dr. Rogers's own substantial economic research.  *See, e.g.*, Def. Ex. 95 (Dr. Rogers's CV); 1/30/26 AM Trial Tr. at 34:7-37:12.  Dr. Rogers continued to do all of this work after his interview with OIG on February 4, 2020, through his administrative leave on March 15, 2021.

As a Senior Advisor in charge of Ph.D. recruiting for the Federal Reserve, each year from December to April, Dr. Rogers managed the application process of the approximately 2,000 candidates and assisted the various divisions in interviewing and selecting candidates for employment at the Federal Reserve and in competing against universities, investment banks, and other similar organizations looking to hire young, promising economists.  This required coordinating among the different divisions, making interview offers, scheduling on-campus interviews, and traveling to the American Economic Association annual meeting to recruit promising economists.

Dr. Rogers did this laborious work through 2021.  Dr. Rogers was involved in the hiring of most, if not all, Ph.D. economists to the Federal Reserve for many years, including the final year of his employment.

As the Senior Advisor overseeing the research division of International Finance, Dr. Rogers's responsibilities included production of the working paper series "International Finance Discussion Papers."  Dr. Rogers read every paper submitted to the series, made edits and offered suggestions, and ultimately approved each research paper for publication.  In 2020, there were thirty-nine such papers; in 2021, there were twenty-seven.  *See* Board of Governors of the Federal Reserve System: International Finance Discussion Papers (IFDP) (2020-2021) *available at* https://www.federalreserve.gov/econres/ifdp/2020.htm    and    https://www.federalreserve.gov /econres/ifdp/2021.htm.

Dr. Rogers organized several conferences between 2020 and 2021.  For example, he organized the Eleventh Conference on International Research Forum on Monetary Policy (March 26-27, 2020); Developments in Empirical Macroeconomics (April 6-7, 2020); and the Fourth Biennial Conference on "Uncertainty and Economic Activity: Global Perspectives" (May 7-8, 2020).  Although the COVID-19 pandemic disrupted many such planned gatherings, Dr. Rogers put in the considerable work to organize them.

Considering the overall timeline for academic publications, Dr. Rogers was responsible for research papers published for quite some time after being placed on administrative leave in March 2021.  Moreover, the work that Dr. Rogers did after February 4, 2020 until his retirement has been of continuous value to the Federal Reserve.  The research he conducted and published during this time period has been referenced many times by scholars around the world, contributing to the Federal Reserve's prestige.

For example, Dr. Rogers's paper, "Monetary policy uncertainty," published in the Journal of Monetary Economics (Nov. 2020), has been cited at least 692 times per Google Scholar. Dr. Rogers's paper, "A unified measure of Fed monetary policy shocks," also published in the Journal of Monetary Economics (March 2021), has been cited at least 409 times per Google Scholar. Scholars at the Federal Reserve Board frequently still cite Dr. Rogers's work from those years. *See, e.g.*, Abdullah, Smain, and Manjola Tase (2025), "Policy Rate Uncertainty and Money Market Funds (MMF) Portfolio Allocations," Finance and Economics Discussion Series 2025-063, Washington: Board of Governors of the Federal Reserve System, https://doi.org/10.17016/FEDS.2025.063; Brennan, Connor M., Margaret M. Jacobson, Christian Matthes, and Todd B. Walker (2024), "Monetary Policy Shocks: Data or Methods?," Finance and Economics Discussion Series 2024-011, Washington: Board of Governors of the Federal Reserve System, https://doi.org/10.17016/FEDS.2024.011; and Smolyansky, Michael, and Gustavo Suarez (2024), "Non-monetary news in Fed announcements: Evidence from the corporate bond market," Finance and Economics Discussion Series July 2024, p. 2 n. 3; p.7; p. 9; p. 26; p. 27; p. 29, Washington: Board of Governors of the Federal Reserve System, https://doi.org/10.17016/FEDS.2021.010r1 (revised January 2025).

The reality is that the Federal Reserve received the full value of Dr. Rogers's employment from February 2021 through Dr. Rogers's forced retirement on April 30, 2021. This is apparent from his 2020 Mid Cycle Assessment, which indicates that not only did Dr. Rogers do his job—he did it well. *See* Exhibit A (Dr. Rogers's 2020 Mid Cycle Assessment) (indicating that Dr. Rogers exceeded expectations in many performance assessment categories). Therefore, the Federal Reserve has not suffered any actual loss related to Dr. Rogers's compensation and in fact owes Dr. Rogers for the recent cessation of the pension payments Dr. Rogers earned from his years of service at the Federal Reserve.

B. The Government's Case Citations are Inapposite and Its Salary, Bonus, and Pension-Based Loss Claims Unsupported

The cases and the Guidelines application note that the government cites in its discussion of Dr. Rogers's salary and benefits are inapposite and do not support the government's claims.

First, the government cites two cases and states that they stand for the proposition that "Courts have considered lost salary payments and other employment related payments when calculating the loss resulting from a defendant under § 2B1.1(b)(1)." But the government fails to mention these cases' many distinguishing characteristics—the most relevant of which is that the loss the government suffered in them arose from defendants taking compensation while not doing work for that compensation, which is not the case with Dr. Rogers. In *United States v. Tadios*, the defendant, the CEO of a federally funded tribal health facility, was convicted of federal funds fraud and related crimes for using tribal and clinic funds to finance personal trips to visit her husband in prison while falsely claiming that she was engaged in official business and collecting a salary for work she was not doing. 822 F.3d 502, 503 (9th Cir. 2016). Similarly, *United States v. Burns* concerned a defendant convicted of wire fraud, a false statement scheme, and falsifying documents for a scheme through which he collected his federally-funded non-profit salary while he was a full-time student at Harvard and not doing the work for which he was paid. 104 F.3d 529, 532-533 (2nd Cir. 1997). Neither of these cases—in which defendants were essentially convicted of defrauding their federally-funded employers of their salaries—support using Dr. Rogers's salary to calculate a loss that the Federal Reserve never suffered. Tellingly, the government provides no case in which a Court calculated a defendant's loss amount based on a salary that he earned, as Dr. Rogers did.

The government also cites to the Guideline application note for "credits against loss," USSG § 2B1.1(b)(1), Application Note 3(D)(i), which states that "[l]oss shall be reduced by . . . the fair market value of . . . the services rendered by the defendant . . . before the offense was detected." The

government then claims that because the Federal Reserve theoretically might have terminated Dr. Rogers earlier than he retired that "it is difficult . . . to determine what portion of his work between February 2020 and March 2021, if any, should be credited against the loss the Board suffered . . .." But it is not difficult. A straightforward application of the Guideline means that Dr. Rogers's full salary and benefits for the entire period that he did work for the Federal Reserve should be credited against any claimed loss (even though the government has articulated no loss against which his salary should be credited). Ultimately, the application note demonstrates that there was no loss once accounting for the work that Dr. Rogers performed after his February 4, 2020 OIG interview.

Finally, the government provides no support, argument, or explanation for its bald assertions that the Federal Reserve Board could legally have denied Dr. Rogers a 2020 bonus or the pension that he earned, from 2020 to 2025, based on his almost thirty years of service. The Court should decline to consider them for loss purposes.

**II.     Dr. Rogers's False Statement Did Not Cause the Federal Reserve Loss in the Form of Delayed Termination Related to the Blackmail and Threats**

When Dr. Rogers spoke with agents for the Federal Reserve OIG on February 4, 2020, he ultimately admitted to sending and soliciting risqué photographic materials with his Federal Reserve electronic devices. *See, e.g.*, Transcript of Gov. Ex. G2 at 75 (February 4, 2020 OIG Interview Excerpt) (Hershkowitz: "No, like I said, is there anything else you'd you'd like us to know. Again, we, we don't judge, we, we talk to all walks of life here, we're all humans, we have our own life story." Rogers: "I, I, I, I'm, I'm just a little embarrassed about, you know, the, the nude photos maybe 'cause of my Catholic upbringing or whatever. You know, seeing your mother in the room or whatever. And you'll probably see some of those . . . ."). OIG investigated Dr. Rogers, and by May 20, 2020, the Board of Governors revoked Dr. Rogers's Secret level security clearance. Furthermore, OIG referred the matter of the blackmail threats and Dr. Rogers's related electronics

usage conduct to the U.S. Attorney's Office for the District of Columbia, which declined to prosecute the matter on November 13, 2020. The Federal Reserve had sufficient information early in 2020 to terminate Dr. Rogers's employment and chose not to do so. When the Federal Reserve ultimately forced termination of Dr. Rogers's employment, it did so on the basis of misusing Federal Reserve equipment and the attendant violations of use policy, but with no additional information that had not already been provided to OIG by Dr. Rogers himself.

III.    **Dr. Rogers's False Statement Did Not Cause the Federal Reserve Loss Through Delay in Taking Preventive Measures Implicated by the Government's Investigation into Dr. Rogers**

The government has alleged that, "[a]s a result of the defendant's offense, the Board has taken numerous steps to protect itself and its employees from malicious activity from foreign governments that it likely would have implemented earlier had the defendant told the truth during his February 2020 interview." Gov. Supp. Sent. Br. 1 (ECF No. 130). But the government then cites a single document, published two weeks ago, that belies its point. *See* "Board OIG Evaluation Report, *The Board Can Strengthen Its Process to Monitor and Mitigate International Travel Risks* (June 15, 2026).

The Federal Reserve OIG report that the government cites demonstrates instead that the Federal Reserve has not made any significant changes to mitigate the international travel risks posed by foreign actors based on the investigation into Dr. Rogers more than five years later. These were the findings by the OIG:

> The Board of Governors of the Federal Reserve System's international travel processes for its employees related to monitoring and mitigating their international travel risks should be strengthened. The Board does not have a formal program to prepare employees before international travel on how to identify and mitigate possible threats to personal safety and Board information. Employees also do not receive post-travel questionnaires to report suspicious activity that could help mitigate potential security risks for future travelers. Further, the Board does not have (1) a program to aggregate and analyze available employee travel data; (2) a process to share

travel-related information among relevant groups to identify and escalate travel risks, when appropriate; or (3) a process to assess compliance with its international travel reporting requirements.

The Board limits its international travel reporting requirements to employees with a security clearance and does not require reporting by employees with access to sensitive Federal Reserve System information. Finally, the Board does not consistently inform division designated travel reviewers of travel risks before their review of employee requests to use Board devices while on international travel. Without these practices, the Board limits the support it offers to its divisions, which increases operational and information security risks.

OFFICE OF INSPECTOR GENERAL, BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM: THE BOARD CAN STRENGTHEN ITS PROCESS TO MONITOR AND MITIGATE INTERNATIONAL TRAVEL RISKS, 1 2026-MO-B-009R (June 15, 2026).

Prior to Dr. Rogers's interview, the Federal Reserve OIG already had significant concern about a potential Chinese intelligence element implicated by Hummin Lee. *See* 1/23/26 AM Trial Tr. at 35:24-36:6 ("So in the similar vein that I heard Dr. Rogers's name in 2019 related to insider threat concerns, I had also heard of an individual named Jian Wang, who previously had worked at the Federal Reserve Bank of Dallas. And so this was a red flag to me, for lack of a better term, that this individual, Hummin Lee, who folks have concerns about, is friends with both Dr. Rogers and Jian Wang, who I had some familiarity with, not super into the weeds.") Then, during his interview, Dr. Rogers gave answers to Agents Hershkowitz and Perez that increased their concern about Hummin Lee and Dr. Rogers. *See id.* at 68:17-69:7 (A.: "[Dr. Rogers] was telling us that he had been offered packets of money. He would be out to dinner with Hummin, his boss, others from the institute, and he had been offered money. And there's a clip in there where he sort of also talks about writing reports for the institute. It seemed like Dr. Rogers thought he was being asked to write reports or they wanted him to write reports for it. It's definitely very strange to us when someone says, 'People are offering us packets of money to do something.' It's sort of another red flag." Q.: "Why

is that a red flag?" A.: "I think in most of the legitimate society, folks are paid through normal means: checks, credit card, banks, wire transfers. So it seems strange that after midnight, after dinners, somebody would be offering a U.S. academic packets of money."). Dr. Rogers even candidly described Hummin Lee as his best friend in China without whom he might have been unable to marry the woman who is now his wife and the mother of his child. Whatever heightened pre-interview concern the Federal Reserve had regarding Hummin Lee, nothing in the interview would have diminished that concern and obviously increased it.

Contrary to the government's claim that somehow a one-word answer by Dr. Rogers in his interview delayed the Federal Reserve in taking preventive measures, the government's own testimony indicated that the interview raised the level of concern so that the government could implement any preventive measures it thought appropriate—measures that the Federal Reserve has still not taken six years later.

## IV.    Conclusion

In service of its efforts to artificially increase Dr. Rogers's advisory Guidelines range, the government has offered several unavailing arguments for actual loss attributable to a single word uttered by Dr. Rogers during an interview in which he sought help to extricate himself from blackmail and kidnapping threats. There was no actual loss. The government has failed to meet its burden and the Court should not increase Dr. Rogers's advisory Guidelines range based on a loss that does not exist.

July 2, 2026                                    Respectfully submitted,


_/s/ Stephen A. Saltzburg_____
Stephen A. Saltzburg (D.C. Bar No. 156844)
2000 H Street, NW
Washington, DC 20052
Tel.: (202) 994-7089

Fax: (202) 994-9811
Email: sasaltz@law.gwu.edu

*/s/ Jonathan K. Gitlen*
Jonathan K. Gitlen (D.C. Bar No. 990918)
Gitlen Law PLLC
1 Thomas Circle, Suite 400
Washington, DC 20005
Tel.: (202) 568-5788
Fax: (202) 301-8556
Email: jgitlen@jgitlenlaw.com

*/s/ Jonathan Wrobloewski*
Jonathan J. Wroblewski (*pro hac vice*)
502 N. Hudson Street
Arlington, Virginia 22201
Tel.: (703) 623-6824
Email: jwroblewski@law.harvard.edu

*/s/ Molly Gaston*
Molly Gaston (*pro hac vice*)
Gaston & Cooney PLLC
1455 Pennsylvania Ave. NW, Suite 400
Washington, DC 20004
Tel.: (202) 657-0012
Email: mollygaston@gastoncooney.com

*Counsel for Defendant*